**Charles J. Paternoster**, OSB No. 024186
E-mail:  cpaternoster@pfglaw.com
PARSONS FARNELL & GREIN, LLP
1030 SW Morrison Street
Portland, Oregon 97205
Telephone:  (503) 222-1812
Facsimile:  (503) 274-7979

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **R. ALEXANDER ACOSTA**, Secretary of Labor, U.S. Department of Labor,<br><br>       Plaintiff,<br><br> v.<br><br>**SENVOY, LLC; DRIVER RESOURCES, LLC; ZOAN MANAGEMENT, INC.; AND GERALD E. BRAZIE, JR.,**<br><br>       Defendants. | Case No. 3:16-cv-02293-PK<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.   FACTS ......................................................................................................... 2

   A.   Senvoy, LLC and Driver Resources, LLC: History and Background ................................ 2

   B.   Brazie is an Industry Veteran. ................................................................................ 2

   C.   A Day in the Life of a Driver Resources' Driver. ..................................................... 5

III.   ARGUMENT ................................................................................................ 6

   A.   Summary Judgment Standard. ................................................................................ 6

   B.   The Burden to Establish Violations Falls to the Secretary .................................... 7

   C.   Economic Realities Under the FLSA. ...................................................................... 7

   D.   Disputed Issues of Material Fact Which Preclude Summary Judgment. ................ 8

   E.   The Drivers Are Independent Contractors. ........................................................... 14

      1.   The Drivers Control How They Perform the Services. .................................... 14

         a.   Drivers are free to reject deliveries. ................................................ 14

         b.   Drivers control the means and manner of the day-to-day work. ................. 15

         c.   Drivers determine the hours they work. .......................................... 16

         d.   Drivers must provide replacement drivers. ........................................ 16

         e.   Drivers may work for others. ............................................................ 16

         f.   Drivers carry their own insurance and are responsible for correcting their mistakes. .. 16

         g.   Drivers can negotiate their pay. ....................................................... 17

         h.   Monitoring of deliveries is not evidence of control. ........................ 17

      2.   Drivers Have the Opportunity for Profit or Loss Depending Upon Their Managerial Skills. ................................................................................................ 18

Page i **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

3.   Drivers Invest Significantly in Equipment and May Employ Helpers............................ 20

4.   The Drivers Are Skilled Business People. ...................................................... 21

5.   The Drivers' Businesses Are Not Integral to Senvoy's Business. .................................. 22

F.   The Secretary Cannot Show Minimum Wage Violations Meriting Summary Judgment. .... 22

G.   The Secretary Cannot Show Overtime Violations Meriting Summary Judgment............ 23

H.   The Secretary Further Attempts to Improperly Use the Retaliation Statute. .................... 24

I.   Defendants Are Not Required to Keep Records in a Particular Fashion. ............................ 25

J.   Brazie Was Involved In Daily Operations. ........................................................... 27

K.   The Secretary Has Not Demonstrated Defendants' Willful FLSA Violations. ................ 28

1.   Extended Statute of Limitations. ....................................................... 28

2.   Liquidated Damages........................................................................ 33

L.   An Injunction is an Extraordinary Measure Not Appropriate in Light of the Secretary's
Failure to Show Substantial FLSA Violations. ........................................................... 34

IV.   CONCLUSION.............................................................................................. 35

## TABLE OF AUTHORITY

**Cases**

*Alexander v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 981 (9th Cir. 2014) ................................................................... 15

*Alvarez v. IBP, Inc.*,
  339 F.3d 894 (9th Cir. 2003) ......................................................... 32, 33, 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................... 6

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) ............................................................................ 7, 25

*Bonnette v. California Health and Welfare Agency*,
  704 F.2d 1465 (9th Cir. 1983) .............................................................. 27, 28

*Brock v. Big Bear Market No. 3*,
  825 F.2d 1381 (9th Cir. 1987) ................................................................. 35

*Browning v. Ceva Freight, LLC*,
  885 F.Supp.2d 590 (E.D.N.Y. 2012) ........................................................... 18

*Campos v. Zopounidis*,
  No. 3:09–cv–1138 (VLB), 2011 WL 2971298 (D. Conn. July 20, 2011) ................................... 21

*Carter v. XPO Last Mile, Inc.*,
  No. 16-CV-01231-WHO, 2016 WL 5680464 (N.D. Cal. Oct. 3, 2016) ..................................... 34

*Chao v. Me and Lou's Rest.*,
  No. CV07-385-E-EJL, 2008 WL 4832880 (D. Idaho Nov. 5, 2008) ........................................ 26

*Chao v. Mid-Atl. Installation Servs., Inc.*,
  16 F. Appx. 104 (4th Cir. 2001) ........................................................... 15, 18

*Collinge v. IntelliQuick Delivery, Inc.*,
  No. 2:12–cv–00824 JWS, 2015 WL 1299369 (D. Ariz. Mar. 23, 2015) ............................ 14, 15

*Donovan v. Sureway Cleaners*,
  656 F.2d 1368 (9th Cir. 1981) ............................................................. 8, 17

*Douglas v. Xerox Business Services, LLC*,
  875 F.3d 884 (9th Cir. 2017) .................................................................. 22

*Falk v. Brennan,*
    414 U.S. 190 (1973) ................................................................................. 27

*Flores v. City of San Gabriel,*
    824 F.3d 890 (2016) ............................................................................... 30

*Flores v. City of San Gabriel,*
    No. CV 12-04884-JGB (JCGx), 2013 WL 5817507 (C.D. Cal. Oct. 29, 2013) ........................ 30

*Freund v. Hi–Tech Satellite, Inc.,*
    185 Fed. Appx. 782 (11th Cir. 2006) ........................................................ 21

*General Elec. v. Porter,*
    208 F.2d 805 (9th Cir. 1953) ................................................................... 34

*Herman v. Express Sixty-Minutes Delivery Service, Inc.,*
    161 F.3d 299 (5th Cir. 1998) ................................................. 14, 15, 18, 22

*Herman v. RSR Sec. Services Ltd.,*
    172 F.3d 132 (2nd Cir. 1999) .................................................................. 33

*Hugler v. Westside Drywall, Inc.,*
    No. 3:15-CV-02411-BR, 2017 WL 1027026 (D. Or. Mar. 14, 2017).......................... 32

*Justice v. Rockwell Collins, Inc.,*
    ___ Fed. Appx. ___, 2017 WL 6559788 (9th Cir. 2017) ......................................... 24

*Karlson v. Action Process Serv. & Private Investigations, LLC,*
    860 F.3d 1089 (8th Cir. 2017) ................................................................. 20

*Keller v. Miri Microsystems LLC,*
    781 F.3d 799 (6th Cir. 2015) ............................................................... 7, 20

*Koral v. Inflated Dough, Inc.,*
    No. CV 13-CV-02216-WYD-KMT, 2014 WL 4904400 (D. Co. Sept. 29, 2014)..................... 23

*Local 246 Util. Workers Union of Am. V. S. California Edison Co.,*
    83 F.3d 292 (9th Cir. 1996) .................................................................... 33

*Lucero v. Regents of Univ. of Cal.,*
    No. C-91-3999 MHP, 1993 WL 341287 (N.D. Cal. Aug. 23, 1993) .......................... 31

*Martin v. Liu,*
    No. 85-5462-JMI (PX), 1992 WL 95719 (C.D. Cal. Jan. 28, 1992) ...................... 25, 26

*Mathis v. Hous. Auth. of Umatilla Cty.*,
 242 F. Supp. 2d 777 (D. Or. 2002) ............................................................... 21

*McLaughlin v. Richland Shoe Co.*,
 486 U.S. 128 (1988) ............................................................................... 29, 32

*Mitchell v. Hertzke*,
 234 F.2d 183 (10th Cir. 1956) ..................................................................... 35

*Moba v. Total Transp. Servs. Inc.*,
 16 F. Supp. 3d 1257 (W.D. Wash. 2014) ....................................................... 21

*Real v. Driscoll Strawberry Assocs., Inc.*,
 603 F.2d 748 (9th Cir. 1979) ............................................................... 6, 8, 23

*Rutherford Food Corp. v. McComb*,
 331 U.S. 772 (1947) .................................................................................... 27

*Saleem v. Corp. Transportation Grp., Ltd.*,
 854 F.3d 131 (2nd Cir. 2017) ................................................................. 19, 20

*Serv. Emps. Int'l Union, Local 102 v. Cnty. of San Diego*,
 60 F.3d 1346 (9th Cir. 1995) ....................................................................... 31

*Slayman v. FedEx Ground Package System, Inc.*,
 765 F.3d 1033 (9th Cir. 2014) ........................................................... 15, 29, 30

*Slezak v. City of Palo Alto*,
 No. 16-CV-03224-LHK, 2017 WL 2688224 (N.D. Cal. June 22, 2017) ......... 28, 29, 34

*Solis v. Velocity Exp., Inc.*,
 No. CV 09–864–MO, 2010 WL 3259917 (D. Or. Aug. 12, 2010) ......... 7, 8, 17, 18, 30

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
 809 F.2d 626 (9th Cir. 1987) ..................................................................... 6, 7

*Walling v. Panther Creek Mines*,
 148 F.2d 604 (7th Cir. 1945) ................................................................. 26, 27

**Statutes**

29 U.S.C. § 203(d) ........................................................................................ 27

29 U.S.C. § 206(a) ........................................................................................ 22

29 U.S.C. § 207 ............................................................................................ 23

Page v **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

29 U.S.C. § 211(c) ........................................................................................................ 25

29 U.S.C. § 215(a)(3) .............................................................................................. 24, 25

29 U.S.C. § 216(b) ................................................................................................. 25, 33

29 U.S.C. § 254(a) .......................................................................................................... 7

29 U.S.C. § 255(a) ........................................................................................................ 28

29 U.S.C. § 259(a) ........................................................................................................ 32

29 U.S.C. § 260 ........................................................................................................ 33, 34

**Rules**

Fed.R.Civ.P. 56(c) .......................................................................................................... 6

**Regulations**

29 C.F.R. § 778.112 ...................................................................................................... 24

29 C.F.R. § 516.2(a)(7) ................................................................................................. 26

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

At the heart of this dispute is a question of whether delivery drivers are properly classified as independent contractors for purposes of the Fair Labor Standards Act ("FLSA").  Despite the fact-intensive nature of the inquiry and the existence of numerous disputed material facts, the Secretary of Labor brings his motion seeking summary judgment of the classification issue.  The Court should deny the Secretary's motion.

The determination of whether drivers are properly classified as independent contractors is highly fact dependent and not properly subject to summary adjudication.  While the Secretary touts the existence of numerous "undisputed facts," the reality is that many of these "facts" are in dispute.  The Secretary conflates certain evidence and cherry-picks other evidence to support his motion.  But the bottom line is that the drivers are entrepreneurial business people who make more or less money depending upon how they perform the delivery services and if they hire additional helpers.  While Defendants believe all drivers are properly classified as independent contractors, the evidence demonstrates that, at the very least, there are numerous material disputed factual issues which preclude summary judgment on the classification issue.

In addition, the Secretary seeks a determination that Defendants have violated the FLSA's overtime, minimum wage, and record-keeping provisions, and requests a prospective injunction to prohibit future violations.  As described in greater detail below, the Secretary's additional arguments generally must fail – he presents them unsupported by legal arguments or factual evidence sufficient to satisfy the summary judgment standard this Court must apply.

Page 1  **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

## II.  FACTS

### A.  Senvoy, LLC and Driver Resources, LLC: History and Background.

1.    Senvoy provides logistic services in and around the Pacific Northwest to its customers, meaning Senvoy arranges for the transportation of customers' packages and freight, but does not provide actual delivery services itself.  Paternoster Decl., ¶ 3, Ex. B ("Conkey Dep.") 67:23 – 68:3.

2.    Actual delivery of goods is accomplished through a third-party vendor that supplies the drivers who are then responsible for all aspects of the delivery services.  Paternoster Decl, ¶ 2, Ex. A ("Brazie Dep.") 58: 13-19; 61:9-13.  This vendor is Driver Resources.  Brazie Dep. 40:16-17; 61:9-13; Paternoster Decl., ¶ 4, Ex. C ("Kahut Dep."), 20:6-8.

3.    Senvoy solicits its services to industries that have delivery needs; a customer then hires Senvoy to arrange for the delivery.  Brazie Dep. 37:15-19; 61:9-13.  Senvoy is the point of contact for the customer and manages the customer's experience while driver acquisition and management are left to a separate entity that has the resources and expertise to manage a fleet of drivers.  Brazie Dep. 61:11-24.

### B.  Brazie is an Industry Veteran.

4.    Brazie is a veteran of the delivery services business.  He founded the entities. Brazie Dep. 25:8-14.  Prior to Senvoy's founding in 1999, Brazie worked for two other delivery service companies for nearly a decade.  Brazie Dep. 21:7-22:4.

5.    Immediately prior to Senvoy's founding, Brazie ran a delivery services business called Express Systems Northwest.  Brazie Dep. 21:07-14.  Prior to that, he was the operations manager/dispatcher for another courier company, American Messenger.  Brazie Dep. 22:23-24:3.

6.    Drivers were employees at Senvoy's founding.  Conkey Dep. 68:15-18.  However, a seismic shift occurred in the delivery services market in approximately 2008 and 2009 as more courier companies began transitioning to using independent contractors rather than employees to perform delivery services.  Brazie Dep. 42:13-17; 43:1-2.  This included both local and national courier companies.  Brazie Dep. 42:16-24; 43:19-44:13.

7.    While Senvoy had not previously had trouble recruiting drivers, it soon became increasingly difficult to hire drivers because of the shift toward the independent contractor model.  Brazie Dep. 42:13-43:3.  As a result, it became nearly impossible for Senvoy to compete.  Brazie Dep. 43:2-3.

8.    During this time, Brazie was approached by other companies seeking to sell Senvoy on using their independent contractors for deliveries; in other words, seeking to replace Senvoy's entire driving workforce with their own independent contractor drivers.  Brazie Dep. 51:9-13; 56:14-18.

9.    These third party companies included a company called NICA (National Independent Contractor Administration).  Brazie Dep. 52:8-9; 56:14-18.

10.  Brazie knew that the market for these types of driving services was becoming increasingly competitive; as noted, both local and national courier companies were rapidly moving toward independent contractor drivers.  Brazie Dep. 42:16-24.

11.  In order to remain competitive in the marketplace, and rather than outsourcing its driving services to NICA or a similar company and laying off Senvoy's drivers, Brazie saw an opportunity to build a better model for providing contracted driver services and to provide Senvoy's drivers an opportunity to become independent contractors if they desired.  Brazie Dep. 59:5-9.

Page 3  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

12. Brazie spent approximately a year researching the independent contractor model and the state of affairs in the industry: "I spent the better part of a year researching the good and the bad, what got companies into trouble and what didn't, what was my competition doing locally, what was the competition doing on a national level, and started to craft this framework to put together [the Driver Services Agreement]." Brazie Dep. 43:12-16.

13. Brazie studied what the other courier companies were doing with their independent contractors and the current developments in the industry. He found, as a general matter, that while many companies would label drivers as independent contractors for administrative purposes, in practice they would direct them and treat them like employees. Brazie Dep. 43:3-16; 44:12-47:5; 50:1-9; 50:10-51:22; 52:19-54:19.

14. For example, the drivers would be directed like employees in terms of control. Brazie Dep. 46:6-7. They also would not be responsible for work done incorrectly. Brazie Dep. 47:2-4.

15. Brazie thought that through his research he had developed "a better mousetrap. I thought I was more thorough, covered what truly was the independent contractor model…" Brazie Dep. 59:5-8. He wanted to use his model to "educate courier companies on how to use that independent contractor model". Brazie Dep. 59:7-9.

16. Brazie's aim was to compete with the NICAs of the world. That is, to build a group of independent contractor drivers who would provide delivery services to courier companies other than just Senvoy. Brazie Dep. 58:25-59:9.

17. Brazie spent years trying to sell the model but ultimately those efforts failed. Brazie Dep. 59:10-16.

Page 4 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

**C.  A Day in the Life of a Driver Resources' Driver.**

18. Drivers who choose to join the Driver Resources' network sign a Driver Services Agreement ("DSA") with Driver Resources.

19. The DSA sets out the services the driver will provide and the terms of the parties' relationship.  *See generally* Paternoster Decl., ¶ 7, Ex. 1 DR-DOL000003-51.

20. The DSA is a standard contract, the format and terms of which are generally consistent among drivers.  Kahut Dep. 34:7-20.  That said, every provision of the DSA is negotiable.  Kahut Dep. 36:6; Brazie Dep. 82:16-19 ("[a]ll parts of the contract are essentially negotiable.  So, anything having to do with that contract could be negotiated in or out.").

21. Drivers provide the vehicles for deliveries and are responsible for all costs associated with their vehicles.  DSA §§ 2.1 and 2.5, DR-DOL000011-12.

22. Drivers determine nearly every aspect of the ways in which they conduct their businesses—from choosing what vehicle to use for deliveries to what route to take to the order of deliveries.  DSA § 15.8, DR-DOL000033.

23. A typical on-demand delivery starts with an order by a customer to Senvoy, which Senvoy then offers to a driver who is in the vicinity of the requested services.  Conkey Dep. 20:11-13.

24. The driver is given the approximate pick-up and delivery time frame, the location, and any customer-requested special instructions.  DSA § 1.3, DR-DOL000008.

25. Drivers are not required to accept any particular on-demand orders.  Conkey Dep. 34:22-35:6; DSA § 1.2, DR-DOL000008.

26. Drivers are responsible for correcting defective work as well as covering the costs of providing substitute operators in the event the driver is unable to perform the agreed-upon

services.  DSA § 1.5, DR-DOL000010; § 5.4, DR-DOL000018; *see also* Brazie Dep. 157:2-19; Conkey Dep. 17:11-14.

27. Drivers also have the opportunity to increase revenues by adding or expanding routes or on-demand services and by creating efficiencies in their businesses.  Declaration of Gerald E. Brazie Jr. ("Brazie Decl.") ¶ 5.

28. In contrast to Driver Resources' independent contractor drivers, Senvoy also employees a small number of drivers who drive Senvoy vehicles and are subject to Senvoy's control and discipline.  Conkey Dep. 16:5-17; 18:20-24; Brazie Dep. 61:14-17.

### III. ARGUMENT

#### A. Summary Judgment Standard.

It is well-settled that summary judgment under the provisions of Fed.R.Civ.P. 56(c) is proper only if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "[S]ummary judgment is an extreme remedy * * * which is not to be entered unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernable circumstances."  *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 753 (9th Cir. 1979) (quotation omitted).

A fact is "material" when it is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The evidence must be viewed in the light most favorable to the nonmoving party.  *T.W. Elec Serv., Inc.*, 809 F.2d at 630.  "Inferences must also be drawn in the

light most favorable to the nonmoving party." *Id.* at 631. "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true." *Id.*

"Whether a worker is an 'employee' under the FLSA is a question of law that rests on factual findings about the economic reality of a worker's relationship to his or her employer." *Solis v. Velocity Exp., Inc.*, No. CV 09–864–MO, 2010 WL 3259917, at *2 (D. Or. Aug. 12, 2010); *see also Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015).

**B. The Burden to Establish Violations Falls to the Secretary.**

Although not discussed in the Secretary's motion, the burden of proof in this action falls on the Secretary. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds by* c. 52 § 4, 61 Stat. 86-87 (codified at 29 U.S.C. § 254(a)) (noting that an employee seeking unpaid minimum wages or overtime compensation under the FLSA "has the burden of proving that he performed work for which he was not properly compensated"); *see also Velocity Exp., Inc.*, 2010 WL 3259917, at *2 (D. Or. Aug. 12, 2010) (Secretary has the burden to prove a worker is an employee for FLSA purposes).

**C. Economic Realities Under the FLSA.**

The Secretary contends that delivery drivers are employees for purposes of the FLSA. But contrary to the Secretary's assertions, when examining the economic realities of the drivers' businesses, the drivers are in fact in business for themselves.

The Ninth Circuit has identified a number of factors relevant to determining whether a person is an independent contractor or an employee for FLSA purposes, including: (1) the degree of the alleged employer's right to control the manner in which the work is performed; (2) the

alleged employee's opportunity for profit or loss depending upon his or her managerial skill; (3) the alleged employee's investment in equipment or materials required for the task, or his or her employment of helpers; (4) whether the services rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *See Real*, 603 F.2d at 754.

"Neither the presence nor the absence of any individual factor is determinative." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981). Ultimately the determination depends "upon the circumstances of the whole activity" and "whether, as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" *Id*. (quotations omitted).

**D.  Disputed Issues of Material Fact Which Preclude Summary Judgment.**

Many of the facts cited by the Secretary as "undisputed" are in fact disputed.  Because there are disputed issues of material fact summary judgment is not warranted in this case. *See Velocity Exp., Inc.*, 2010 WL 3259917, at *2 (D. Or. Aug. 12, 2010).

*Solis v. Velocity Exp., Inc.* is particularly instructive on this issue.  In that case, Judge Mosman examined the economic realities of delivery drivers in an action brought by the Secretary. 2010 WL 3259917 (D. Or. Aug. 12, 2010).  Judge Mosman found that while the company in that case "has made a strong case that the delivery drivers should be classified as independent contractors because the company did not exercise control over the manner in which the delivery drivers performed their deliveries," summary judgment was nevertheless inappropriate because of "substantial disputes of material fact" regarding the control exercised by the company. *Id.* at *3. Here too there are material disputed facts precluding summary judgment.

Page 8  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

The following table contains a non-exclusive list of material allegations made by the Secretary which are characterized as "undisputed facts" (but which are in fact disputed), alongside Defendants' contrary evidence or explanation:

## DISPUTED FACTS

| Secretary's Allegation: | Contrary Evidence/Explanation: |
|---|---|
| "Aside from discussions with each Driver regarding the prices paid for particular routes or deliveries, the language and terms of the DSA are not negotiable: every DSA contains the same provisions, and Drivers may not include new or different terms or opt out of any term, except for an optional tax-processing payment program." Pl.'s Mot. Part. Summ. J. & Prelim. Inj. ("Pl.'s Mot.") 5. | Every provision of the DSA is negotiable. Brazie Dep. 82:16-19 ("All parts of the contract are essentially negotiable.  So, anything having to do with that contract could be negotiated in or out."); Brazie Dep. 80:22-81:9 (same).  *See also* Kahut Dep. 36:6-9 (testimony of Driver Resources' third party administrator stating, "Everything's negotiable."). |
| "The DSA also specifies the hours Drivers must work."  Pl.'s Mot. 6. | Under the DSA, the drivers contract to be available for certain timeframes during which they have the option to accept or reject deliveries either for route services or on-demand services.  DSA § 1.1, DR-DOL00008; *see also* Kahut Dep. 55:9-56:4 (explaining that most on-demand drivers contract to be available during normal business hours to accept deliveries because that is when it is the busiest and when drivers prefer to work because they can make the most money). |
| "The DSA also gives Defendants the right to specify the vehicle the Driver must use when making deliveries or driving a particular route."  Pl.'s Mot. 6. | Drivers determine the vehicles that will be used for any given delivery.  DSA § 4.1, DR-DOL000016 ("Driver may, in Driver's discretion, own and operate more than one vehicle in performing the Driver Services."). |
| "The DSA prevents Drivers from competing with Senvoy, containing non-negotiable terms that harm Drivers' ability to increase their profits."  Pl.'s Mot. 6. | The non-competition covenant in the DSA only prevents drivers from competing with Senvoy's customers, it does not prevent drivers from engaging in work as a delivery driver for other entities.  DSA § 11, DR- |

Page 9 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

| | DOL000028 (prohibiting drivers from providing driving services to any Delivery Service Company (i.e., Senvoy) or any customer thereof). |
|---|---|
| "[D]espite Defendants touting how Drivers actively negotiate their pay, Drivers cannot maximize their profit other than through agreeing to perform the work or not perform the work." Pl.'s Mot. 8. | Drivers have the opportunity to increase profit by adding or expanding routes or on-demand services, by creating efficiencies in their businesses, and by hiring helpers. Brazie Decl. ¶ 5. Drivers who make the most money do so by creating efficiencies in their businesses through choosing fuel efficient vehicles, strategically determining the order of stops, understanding the traffic patterns and short-cuts, accepting as many orders as possible, and taking on additional routes. Brazie Decl. ¶ 6. |
| "Drivers have no ability to negotiate any aspect of the delivery in order to maximize profits…" Pl.'s Mot. 9. | While Senvoy maintains the customer relationship, drivers may negotiate directly with customers regarding exact delivery times. Paternoster Decl., ¶ 5, Ex. D ("Snyder Dep.") 30:2-10 (noting that drivers may contact customers regarding timing of deliveries). |
| "Drivers must deliver what Senvoy demands, when Senvoy demands it ..." Pl.'s Mot. 9. | On-demand drivers are free to reject or accept any delivery offered to them. DSA § 1.2, DR-DOL000008; *see also* Conkey Dep. 34:22-35:6 (route drivers can reject additional deliveries); Snyder Dep., 146:13-17 (drivers can reject deliveries). |
| "Chargebacks are disciplinary penalties Defendants levy on Drivers who fail to act as expected." Pl.'s Mot. 9.<br><br>"Defendants can increase chargebacks arbitrarily simply to get a Driver's attention." Pl.'s Mot. 9. | Drivers are responsible for correcting their mistakes similar to any other independent business person, including paying to fix their mistakes if necessary. Chargebacks are not disciplinary in nature. Conkey Dep. 17:11-14 (Chargebacks are "to get our money recuperated."); Snyder Dep., 136:22-137:138 ("[Chargebacks are] based strictly on cost to fix the error…[they] would not be viewed as a penalty."); *see also* Brazie Dep. 149:18-150:8 ("if they truly are an independent contractor and |

Page 10  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

| | have their own company, [the drivers] have to be responsible for the mistakes that they make"). |
|---|---|
| "[F]rom start to finish, Defendants direct and control all material aspects of the Drivers' work."  Pl.'s Mot. 9. | The method and means by which deliveries are accomplished is left to the driver.  DSA § 2.6, DR-DOL000012 (so providing).  It is within the drivers' discretion to determine which vehicle to use for which delivery, how to load and secure packages for transport, the route driven, the order of deliveries, and how to maintain and care for their equipment.  DSA § 2.6, DR-DOL000012; Kahut Dep. 32:17-21; 33:2-5; Snyder Dep., 30:2-10; 64:1-7; 71:8-13; 72:3-4. |
| "As a condition of being eligible to perform deliveries, Defendants require Drivers to participate in a 'ride-along.'"  Pl.'s Mot. 10.<br><br>"During these required ride-alongs, Drivers learn how to make deliveries for Senvoy."  Pl.'s Mot. 10. | Ride-alongs are not a condition to performing services.  Brazie Decl. ¶ 7.<br><br>During those ride-alongs which are performed, drivers are given information about the expectations of the customers.  Paternoster Decl., ¶ 6, Ex. E 23:24-25 (so providing). |
| "Drivers must … purchase and wear a Senvoy uniform."  Pl.'s Mot. 10-11. | Uniforms are required for drivers only to the extent that the customer requires uniforms.  DSA § 2.12, DR-DOL000014; *see also* Brazie Dep. 93:2-13 (uniforms are required because "customers insist on there being uniforms, right, and so they have a uniformed driver walk through the door.  Senvoy doesn't want to do that.  The customer wants that.  So, it's driven largely by the customer needs.").  The uniform requirement is negotiable, like any other contract provision.  Brazie Dep. 82:9-15 (so stating). |
| "Defendants track Drivers' every move."  Pl.'s Mot. 12. | Senvoy monitors *deliveries* because Senvoy has the contract with the customer and is responsible for tracking the delivery of the package for the customer.  Brazie Dep. 61:11.  The monitoring is done to ensure the final result of the delivery, not to |

Page 11  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

| | |
|---|---|
| | "track the driver's every move." Snyder Dep. 113:1-7. The customer's contract is with Senvoy, not the driver; it is thus Senvoy's responsibility to ensure the delivery is completed. Brazie Dep. 35:7-10. Additionally, drivers do not report to anyone. Kahut Dep. 63:10-11. If issues come up with respect to the performance of services, those issues are referred to Driver Resources; the drivers are not subject to Senvoy's control or discipline with respect to how they perform their services. Snyder Dep., 34:19-35:10; Conkey Dep. 16:18-24. |
| "During the workday … Drivers must only perform Senvoy deliveries during their contracted hours, to the exclusion of all other work." Pl.'s Mot. 12. | Drivers may work for other delivery service companies. The DSA does not prohibit drivers from taking on other delivery jobs so long as Senvoy's customer's cargo is not in the drivers' vehicles. DSA § 2.6, DR-DOL000012. |
| "At the beginning of the workday, Drivers must notify Senvoy that they are on duty." Pl.'s Mot. 12. | On-demand drivers use the courier application on their phone to let dispatchers know when they are available to perform deliveries, otherwise dispatchers would not know if a particular driver was available for delivery requests. Kahut Dep. 63:21-23. |
| "After checking in, Drivers then perform the deliveries Senvoy has assigned to them…" Pl.'s Mot. 12. | On-demand drivers are free to reject or accept any delivery offered to them. DSA § 1.2, DR-DOL000008; *see also* Snyder Dep. 146:13-17 (drivers can reject deliveries).<br><br>Route drivers specifically contract to perform deliveries on particular routes and therefore are contractually obligated to fulfill the deliveries on those routes. Conkey Dep. 32:19-33:7. Like on-demand drivers, however, if other, additional deliveries are offered to route drivers (such as adding a stop along the route that was not part of their original contract), they too are free to accept those additional |

Page 12 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

| | |
|---|---|
| | deliveries or reject them without penalty. Conkey Dep. 34:22-35:6. |
| "Drivers cannot negotiate … the timing of deliveries with customers; such conversations must occur with Senvoy directly." Pl.'s Mot. 13. | Drivers may negotiate directly with customers regarding exact delivery times. Snyder Dep., 30:2-10 (so noting). |
| "If Drivers do not meet Senvoy's expectations, Defendants discipline them either through issuing 'chargebacks,' … or withholding work." Pl.'s Mot. 14. | The drivers are not subject to Senvoy's control or discipline with respect to how they perform their services. Snyder Dep., 34:19-35:10 (Senvoy refers any driver issues to Driver Resources); Conkey Dep. 16:14-24 (discussing differences with respect to employee drivers, who are subject to discipline).<br><br>As noted, chargebacks are used to hold drivers accountable for their work, similar to any other independent business person. They are not disciplinary in nature. Conkey Dep. 17:11-14 (Chargebacks are "to get our money recuperated."); Snyder Dep., 136:22-137:138 ("[Chargebacks are] based strictly on cost to fix the error…[they] would not be viewed as a penalty."). |
| "[D]espite claiming that on-demand Drivers can refuse orders, Defendants withhold work when Drivers refuse too many orders." Pl.'s Mot. 14. | Defendants would not refuse work to a driver because the driver rejected an order. Snyder Dep., 35:7-10 (so stating).<br><br>The Secretary mischaracterizes the testimony of former employee Christine Lewis. Ms. Lewis, who no longer works for Defendants, was questioned about an instance where a driver "just rejects **all** work" and in response she stated that it would simply be "a waste of time" to further offer deliveries to such a driver. |

Page 13 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

### E. The Drivers Are Independent Contractors.

#### 1. The Drivers Control How They Perform the Services.

As demonstrated above, there are numerous material factual disputes regarding drivers' relationships with Defendants. Nevertheless, the evidence when viewed in the light most favorable to Defendants shows that Defendants have limited control and oversight over the drivers. Several key elements demonstrate that Defendants did not control the drivers: (1) drivers can (and do) refuse delivery requests even during periods they contract to be available without penalty; (2) the drivers control the day-to-day work including the manner and means of how the work is performed; (3) drivers determine the hours they work; (4) drivers are responsible for finding their own replacements and may employ helpers; (5) drivers are not prohibited from working for other delivery service companies; (6) drivers carry their own insurance and are responsible for correcting their mistakes; and (7) drivers negotiate their pay.

##### a. Drivers are free to reject deliveries.

First, on-demand drivers are free to reject any delivery offered to them without penalty. DSA § 1.2, DR-DOL000008; *see also* Snyder Dep., 146:13-17 (drivers can reject deliveries). This supports a finding that those drivers are independent contractors. *See Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824 JWS, 2015 WL 1299369, at *3 (D. Ariz. Mar. 23, 2015) (on-demand drivers could reject deliveries which weighed in favor of independent contractor status); *see also Herman v. Express Sixty-Minutes Delivery Service, Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (same).

Route drivers, on the other hand, contract to perform deliveries on particular routes and therefore are contractually obligated to fulfill those deliveries. Like on-demand drivers, however, if additional deliveries are offered they too are free to accept them or to reject them without

penalty.  Conkey Dep. 34:22-35:6 (so providing).  Once again this supports a finding that these drivers are independent contractors.  *See Collinge*, 2015 WL 1299369, at *3 (D. Ariz. March 23, 2015).

      **b.**    **Drivers control the means and manner of the day-to-day work.**

In addition, the evidence viewed in the light most favorable to Defendants demonstrates that drivers control the method by which deliveries are accomplished.  It is within the drivers' discretion to determine how to load and secure packages for transport, the route driven, and the order of deliveries.  Snyder Dep., 30:2-10; 64:1-7; 71:8-13; 72:3-4.  This supports a finding of independent contractor status.  *See Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. Appx. 104, 106 (4th Cir. 2001) (cable installers were not subject to defendant's control where evidence indicated they were free to complete the jobs within their routes in whatever order they wish); *see also Herman*, 161 F.3d at 302-03; 305 (finding that courier drivers who provided services for customers of defendant's delivery service were independent contractors).[1]

Drivers also control the means by which deliveries occur.   They supply the primary piece of equipment:  namely, a vehicle.  DSA § 2.1, DR-DOL000011.  And they are responsible for all of the costs associated with their vehicles including fuel, maintenance, and insurance.  DSA § 2.5, DR-DOL000012.  Indeed, Defendants have no control over the vehicles.  DSA § 2.6, DR-DOL000012.[2]

---

[1]  In contrast, the FedEx delivery drivers in *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014) were accompanied on ride-alongs by management representatives up to four times each year where supervisors scrutinized minor details of their performance.  *Id*. at 985.

[2]  Once again, this is in stark contrast with the control found by the Ninth Circuit over FedEx delivery drivers.  FedEx dictated every aspect of the drivers' vehicles down to the paint color ("FedEx white", a specific shared of Sherwin-Williams paint, or its equivalent) and the dimensions of the vehicle and the shelves inside the vans.  *See Slayman v. FedEx Ground Package System, Inc.*, 765 F.3d 1033, 1039 (9th Cir. 2014) (applying Oregon law).

Page 15  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

Finally, the result is further cemented when the indicia of control present over the drivers is compared to Senvoy's *employee* drivers, who drive vehicles owned by Senvoy and who are subject to discipline and control.  Conkey Dep. 16:5-17; 18:20-24.

        **c.**      **Drivers determine the hours they work.**

Further, the drivers' schedules are not dictated by the Defendants.  Under the DSA, the drivers contract to be available for certain timeframes.  Kahut Dep. 55:9-13; Conkey Dep. 29:11-23.  It should come as no surprise that most on-demand drivers contract to be available during normal business hours.  Kahut Dep. 55:9-13; Conkey Dep. 29:11-23.  This is because most on-demand deliveries are requested during this timeframe.  Kahut Dep. 55:24-56:4.  But even though on-demand drivers contract to be available during specified timeframes, they are nevertheless entirely free to accept or reject offered deliveries without penalty during their contracted periods of availability.  Conkey Dep. 34:22-35:6; DSA § 1.2, DR-DOL000008.

        **d.**      **Drivers must provide replacement drivers.**

Drivers are also responsible for finding replacements in the event they are unable to complete their scheduled routes.  DSA § 1.5, DR-DOL000017.

        **e.**      **Drivers may work for others.**

In addition, drivers may work for other delivery service companies.  The DSA does not prohibit drivers from taking on other delivery jobs so long as Senvoy's customer's cargo is not in the drivers' vehicles.  DSA § 2.6, DR-DOL000012.

        **f.**      **Drivers carry their own insurance and are responsible for correcting their mistakes.**

Drivers also are required to maintain their own automobile insurance and occupational accident insurance.  DSA §§ 5.1; 5.3, DR-DOL000017-18.  Moreover, drivers are responsible for

---

Page 16 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

correcting their mistakes similar to any other independent business person.  Conkey Dep. 17:11-14 (Chargebacks are "to get our money recuperated."); Snyder Dep., 136:22-137:138 ("[Chargebacks are] based strictly on cost to fix the error…[they] would not be viewed as a penalty.").

> **g.    Drivers can negotiate their pay.**

As discussed previously, all aspects of the DSA are negotiable.  Brazie Dep. 82:16-19 ("[a]ll parts of the contract are essentially negotiable.  So, anything having to do with that contract could be negotiated in or out."); Brazie Dep. 80:22-81:9 (same).  This includes the amount of pay for a route or on-demand delivery and drivers routinely negotiate these amounts.  Brazie Dep. 80:22-25; 141:13-16 and 144:3-21.

> **h.    Monitoring of deliveries is not evidence of control.**

The Secretary also puts undue focus on Senvoy's monitoring of the delivery of customers' packages.  But this reliance is misplaced given that Senvoy is the contracting party with the customer and therefore has the responsibility to ensure that packages are timely and appropriately delivered.  Defendants do not require drivers to contact dispatch before or after deliveries are made; if a customer issue arises, then Senvoy may be involved in helping to seek a resolution.  But again this is a result of the customer's relationship with Senvoy.  It does not demonstrate control over the driver but merely reflects the contractual relationship.  *See generally Velocity Exp., Inc.*, 2010 WL 3259917, at *5 (D. Or. Aug. 12, 2010).  Moreover, it is not the case that drivers "check-in" with anyone; on-demand drivers use the courier application on their phones to let dispatchers know when they are available to perform deliveries.  Kahut Dep. 63:21-23.

Finally, as with any case involving independent contractors, there are elements where drivers are subject to control; indeed, the economic realities test is not dependent on any one factor or element.  *See Donovan*, 656 F.2d at 1370.  Moreover, every case presents unique factual

elements that may or may not evidence control depending on the very specific circumstances of each particular case. *See Velocity Exp., Inc.*, 2010 WL 3259917, at *3 (D. Or. Aug. 12, 2010). This is, in part, why summary judgment is inappropriate in a case like this where it is best left to the fact-finder to evaluate the relationship between the parties.

### 2. Drivers Have the Opportunity for Profit or Loss Depending Upon Their Managerial Skills.

The next factor courts consider is whether drivers have an opportunity for profit or loss based on their managerial skills. This factor weighs in favor of finding the drivers to be independent contractors. Drivers are entrepreneurial businesspeople who are not guaranteed any particular amount of work and who may make more or less money depending upon how they perform the services.

There is no dispute that drivers may hire additional helpers to assist them in performing services including taking on additional routes and deliveries. DSA § 4.2, DR-DOL000017. Hiring additional helpers allows drivers to increase their profits and involves managerial skills with respect to their hiring, training, and managing. This factor weighs in favor of independent contractor status. *See generally Browning v. Ceva Freight, LLC*, 885 F.Supp.2d 590, 608 (E.D.N.Y. 2012) ("[w]hether the drivers made more money or less also depended largely on their investment in bigger vehicles and hiring additional employees in order to increase their efficiency and capacity."); *Mid–Atl. Installation Servs., Inc.*, 16 Fed.Appx. at 107 (affirming a finding of the district court as to independent contractor status based partly on the installer's decision whether to hire his own employees or to work alone).

Moreover, drivers have the ability to take on as many or as few jobs as they wish and to capitalize on their skills through performing the services as efficiently and economically as possible which further supports independent contractor status. *See Herman*, 161 F.3d at 304

Page 18 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

(opportunity for profit and loss factor weighed in favor of independent contractor status where drivers had the ability to choose how much they wanted to work and the drivers could use skill, initiative and understanding of the courier business to increase profit). The DSA does not guarantee a certain amount of work. DSA § 13, DR-DOL000029. The DSA in fact explicitly recognizes the opportunities drivers have under the contract for entrepreneurial advancement based on their own initiative and independent judgment. *See* DSA Recital (F), DR-DOL000008.

In addition, contrary to the Secretary's assertions, the DSA also does not prohibit drivers from taking on other delivery jobs so long as Senvoy's customer's cargo is not in the drivers' vehicles. DSA § 2.6, DR-DOL000012. The non-competition covenant in the DSA merely prevents drivers from competing for Senvoy's customers, it does not prevent drivers from engaging in work as a delivery driver for other entities. DSA § 11, DR-DOL000028 (prohibiting drivers from providing driving services to any Delivery Service Company (i.e., Senvoy) or any customer of Senvoy). This weighs in favor of independent contractor status. *See Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 141 (2nd Cir. 2017) (noting that "a company relinquishes control over its workers when it permits them to work for its competitors").

Finally, the drivers' pay is in fact the subject of negotiation. Brazie Dep. 82:16-19; 126:2-13; Kahut Dep. 36:6; 37:24-38:6. Contrary to the Secretary's assertions, the drivers' pay is not predetermined. While the drivers do not participate in setting the amounts paid by Senvoy's customers, the amount paid to drivers is not simply the product of a formula. Unsurprisingly, Brazie testified that he had a general idea of what he thought Senvoy should pay on deliveries in order for Senvoy to be profitable. Brazie Dep. 123:8-14. However, the amount was not a floor and the final pay was the subject of negotiation, and could even exceed the amount paid to Senvoy

Page 19 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

by the customer.  Brazie Dep. 127:1-7 (Brazie testifying that there are several routes for which

drivers receive more than Senvoy is paid for the route).

### 3.  Drivers Invest Significantly in Equipment and May Employ Helpers.

The next factor considers the investment in equipment, materials and labor required to

perform the services.  Contrary to the Secretary's assertions, the drivers make significant

investments in order to perform the services.

The drivers' vehicles are indisputably the most important investment that drivers make to

perform the services.  The drivers not only must furnish the vehicles they use at their own expense,

but are responsible for every aspect of the vehicles from maintenance and repair to paying for their

own fuel costs to providing a substitute vehicle if necessary.  DSA §2, DR-DOL000011-12.

Similarly, drivers are responsible for furnishing and maintaining other ancillary equipment used to

load, store, transport, and unload packages.  *Id*.  Accordingly, it is undisputed that the drivers make

significant investments in their businesses.

The Secretary argues that this factor weighs in favor of employment status because the

investments made by the drivers are comparatively less than those made by Defendants.  While the

relative investments made by the drivers in comparison to Defendants may be a relevant

consideration, the inquiry does not end there.  *See Keller*, 781 F.3d at 810-11.  A worker's

investment must be "consider[ed] in light of the broader question:  whether that capital investment

is evidence of economic independence."  *Id*. at 810.  Indeed, as the Eighth Circuit recently

recognized, comparisons between the purported employer and employee have "little relevance" to

determining whether a person is an employee or independent contractor as a matter of economic

reality under FLSA.  *See Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d

1089 (8th Cir. 2017) (recognizing that "[l]arge corporations can hire independent contractors, and small businesses can hire employees.").

Here, drivers run their own delivery businesses and their investments further their opportunity for profit. This supports a finding of independent contractor status. *See, e.g., Freund v. Hi–Tech Satellite, Inc.*, 185 Fed. Appx. 782, 783–84 (11th Cir. 2006) (upholding a district court finding that a cable installer invested in the equipment necessary to perform installations because "[h]e drove his own vehicle and provided his own tools and supplies for each installation.").

### 4. The Drivers Are Skilled Business People.

While the mere act of driving a vehicle may not, in isolation, be considered a special skill, the drivers rely on their own experience and managerial skills in running their businesses which does require specialized skills. The DSA in fact explicitly recognizes that the relationship between drivers and Driver Resources is intended to further the drivers' opportunity for profit. DSA Recital (F), DR-DOL000008 ("Company and Driver intend that Driver will provide the Driver Services to further each of their respective business objectives and to further Driver's entrepreneurial opportunities for profit."). In analyzing this factor, "courts look to see how an employee's skills are utilized…" *Mathis v. Hous. Auth. of Umatilla Cty.*, 242 F. Supp. 2d 777, 784 (D. Or. 2002) (finding that nurses did not use their skills in an independent manner). *See also Moba v. Total Transp. Servs. Inc.*, 16 F. Supp. 3d 1257, 1265 (W.D. Wash. 2014) ("business management skills" exercised by truck drivers supported finding of independent contractor status). The Secretary cites *Campos v. Zopounidis*, No. 3:09–cv–1138 (VLB), 2011 WL 2971298 (D. Conn. July 20, 2011) for support of the proposition that mere driving is not a special skill; *Campos* involved a pizza delivery driver who was paid an hourly wage. Here, in contrast, drivers are entrepreneurial business people who make more or less money depending upon how they perform

the services and if they hire additional helpers. The skills used by the drivers extend far beyond merely driving.

### 5. The Drivers' Businesses Are Not Integral to Senvoy's Business.

Finally, as noted, Senvoy provides logistic services, meaning Senvoy arranges for the transportation of customers' packages and freight, but does not provide actual delivery services itself. Conkey Dep. 67:23-68:3. Thus, delivery drivers are not integral to Senvoy's business.

While Senvoy does not dispute that delivery drivers are necessary to accomplish actual delivery of packages for which Senvoy provides logistic services, this factor does not preclude a finding of independent contractor status. *See Herman*, 161 F.3d at 305 (affirming district court's finding that delivery drivers were independent contractors in relation to delivery service company).

In sum, the Secretary has failed to meet his burden to show that the undisputed facts establish the drivers are employees under the FLSA.

### F. The Secretary Cannot Show Minimum Wage Violations Meriting Summary Judgment.

The FLSA requires employers to pay a federally-established hourly minimum wage – currently $7.25 per hour – to employees engaged in commerce "in any workweek." Fair Labor Standards Act § 6, 29 U.S.C. § 206(a). Compliance is determined by examining the employee's workweek as a whole. *See, e.g.*, *Douglas v. Xerox Business Services, LLC*, 875 F.3d 884 (9th Cir. 2017) (so stating). Despite that framework, the Secretary cites to a single driver and a single day to make his point that Defendants habitually violated the minimum wage requirements. *See* Pl.'s Mot. 29. That bare example not only fails to demonstrate that Defendants violated the FLSA as to all of the drivers named in this action, but it is unsatisfactory evidence even as to the one example driver – the regulations require the calculation to be made based on sums for an entire workweek, not a single day.

The Secretary also notes that the example given is further flawed by any "chargebacks or other changes to the Driver's mileage, hours, or pay that may have actually occurred[.]"[3] Pl.'s Mot. 29.  To the extent that the Secretary suggests its calculations are incomplete based on insufficient information and detail, Defendants agree.  However, contrary to the Secretary's belief that the Court should declare Defendants in violation of the FLSA's minimum wage requirements now and deal with the details later, it would be inappropriate for the Court to grant summary judgment simply based on the Secretary's allegations.  That is not the summary judgment standard.  *See, e.g., Real*, 603 F.2d at 753 (standard requires movant to establish "that the other party is not entitled to recover under any discernable circumstances.").  In this case, the parties disagree as to nearly every aspect of the Secretary's calculations, from the number of hours and miles of drivers, to the amounts charged to drivers' accounts for any number of reasons.  *See* Brazie Decl. ¶ 4.  At a bare minimum, issues of material fact exist to preclude summary judgment.

### G.  The Secretary Cannot Show Overtime Violations Meriting Summary Judgment.

Under the FLSA, employers must pay a premium overtime rate for all hours over 40 hours per week.  29 U.S.C. § 207 (stating rule).  When an employee is paid a flat per-job or per-day amount, the "regular rate" of pay for that employee for purposes of calculating an overtime rate

---

[3]  In his motion, the Secretary suggests that the IRS mileage reimbursement rate is the appropriate rate to apply here.  Pl.'s Mot. 29 n 15.  While Defendants agree that it could be *an* appropriate rate, case law establishes that it is not the *only* appropriate rate.  *Koral v. Inflated Dough, Inc.*, No. CV 13-CV-02216-WYD-KMT, 2014 WL 4904400 *4 (D. Co. Sept. 29, 2014) (agreeing that employer "may reimburse the Plaintiff using a reasonable approximation of the Plaintiff's expenses" before weighing various plausible methods).  At trial, Defendants intend to demonstrate that a more appropriate industry-accepted rate should apply instead.

Furthermore, because many drivers used a credit system offered by Defendants to pay for gas at a reduced rate – a credit system that the Secretary alleges was illegal and should not be counted – the mileage rate will frequently not apply in order to avoid double compensation for the same expense.

Page 23  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

under the FLSA is "determined by totaling all the sums received * * * in the workweek and dividing by the total hours actually worked."  29 C.F.R. § 778.112.

As with the Secretary's minimum wage arguments, his suggestion that Defendants have violated the overtime requirements of the FLSA is wholly inappropriate for resolution on summary judgment.  In fact, the Secretary does not make an argument, but merely states, "Defendants' own DSAs show that Drivers are paid a flat daily rate while working more than 40 hours per week, depriving them of the FLSA's required half-time premium for the hours above 40."  Pl.'s Mot. 28. The conclusory statement cannot permit summary judgment in the Secretary's favor on this issue, and he cites to little else in support.

## H.  The Secretary Further Attempts to Improperly Use the Retaliation Statute.

The Secretary argues that "by treating Drivers as independent contractors * * * Defendants have chilled the ability of Drivers to make complaints and institute proceedings to protect their rights under the FLSA."  Pl.'s Mot. 29 (citing 29 U.S.C. § 215(a)(3)).  In support of that allegation, the Secretary offers only a citation to the statute, which, plainly stated, prohibits an employer from discriminating against a whistleblower.  *See* 29 U.S.C. § 215(a)(3) (making it unlawful to discriminate against an employee for filing a complaint under the FLSA).

Notably, the Secretary does not argue that the drivers filed a FLSA complaint and suffered retaliatory discrimination from Defendants as a result.  Instead, the Secretary argues that, by misclassifying the drivers as independent contractors, Defendants withheld relevant information regarding the drivers' rights under the FLSA.  The plain text of the statute does not support the Secretary's tortured reading of section 215(a)(3). And courts have consistently rejected claims under section 215(a)(3) when a plaintiff fails to first demonstrate engagement in protected activity. *See, e.g., Justice v. Rockwell Collins, Inc.*, ___ Fed. Appx. ___, 2017 WL 6559788, at * 1 (9th Cir.

2017) (plaintiff's failure to establish a "causal connection between any protected activity and an adverse action" was fatal to a retaliation claim).

Furthermore, the penalties available for a violation of section 215(a)(3) – such as reinstatement and promotion – seek to make the discriminated employee whole; they do not contemplate a blanket penalization untethered to the actual harm caused.  29 U.S.C. § 216(b). Here, there is no support for the Secretary's suggestion that Defendants violated the retaliation provision, or that the drivers suffered the types of harm that could be remedied by section 216(b). Thus, the Secretary's motion must fail.

## I.   Defendants Are Not Required to Keep Records in a Particular Fashion.

The FLSA requires employers to "make, keep, and preserve" records of an employee's "wages, hours, and other conditions and practices of employment maintained by him[.]"  29 U.S.C. § 211(c).  Employers are not, however, required to keep those records in a particular prescribed manner.  It is sufficient to retain information adequate to conclude whether, in light of the mandates of the FLSA, the employer has failed to properly compensate an employee for his efforts.  *See generally Mt. Clemens Pottery Co.*, 328 U.S. at 687-88 (noting that an employer who keeps accurate records allows the employee to "discharge his burden [of proof] by securing the production of those records."); *see also Martin v. Liu*, No. 85-5462-JMI (PX), 1992 WL 95719, at *7 (C.D. Cal. Jan. 28, 1992) (explaining that recordkeeping regulation assists the Secretary in "determining whether the FLSA has been complied with").

As the records produced to the Secretary demonstrate, Defendants provided an accurate accounting of all of the amounts paid to the drivers as well as the hours those drivers were actively engaged in work-related activities.  Brazie Decl. ¶ 3.  Those records satisfy the goal of section 211(c), which is to render the facts sufficiently clear that a court may determine with a reasonable

level of accuracy whether an employer has violated the requirements of the FLSA.  *See, e.g., Liu*, 1992 WL 95719 at *7 (noting purpose is to aid "in determining whether the FLSA has been complied with and (if it has not been) in obtaining recompense in court."); *see also* Brazie Decl. ¶ 4 (discussing errors in the Secretary's calculations not based in a recordkeeping violation, but in a failure of methodology).

In fact, the Secretary here alleges only that Defendants have "admitted that they have not kept any records of the hours Drivers worked[,]" which admission, the Secretary argues, "establish[es] that Defendants violated the FLSA's recordkeeping requirements."  Pl.'s Mot. 28.[4] Specifically, the Secretary notes, that admission proves a violation of the recordkeeping requirement that employers maintain records of "the total daily and weekly hours worked by employees."  *Id.*; *see* 29 C.F.R. § 516.2(a)(7) (requiring employer to keep records of "[h]ours worked each workday and total hours worked each workweek" for each employee).

Therefore, this is not a case in which the Secretary argues that Defendant's records are incorrect or false, but simply that they are, without further explanation, insufficient.  *See* Pl's Mot. 28 (relying on deposition statements as the sole basis for recordkeeping violations); *Cf. Walling v. Panther Creek Mines*, 148 F.2d 604, 605-06 (7th Cir. 1945) (concluding that recordkeeping system did not meet legal requirements where quality of records kept was "slipshod," unreliable, and in some cases, purely estimated).   Defendants disagree.  Defendants produced literally thousands of pages of precise information relating to the hours worked and amounts paid to their drivers.  Brazie Decl. ¶ 3.

---

[4] Although the Secretary cites to *Chao v. Me and Lou's Rest.*, No. CV07-385-E-EJL, 2008 WL 4832880 (D. Idaho Nov. 5, 2008), in support, that case is inapposite to the facts here.  In *Me and Lou's Rest.*, the defendants failed to provide substantial evidence of records because they had been "destroyed or stolen."  *Id.* at *3.  Here, despite deposition testimony, Defendants produced substantial records containing the FLSA-required information, including hours.

Furthermore, the Secretary's own request for the Court to order the parties to confer to establish the precise level of damages makes the point. *See* Pl.'s Mot. 1 (suggesting that the Secretary "is optimistic that the parties may be able to stipulate as to the amount of back wages and liquidated damages owed or the methodology for reconstructing this amount since any evidence supporting a reconstruction will be based upon the set of records produced by Defendants in discovery.")  The Secretary agrees that Defendants have produced "records" sufficient to allow the parties to reach an agreement on any damages allegedly owed. *Id*.  Thus, any deposition "admissions" are factually inconsistent with the Secretary's own statements in his motion.  Moreover, the Secretary's position is contradicted by the substantial records produced by Defendants, which, at a minimum, raise a question of fact that is both genuine and material to the resolution of this allegation; therefore, summary judgment must be denied. *See* Brazie Decl. ¶ 4 (noting a material factual dispute that "is not a product of the adequacy of the records provided, but rather of the methodology employed by the Secretary.").

### J.  Brazie Was Involved In Daily Operations.

Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee * * *." 29 U.S.C. § 203(d).  An employee may have multiple statutory employers, *Falk v. Brennan*, 414 U.S. 190, 195 (1973), if each exercised the requisite control. *See Rutherford Food Corp. v. McComb*, 331 U.S. 772, 730 (1947) (emphasizing the applicable "circumstances of the whole activity" analysis).

Courts have applied a four-factor test to determine whether an individual meets the definition of an employer, including, the power to hire and fire; control of work schedules and rate of pay; and maintenance of employment records. *See Bonnette v. California Health and Welfare*

Page 27 **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

*Agency*, 704 F.2d 1465 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (9th Cir. 1985).

The Secretary asserts that Brazie qualifies as an employer under the statute. To the extent that the Secretary suggests Brazie has daily involvement with some aspects of the shared operations, Defendants do not disagree. Brazie owns 99 percent of Driver Resources and Senvoy; he understandably takes an interest in the health of those companies. *See* Pl.'s Mot., Ex D at 189:23-190:5 (noting ownership interest).

As argued throughout this responsive memorandum, Defendants continue to disagree that they qualify as employers or that the Secretary has established actual violations of the FLSA. Nevertheless, in the event that the Court rules against Defendants on those issues, Defendants do not dispute Brazie's control over the defendant businesses.

**K. The Secretary Has Not Demonstrated Defendants' Willful FLSA Violations.**

The Secretary uses the term "willful" in two relevant instances: (1) to seek to extend the statute of limitations to three years, and (2) to permit liquidated damages. Both are discussed below, and for similar reasons, the Secretary fails to carry his burden for summary judgment on either issue.

**1. Extended Statute of Limitations.**

Under the FLSA, the Secretary is limited to bringing an action for the two years preceding the filing of his complaint. 29 U.S.C. § 255(a) (stating that an action "shall be forever barred unless commenced within two years after the cause of action accrued"). However, if the cause of action arises from a "willful violation" of the FLSA, that statute of limitations may be extended to three years. *Id.* The burden to demonstrate willfulness falls on the Secretary, and Defendants disagree that the Secretary has satisfied that standard. *Slezak v. City of Palo Alto*, No. 16-CV-

03224-LHK, 2017 WL 2688224, at *2 (N.D. Cal. June 22, 2017) ("The burden is on the employee to show a willful violation of FLSA.").

The Secretary argues that a finding of willfulness is appropriate here to extend the statute of limitations to three years. That is so because, in the face of disputes regarding the classification of drivers of the kind at issue here, *see Slayman v. FedEx Ground Pkg. Sys., Inc.*, 765 F.3d 1033 (9th Cir. 2014), Defendants "failed to take any action or make any reasonable inquiry about their compliance with the FLSA, despite obvious, repeated signs they are violating the law." Pl.'s Mot. 30; *see also id.* at 31. In support, the Secretary cites to deposition testimony in which Brazie stated that since the beginning of Defendants' use of independent contractors, "there have been disputes" over their classification. *Id.* at 30 (quoting Pl.'s Ex D at 192: 7-11). Furthermore, the Secretary suggests that Defendants' failure to seek "legal advice or guidance from a government agency to determine the lawfulness of their scheme," – instead relying on "internet self-help" research to inform themselves – constitutes *per se* willfulness. *Id.* at 30-31.

The Secretary's argument ignores several key issues, all of which prove fatal to his position on summary judgment. First, the Secretary argues that because Defendants understood there was some dispute as to whether delivery drivers were properly characterized as independent contractors, the Court should find that they willfully violated the FLSA, triggering the extended three-year statute of limitations. Pl.'s Mot. 31-32. That interpretation distorts the relevant analysis and ignores the reality of the legal landscape during the relevant time period. *See, e.g., Slezak*, 2017 WL 2688224 at *3 (concluding that a party "likely has a good defense on the charge of willfulness" when it relied on unsettled law); *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135-36 (1988) (rejecting a proposal that the willful standard should be satisfied if an employer "acted without a reasonable basis for believing that it was complying with the statute,"

because such a construction would impermissibly allow "a finding of willfulness to be based on nothing more than negligence or, perhaps, on a completely good-faith but incorrect assumption that" the employer had complied with the FLSA).

The Secretary cites to deposition testimony from Brazie that he "did all of the homework prior to 2010" to ensure that his system was lawful. *Id*. at 31 (quoting Pl.'s Ex D at 200:24 - 201:1). The Secretary suggests that the crafting of the DSA "prior to 2010" was relevant because it was during that period that Defendants conceived of the independent contractor framework used here, however, the Secretary overlooks the fact that the case law at the time did not favor his current interpretation of the FLSA. *See, e.g., Velocity Exp., Inc.*, 2010 WL 3259917 (concluding that the Court could not resolve on summary judgment facts very similar to those presented in this case); *see also Slayman*, 765 F.3d at 1040-41 (noting that, in litigation spanning 2003 through 2009, the Judicial Panel on Multidistrict Litigation favored defendant delivery carrier's classification of drivers, holding that drivers "were independent contractors as a matter of law"); *see also Flores v. City of San Gabriel*, No. CV 12-04884-JGB (JCGx), 2013 WL 5817507 (C.D. Cal. Oct. 29, 2013) (concluding in 2013 that an employer acted in good faith by employing internal personnel to monitor FLSA compliance even when some case law may have implied that employer was not fully complying), *reversed in part by Flores v. City of San Gabriel*, 824 F.3d 890 (2016).

In fact, in the *Slayman* decision the Secretary cites as the centerpiece of his argument, the Ninth Circuit observed that the 2003 through 2009 litigation between delivery drivers and FedEx resulted in victories for FedEx on "nearly all of [its] motions[,]" including the legal conclusion that its delivery drivers *were* independent contractors. *Slayman*, 765 F.3d at 1040-41 (reciting procedural history). It was in that atmosphere that Defendants reclassified their drivers. *See* Pl.'s Mot, Ex. D at 43 (noting timeframe for model development was 2008-09). And it was not at all

implausible for Defendants to believe that they were doing so in full compliance with the FLSA based on the information available in 2010. *See Lucero v. Regents of Univ. of Cal.*, No. C-91-3999 MHP, 1993 WL 341287, *12 (N.D. Cal. Aug. 23, 1993) (noting that, "given the confused state of the law [on this issue] in recent years, * * * the court cannot conclude from the evidence in the record that [the defendant's actions] constituted a 'willful' violation of the FLSA."); *see also* Brazie Dep. 42:13-17 (explaining that "in 2008 and [200]9, the ground shifted underneath the courier industry, and * * * most of the companies in Oregon moved to independent contractors.").

In addition the Secretary's blanket assertions that Defendants have "fail[ed] to make any changes," or "come into full compliance with the FLSA[,]" lack a sound basis. *See* Brazie Dep. 43:12-16 ("I spent the better part of a year researching the good and bad, what got companies into trouble and what didn't, what was my competition doing locally, what was the competition doing on a national level, and started to craft this framework to put together [the DSA]."); *see also* Brazie Dep. 43:22-46:21 (describing the practices of other delivery companies Brazie studied, and the detailed process he used to create the DSA).

In short, the Secretary's position would essentially require Defendants to comply with the Secretary's interpretation despite pending litigation in which Defendants took a reasonable position contrary to the Secretary's own, or risk significantly extending the statute of limitations. That cannot be the intent of the statute. To the contrary, courts have concluded the Secretary must offer evidence to demonstrate that actions taken that violate the FLSA were done deliberately. *Serv. Emps. Int'l Union, Local 102 v. Cnty. of San Diego,* 60 F.3d 1346, 1355-56 (9th Cir. 1995) (reversing when the defendant's violations were not "deliberate"). Mere awareness of the FLSA and how it might apply to an employer is insufficient to carry the Secretary's burden on this issue. The United States Supreme Court has rejected a similar less-stringent standard, noting that "it

would be virtually impossible for an employer to show that he was unaware of the Act and its potential applicability," and under an awareness standard, "the normal 2-year statute of limitations would seem to apply only to ignorant employers, surely not a state of affairs intended by Congress." *Richland Shoe Co.*, 486 U.S. at 132-33; *see also Hugler v. Westside Drywall, Inc.*, No. 3:15-CV-02411-BR, 2017 WL 1027026, *5 (D. Or. Mar. 14, 2017) (noting that "it is insufficient for the DOL merely to present evidence of an employer's negligence.").

Furthermore, the Secretary's argument that Defendants willfully ignored the FLSA requirements because they did not seek "guidance from a government agency to determine the lawfulness of their scheme," is without merit. By arguing that Defendants failed to demonstrate good faith because they did not seek an opinion from the Department of Labor, the Secretary seems to conflate the good faith defense offered by section 259 – insulating an employer's good faith reliance on an opinion letter or other administrative ruling – with the similar defense implicated by section 260.[5] Had Defendants sought such an opinion letter, they would be entirely immune to this suit. *See* 29 U.S.C. § 259(a) (stating standard and effect); *see also Alvarez v. IBP, Inc.*, 339 F.3d 894, 907 (9th Cir. 2003) (explaining that section 259 was intended to "protect employers from liability if they took certain actions on the basis of an interpretation of the law by a government agency"). Moreover, if, as the Secretary suggests, the absence of such an opinion here frustrates a good faith argument under section 260, such a reading would render this section superfluous.

---

[5] Under section 259, an employer is not liable under the FLSA "if he pleads and proves that the action or omission complained of was in good faith conformity with and in reliance on an y written administrative regulation, order, ruling, approval, or interpretation, of [the relevant US DOL administrator], or any administrative practice or enforcement policy of such agency." 29 U.S.C. § 259(a).

Finally, the Secretary's argument fails because it invites an examination of material facts, which the Secretary cannot plausibly depict as uncontested on this motion.  For that reason alone, determination of this issue on summary judgment is inappropriate, and the Secretary's motion must be denied.

**2.  Liquidated Damages.**

The Secretary asks this Court to order the parties to "meet and confer regarding the precise amount of back wages (and the equal amount of liquidated damages) dues."  Pl.'s Mot. 1.  The Secretary suggests that doing so would be appropriate because he anticipates that "the parties may be able to stipulate as to the amount of back wages and liquidated damages owed or the methodology for reconstructing this amount since any evidence supporting a reconstruction will be based upon the set of records produced by Defendants in discovery."  *Id.*  However, even if the Court concludes that the drivers are misclassified, Defendants do not concede that liquidated damages are appropriate here.

Under the FLSA, an employer who violates the overtime or minimum wage requirements is liable for the unpaid wages "and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  But Section 260 permits the Court to refrain from awarding liquidated damages when the employer demonstrates that he acted "in good faith and that he had reasonable grounds for believing that this act or omission was not a violation of the [FLSA.]"  29 U.S.C. § 260.  Thus, if the employer demonstrates "subjective and objective good faith" *Local 246 Util. Workers Union of Am. V. S. California Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996), the Court has the discretion to refuse to award liquidated damages.

In order to establish subjective good faith, Defendants "must take active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Herman v. RSR Sec. Services Ltd.*,

172 F.3d 132, 142 (2nd Cir. 1999) (cited with approval by *IBP, Inc.*, 339 F.3d 894.  When, as here, it was not settled law that a party's position was incorrect at the time that the party took that position, the party has "a non-frivolous defense as to whether Defendant[s] would owe liquidated damages * * *."  *Slezak*, 2017 WL 2688224 at *2 (concluding that a party has a non-frivolous good faith defense to liquidated damages when it relied on unsettled law).  In fact, when a defendant seeks to inform itself as to whether the FLSA applies to its circumstances, and then "act[s] on the firm belief that the [FLSA] does not apply[,] [a] subsequent determination that the advice was wrong does not deprive the employer of the relief provided by" section 260.  *General Elec. v. Porter*, 208 F.2d 805, 816-17 (9th Cir. 1953).

Cases involving the interpretation of the FLSA are necessarily fact-bound, *Carter v. XPO Last Mile, Inc.*, No. 16-CV-01231-WHO, 2016 WL 5680464, *5 (N.D. Cal. Oct. 3, 2016) (recognizing in the context of class certification that classification cases under the FLSA require a fact-intensive analysis), and the Secretary has not pointed to binding precedent that would render his position "obvious" enough to conclude that Defendants, as a matter of law, acted without subjective or objective good faith.  Defendants intend to put on fact witnesses at trial that will discuss, in detail, the efforts Defendants took to ensure that they complied with the relevant laws related to independent contractors as they were interpreted at the time when they implemented the independent contractor model.  All of that evidence will tend to show that Defendants acted in good faith.

### L.  An Injunction is an Extraordinary Measure Not Appropriate in Light of the Secretary's Failure to Show Substantial FLSA Violations.

The Secretary asks for a prospective injunction directing Defendants:

> "(1) to treat Drivers as employees; (2) to inform Drivers of their status and rights under the FLSA as employees; (3) to keep track of the hours worked by Drivers and otherwise comply with the recordkeeping requirements of Section 11(c)

of the FLSA; and (4) to pay Drivers in accordance with the minimum wage and overtime provisions of the FLSA, without making improper deductions to their pay or shifting employer costs to Drivers."

Pl.'s Mot. 34-35.

When faced with a request for injunctive relief, a Court "must weigh the finding of violations against factors that indicate a reasonable likelihood that the violations will not recur." *Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987).  Inherent in that inquiry is the foundational need for the Court to first find current violations, not simply allegations that they have occurred or might occur in the future.  And even where the Court has concluded that Defendant has violated the FLSA, it is not always presumed that injunctive relief will follow.  *See, e.g., Mitchell v. Hertzke*, 234 F.2d 183, 187-88 (10th Cir. 1956) (cited favorably and summarized in *Big Bear Market*, 825 F.2d at 1383, as "denial of injunctive relief was proper where proven violations were few, not made in bad faith, the employer had made extraordinary efforts to prevent recurrence, and no reasonable grounds existed for believing future violations would occur.").

Here, the Secretary seeks an injunction based on legal conclusions that he has not proved.  For the reasons explained earlier in this response, the Secretary has not established under the summary judgment standard that the drivers should be classified as employees.  Furthermore, even if the drivers are employees, the Secretary has not adequately demonstrated that Defendants have failed to comply with the minimum wage, overtime, or recordkeeping requirements set out in the FLSA.  In sum, the Secretary's request for an injunction is premature and would require the Court to assume conclusions that are inappropriate for summary judgment.

### IV. CONCLUSION

As noted in the arguments set out above and supported by the attached declarations, the Secretary is not entitled to summary judgment on any of the issues presented in his motion.

Page 35  **DEFENDANT S' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION**

Serious issues of material fact remain in dispute.  The summary judgment standard requires reasonable inferences to be drawn in Defendants favor, frustrating summary judgment here.

As a result, Defendants ask this court to deny Plaintiff's Motion for Partial Summary Judgment and Preliminary Injunction.

DATED this 16th day of February, 2018.

By:    s/Charles J. Paternoster
       Charles J. Paternoster, OSB No. 024186
       Telephone:  (503) 222-1812
       Of Attorneys for Defendants

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b),

54-1(c), or 54-3(e) because it contains 10,894 words, including headings, footnotes, and

quotations, but excluding the caption, table of contents, table of cases and authorities, signature

block, exhibits, and any certificates of counsel.

Page 1  **CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PROSPECTIVE INJUNCTION** was served on:

      Kate S. O'Scannlain, Solicitor of Labor
      Janet M. Herold, Regional Solicitor
      Susan Seletsky, Counsel for FLSA
      Elizabeth Hopkins, Senior Trial Attorney
      Marc A. Pilotin (Cal. Bar. No. 266369), Trial Attorney
      UNITED STATES DEPARTMENT OF LABOR
      90 7th Street, Suite 3-700
      San Francisco, CA 94103
      seletsky.susan@dol.gov
      pilotin.marc.a@dol.gov

      Attorneys for R. Alexander Acosta, Secretary of Labor

by the following indicated method or methods:

  **X**    by **mailing** a full, true, and correct copy thereof in a sealed, first-class postage-paid envelope, and addressed to the attorney as shown above, to the last-known office address of the attorney, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

  **X**    by **transmitting with electronic mail** a full, true, and correct copy thereof to the attorneys at the e-mail addresses shown above, which are the last-known e-mail addresses for the attorneys, on the date set forth below.

      DATED this 16th day of February, 2018.

                      s/Charles J. Paternoster
                      **Charles J. Paternoster**, OSB No. 024186
                      E-mail:  cpaternoster@pfglaw.com
                      PARSONS FARNELL & GREIN, LLP
                      1030 SW Morrison Street
                      Portland, Oregon 97205
                      Telephone:  (503) 222-1812
                      Facsimile:  (503) 274-7979

                      Attorneys for Defendants