THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

R. ALEXANDER ACOSTA,  Secretary
of Labor, U.S. Department of Labor,

                Plaintiff,

      v.

SENVOY, LLC., et al.,

                Defendants.

No. 3:16-cv-2293-PK

**FINDINGS AND RECOMMENDATION**

**PAPAK, Magistrate Judge:**

    Plaintiff R. Alexander Acosta, Secretary of Labor, brings this action against Defendants

Senvoy, LLC (Senvoy); Driver Resources, LLC; ZoAn Management, Inc. (ZoAn); and Gerald E.

Brazie, Jr., seeking injunctive relief, liquidated damages, and compensatory damages under the

Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206, 207, 211, 215, 216, and 217.  Plaintiff

contends that Defendants improperly treat Senvoy's delivery drivers as economically

Page -1-    FINDINGS AND RECOMMENDATION

independent contractors running their own small businesses, when in fact the drivers are Defendants' employees who depend on Defendants to earn a living.  Plaintiff asserts claims for violations of the FLSA's requirements on minimum wage, overtime, and recordkeeping.

Plaintiff now moves for partial summary judgment and for a prospective injunction prohibiting Defendants from continuing to violate the FLSA.  Defendants respond that disputed issues of material fact preclude summary judgment.  For the following reasons, I recommend granting in part Plaintiff's motion for partial summary judgment, holding that the drivers at issue here are employees, that Defendants acted willfully, and that Defendants are liable for liquidated damages.  I recommend denying Plaintiff's motion for partial summary judgment as to the retaliation claim.  I also recommend granting Plaintiff's motion for a prospective injunction ordering that Defendants comply with the FLSA's requirements as to the drivers.  Plaintiff should be ordered to submit a modified proposed injunction in accordance with these rulings.

## BACKGROUND

Brazie founded Senvoy[1] in 1999 after he had worked for almost ten years as an operations manager and dispatcher in the delivery service business.  Paternoster Decl., Ex. A, Brazie Dep. at 21, ECF No. 34-1.  Senvoy initially treated its drivers as employees.  Brazie Dep. 24.

Brazie testified that by 2009, "most of the [courier] companies moved to independent contractors," and "it was getting harder and harder to find employee drivers."  Brazie Dep. 42.  Brazie was "finding it impossible to compete" with delivery businesses that treated their drivers as independent contractors rather than employees, so Brazie decided to convert Senvoy's drivers

---

[1] The business was originally called Delivery Express and began operating as Senvoy in 2002. Pilotin Decl., Ex. 30, at 4.

into independent contractors. Brazie Dep. 43. He spent "the better part of a year researching the good and the bad, what got companies into trouble and what didn't, what was my competition doing locally, what was the competition doing on a national level, and started to craft this framework to put together this document." Brazie Dep. 43. While he was drafting the Driver Services Agreement (DSA) at issue here, Brazie talked to "people about issues they were having, or reading details of lawsuits . . . [and] audits," to find out what "got companies into trouble," and "tried to then craft what is our contract around that." Brazie Dep. 45. For example, Brazie found that although FedEx had been treating drivers as independent contractors for administrative purposes, such as taxes, "in practice . . .[FedEx was] directing them and . . . using them like they were employees." Brazie Dep. 45.[2]

After completing his draft DSA, Brazie concluded that he had created "a better mousetrap. I thought I was more thorough, covered what truly was the independent contractor model . . . ." Brazie Dep. 59. Brazie gave the completed DSA to his attorneys to put into "contract form." Brazie Dep. 75. Brazie testified, "we put everything plus the kitchen sink into the agreement," which is 48 pages. Brazie Dep. 83; Pilotin Decl., Ex. 4 (copy of DSA).

In 2010, Defendants began converting Senvoy's drivers from employees into independent contractors. Senvoy gave notice that it was terminating about 190 drivers, offering the terminated drivers the option of signing DSAs before their employment with Senvoy ended. *See* Pilotin Decl., Ex. 30, at 7-9.

---

[2] Plaintiff notes that Brazie incorporated several provisions from the FedEx driver agreement into the DSA. Pl.'s Mot. Summ. J. 3 n.1, ECF No. 28 (citing DSA provisions copied from the FedEx agreement, including DSA § 3.1, which assigns the driver a Primary Service Area, and DSA § 2.10(f), which requires the driver to comply with a code of conduct).

By treating drivers as independent contractors, Defendants avoid the FLSA's requirements to pay employees overtime and minimum wage, while drivers must pay the costs of owning or leasing a vehicle, such as fuel and insurance expenses. Defendants have continued to use essentially the same DSA form since 2010. Pilotin Decl., Ex. D, Brazie Dep. 74 (Defendants' current DSA is "largely the same agreement" as the original DSA).[3]

Brazie is the owner and chief executive of the other Defendants. Defendants Senvoy, Driver Resources, and ZoAn (the businesses Defendants) are all headquartered in a Portland building owned by Brazie. "Defendants do not dispute Brazie's control over the defendant businesses." Defs.' Response 28, ECF No. 33; Pilotin Decl., Ex. B, Theodore Snyder Dep. 151, 152 (operations manager for Senvoy testified that Brazie is "the boss" and ultimate decision maker).

Defendants work together to provide delivery services to Senvoy's customers in Oregon, Washington, and Idaho. Defendant Driver Resources, which essentially exists only on paper with no assets or employees, "provides Senvoy with all their contract drivers." Pilotin Decl., Ex. E, Jennifer Kahut Dep. 27, 29 (Driver Resources has no assets or employees); Kahut Dep. 20 (Driver Resources provides drivers to Senvoy). Jennifer Kahut, who had previously worked for Senvoy, is president of ZoAn, which oversees and administers Driver Resources, as well as providing administrative services for Senvoy. Pilotin Decl., Ex. E, Kahut Dep. 16. Kahut signs DSAs on behalf of Driver Resources. Driver Resources supplies drivers only to Senvoy, although Brazie had intended to "build a group of independent contractor drivers who would

---

[3] As noted in the text below, in January 2018, Defendants agreed to treat newly hired drivers as employees.

provide delivery services to courier companies other than just Senvoy.  Brazie spent years trying to sell the model but ultimately those efforts failed." Defs.' Resp. 4 (citations to Brazie Dep. omitted), ECF No. 33.

"Drivers' jobs are simple: they pick up Senvoy's customers' packages, either at a Senvoy location or from the customer, and then deliver them to another location specified by Senvoy, at the time specified by Senvoy." Pl.'s Mot. Summ. J. 9.  To become a driver for Senvoy, a person needs only a valid license, a vehicle suitable for package deliveries, and a clean criminal record. Pl.'s Reply 11.  Drivers are generally required to enter into the DSA under a registered business name.

Drivers may agree to work as route drivers or on-demand drivers.  Route drivers have planned, scheduled deliveries with stops "that are logistically connected in time and area for a specific grouping of customers." Pilotin Decl., Ex. H, Gary Conkey Dep. 20.  Defendants generally pay route drivers either per stop or a flat daily rate.  Pilotin Decl., Ex. G, Christine Lewis Dep. 65.  For example, one 2014 agreement provided that the route driver would be paid a flat rate of $160 per day.  Pilotin Decl., Ex. 3, at 000450.  Another route driver agreed to be paid $2.75 per stop.  Pilotin Decl., Ex. 5, at 001274.

On-demand drivers do not have regular or pre-scheduled work, but are assigned work as needed.  Conkey Dep. 20.  On-demand drivers are paid based on a percentage of the amount that the customer pays Senvoy.  Lewis Dep. 87-88. The DSA allows Defendants the "sole and exclusive right" to change pricing.  DSA § 15.16.  In addition to contract drivers, Senvoy employs about ten drivers who fill in as needed.  Pilotin Decl., Ex. B, Theodore Snyder Dep. 16. Their work is essentially the same as the contract drivers' work.

Senvoy requires drivers, whether under contract or employed, to purchase and wear uniforms, which include "pants, shirts, jacket, hat." Lewis Dep. 63. Drivers are also required to wear identification badges, which bear the Senvoy logo and a photograph of the driver with the word "Contractor" "in big, bold letters." Lewis Dep. 64. Defendants' DSAs require that drivers use specific types of vehicles for deliveries, such as a minivan or a 10-foot cargo van, depending on the route or types of packages. *See, e.g.*, Pilotin Decl., Ex. 3, at 449 (DSA requiring "minivan or equivalent size vehicle"); Ex. 5 (DSA requiring minivan); Ex. 24 (2015 DSA requiring use of 10-foot cargo van). However, drivers are not necessarily required to place a Senvoy sign on their vehicles. Lewis Dep. 64 (noting that a Medford, Oregon airport required signs on delivery vehicles).

Since 2008, the State of Oregon has determined several times that Defendants' contract drivers are employees and not independent contractors under Oregon law. *See* Pilotin Decl., Ex. 27 (2008 Employment Appeals Board decision finding Defendants' contract driver David Overfield was an employee); Ex. 32 (2009 settlement agreement between Senvoy and Employment Department in which Senvoy "acknowledges that any delivery service drivers used by Senvoy LLC or Dispatch LLC after December 31, 2007 are to be considered employees of Senvoy LLC for the sole purpose of Unemployment Insurance"); Ex. 28 (2012 Employment Department decision finding that Defendants' contract driver Erlinda Sage was not an independent contractor); Ex. 29 (2014 Employment Department decision finding that Defendants' contract driver Sharon Tovey was not an independent contractor); Ex. 30 (2015 Employment Department decision finding that Senvoy should be taxed as the employer of its couriers); Ex. 31 (2015 finding by Bureau of Labor and Industries compliance specialist that

Defendants' contract driver Sharon Padilla was an employee).[4]

In 2014, the Ninth Circuit issued two decisions holding that FedEx drivers were employees rather than independent contractors. *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1043 (9th Cir. 2014) (FedEx drivers were employees under Oregon's right-to-control test); *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F3d 981, 989-90 (9th Cir. 2014) (FedEx drivers were employees under California law). Brazie was familiar with these decisions.

In January 2018, the parties agreed to a Stipulated Injunction. ECF No. 26. In the Stipulated Injunction, Defendants agree "classify any newly engaged delivery drivers . . . as non-exempt employees," thereby giving newly hired drivers FLSA protection. Stipulated Inj. 1. The remaining issue is the correct classification for contract drivers who began working for Defendants before the January 2018 Stipulated Injunction.

## LEGAL STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d

---

[4] Although the Oregon rulings on the independent contractor issue are not binding here, they are instructive because Oregon law is similar to the FLSA on this issue. *See Gonzales v. Sterling Builders, Inc.*, No. 08-cv-943-BR, 2010 WL 1875620, at *8 (D. Or. May 6, 2010) (Oregon legal analysis on employee status is "not materially different" from FLSA analysis).

365, 369 (9th Cir. 1998). In evaluating a motion for summary judgment, this court must draw all

reasonable inferences in favor of the nonmoving party and may not make credibility

determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150 (2000).

## DISCUSSION

### I. Determining Employee Status Under the FLSA

The FLSA defines "employer" as "any person acting directly or indirectly in the interest

of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA defines "employee"

"any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA defines "to

employ" as "to suffer or permit to work." 29 U.S.C. § 203(g).

Courts construe the FLSA's protections for employees expansively. As the Ninth Circuit

recently explained, the FLSA is "'remedial and humanitarian in purpose. We are not here

dealing with mere chattels or articles of trade but with the rights of those who toil, of those who

sacrifice a full measure of their freedom and talents to the use and profit of others. . . . Such a

statute must not be interpreted or applied in a narrow, grudging manner.'" *Arias v. Raimondo*,

860 F.3d 1185, 1192 (9th Cir. 2017) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No.

123*, 321 U.S. 590, 597 (1944) (ellipses in *Arias*)). The FLSA's definition of "employee" "has

been called 'the broadest definition that has ever been included in any one act.'" *Torres-Lopez v.

May*, 111 F.3d 633, 638 (9th Cir. 1997) (quoting *United States v. Rosenwasser*, 323 U.S. 360,

363 n.3 (1945) (further citation and quotation marks omitted)).

"Whether a worker is an 'employee' under the FLSA is a question of law that rests on

factual findings about the economic reality of a worker's relationship to his or her employer."

Page -8-    FINDINGS AND RECOMMENDATION

*Solis v. Velocity Express, Inc.*, No. CV 09-864-MO, 2010 WL 3259917, at *2 (D. Or. Aug. 12,

2010) (*Velocity Express*).   Courts have found summary judgment motions appropriate for

determining whether workers are entitled to FLSA protections.   Pl.'s Mot. Partial Summ. J. 15 &

n.12 (citing, *inter alia*, *Slayman*, 765 F.3d at 1049).   "Whether an employer-employee

relationship exists depends upon the circumstances of the whole activity, and ultimately,

whether, as a matter of economic reality, the individuals are dependent upon the business to

which they render service." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981)

(citations and quotation marks omitted).   Workers bear the burden of showing that they are

employees protected by the FLSA.   *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 478

(N.D. Cal. 2017) (citing *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999)).

To determine whether workers are employees for FLSA purposes, this court may examine

the following six factors, although the factors are not exhaustive and no single factor is

dispositive.   *Sureway Cleaners*, 656 F.2d at 1370.   The six factors are:

> 1) The degree of the alleged employer's right to control the manner in which the
> work is to be performed; 2) the alleged employee's opportunity for profit or loss
> depending upon his managerial skill; 3) the alleged employee's investment in
> equipment or materials required for his task, or his employment of helpers; 4)
> whether the service rendered requires a special skill; 5) the degree of permanence
> of the working relationship; 6) whether the service rendered is an integral part of
> the alleged employer's business.

*Id.* (quoting *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)

(footnote omitted)).   "Importantly, a contractual label does not determine employment status, nor

does the subjective intent of the parties to a labor contract override the economic realities

reflected in the factors described above." *Tijerino v. Stetson Desert Project LLC*, No.

CV-15-2563-PHX-SMM (lead case), 2017 WL 9511247, at *2 (D. Ariz. June 21, 2017) (citing

Page -9-   FINDINGS AND RECOMMENDATION

*Driscoll Strawberry*, 603 F.2d at 755).

## II. Applying the Economic Reality Factors

Defendants contend that the contract drivers are working as economically independent entrepreneurs who are running their own delivery businesses. I disagree. Considering the evidence in the light most favorable to Defendants, I conclude as a matter of law that under the economic reality test, the drivers are Defendants' employees, entitled to the FLSA's protections.

### A. Defendants' Right to Control How Drivers Perform Their Work

The parties dispute the extent of Defendants' right to control the way drivers perform their work. I find that Defendants use several methods to effectively control the drivers' work.

Defendants require that drivers install a specific application on their cell phones, called "e-Courier," which uses GPS to track drivers. Lewis Dep. 129. Drivers who fail to activate e-Courier during their shifts, which would prevent Defendants from monitoring their deliveries, "would be in breach of their contract." Lewis Dep. 132. Theodore Snyder, an operations manager with Senvoy, spends about 80% of his time in his office monitoring deliveries. Pilotin Decl., Ex. B, Snyder Dep. 115. Jaime Wiggins, a manager with Senvoy, testified that he spent about 15% of his day interacting with drivers. Wiggins Dep. 25.

Defendants generally control the drivers' schedules. When drivers first enter into a DSA, they may choose available shifts, either 8 a.m. to 6 p.m., 9 a.m. to 7 p.m., noon to 8 p.m., or 5 p.m. to midnight. Kahut Dep. 55. Drivers must be available for work throughout their 10-hour shift. Lewis Dep. 155. Defendants require that drivers notify Senvoy when they begin their shift. On-demand drivers are required to log in with the dispatcher, who then sends the driver a daily manifest, which includes "the actual number of stops and number of packages on it." Kahut Dep.

Page -10-  FINDINGS AND RECOMMENDATION

56. Route drivers receive their delivery orders through daily manifests sent by Senvoy. Lewis Dep. 133. If Defendants attempt to contact a driver while the driver is on his or her shift, the DSA requires that the driver respond within 15 minutes. DSA § 1.3. If Senvoy notifies ZoAn or Driver Resources that a driver has not checked in by the beginning of the driver's shift, then the driver would be contacted to determine the reason for the failure to check in.

The parties dispute whether drivers are free to reject work. Defendants contend that on-demand drivers "are free to reject or accept any delivery offered to them." Defs.' Response 10. Plaintiff cites the testimony of Christine Lewis, a former employee of ZoAn, who stated that if a driver refused to accept work, at some point Senvoy "just wouldn't use them at all, because they couldn't count on them, you know, they have a business to run." Lewis Dep. 158. If a driver continued to refuse work, Defendants would send the driver a "breach letter." Lewis Dep. 159. In addition, as to route drivers, the DSA provides, "If Driver has agreed to provide route Driver Services, Driver may not reject the agreed-upon route work except as may otherwise be provided in this Agreement." DSA § 1.2.

The evidence weighs in favor of Plaintiff's assertion that a driver may not freely reject work. However, because of the other evidence establishing Defendants' effective control over drivers, I need not resolve whether route or on-demand drivers may refuse work without penalty.

Drivers must report to Senvoy's depots at specific times for "sorts" of the items to be delivered. For example, a driver who works on the A route, which starts at 8:00 a.m., would be required to load, scan, and process all items at the Senvoy warehouse by 8:00 a.m. Pilotin Decl., Ex. G, Lewis Dep. 164. The A route driver would be expected to return to Defendants' warehouse for sorting by about 11:40 a.m. Lewis Dep. 165.

Defendants argue that "Senvoy monitors *deliveries* because Senvoy has the contract with the customer and is responsible for tracking the delivery of the package for the customer. The monitoring is done to ensure the final result of the delivery, not to 'track the driver's every move.'" Defs.' Resp. 11-12 (citations to record omitted). Regardless of Defendants' proffered reasons for their assertion of control, Defendants do in fact monitor drivers throughout the work day by tracking deliveries. Courts have found that when a delivery service requires that its drivers report to locations at certain times, and monitors the drivers throughout their workday, these facts show control. *See, e.g.*, *Slayman*, 765 F.3d at 1043 (in holding FedEx drivers were employees under Oregon's right-to-control test, court found "FedEx can and does control the times its drivers can work")[5]; *Alexander*, 765 F3d at 989-90 (in holding that FedEx drivers were employees under California law, court found FedEx structured drivers' workloads so that they would have to work 9.5 to 11 hours per day, and required drivers to arrive and return to terminals at specific times)[6]; *see also Velocity Express*, 2010 WL 3259917, at *5 ("evidence that Velocity Express required its drivers to submit specific route forms and check-in with the company daily—and sometimes more frequently—is evidence from which a reasonable trier of fact could find that Velocity Express's requirements were a means of exercising control over its delivery drivers rather than merely a means of verifying that the work was completed").

Plaintiff has submitted other evidence of Defendants' control. Defendants prohibit

---

[5] Decisions applying Oregon law are instructive here because the analysis for determining employee status is essentially the same under Oregon and FLSA law. *See, e.g., Mathis v. Housing Auth. of Umatilla Cty.*, 242 F. Supp. 2d 777, 782-83 (D. Or. 2002).

[6] Decisions applying California law are also instructive here because the California test for employee status is similar to the FSLA test. *See Flores*, 250 F. Supp. 3d at 479 n.6 (noting "substantial overlap" between California law and the FSLA).

Page -12-  FINDINGS AND RECOMMENDATION

drivers from leaving a customer's package in their vehicles overnight. Instead, a driver must either deliver packages the same day or return the packages to Senvoy's depot by the end of their shift. Wiggins Dep. 64, 65. The DSA also requires that while a driver is on his or her shift, the driver may perform deliveries only for Senvoy. DSA § 2.6 (driver's equipment "shall be used by Driver exclusively for carriage of cargo for Customers of" Senvoy).

Defendants indicate that drivers do have control over their work, arguing that drivers may decide how to load and secure packages in their vehicles, choose their routes, and set the order of deliveries. Defs.' Mem. 15. However, the Ninth Circuit rejected similar arguments, noting that while FedEx "does not require drivers to follow specific routes or to deliver packages in a specific order," "the right-to-control test does not require absolute control." *Slayman*, 765 F.3d at 1043-44. The Ninth Circuit has found that "the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Narayan v. EGL, Inc.*, 616 F.3d 895, 904 (9th Cir. 2010) (citation and quotation marks omitted). In *Narayan*, the court explained that its holding on this issue, and similar holdings by other courts, "simply reflect the common-sense rule that, '[i]f an employment relationship exists, the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control.'" *Id.* (citation omitted). Similarly, in *Flores*, the district court noted that even if the delivery drivers at issue there "could control certain aspects of their work --i.e., lunch, vacation, which routes they accepted, and whether they delivered packages in the order listed on the manifest--their independence with respect to these minor tasks is not sufficient to establish their economic independence" under the FLSA. 250 F. Supp. 3d at 486.

Page -13- FINDINGS AND RECOMMENDATION

As a further indication of control, Defendants forbid drivers from speaking directly to Senvoy's customers about the customers' expectations, and drivers have no discretion to negotiate with customers. Senvoy "prefers" that its customers speak directly to Senvoy. Pilotin Decl., Ex. C, Wiggins Dep. 30.

Another sign of control is Defendants' unilateral ability to impose "charge-backs" on drivers. Charge-backs are monetary deductions from the compensation that would otherwise be due to the driver. Defendants contend that they impose charge-backs only to reimburse Senvoy for the cost of a driver's errors, such as missing a delivery. But Plaintiff presents evidence that Defendants use charge-backs to discipline drivers for perceived infractions, and that Defendants do not necessarily base the amount of the charge-back on the actual cost of the driver's error. *See* Snyder Dep. 135 (operations manager testified that amount of charge-backs varies "tremendously"). Jaime Wiggins, a manager for Defendants, sent an internal email to Defendants about a driver who had made a mistake on a delivery. Wiggins wrote that the driver "has to pay closer attention to this work, otherwise, we will look to increase the charge-backs until such time he figures this out and cares enough not to drop the ball like this." Pilotin Decl., Ex. C, Wiggins Dep. 68. When Plaintiff asked Wiggins about this email at his deposition, Wiggins testified, "I'm going to do whatever's necessary to get the work done; maybe just pull that work and have someone else do it." Wiggins Dep. 68. I find that charge-backs are another tool Defendants use to control drivers. *See Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-cv-00824-JWS, 2015 WL 1299369, at *3 (D. Ariz. Mar. 23, 2015) (noting delivery service's use of charge-backs to control and discipline its drivers).

Defendants also control drivers' appearance, requiring them to purchase and wear

Senvoy-approved uniforms and identification badges, "maintained in a clean and presentable fashion, free of damage and extraneous markings." DSA § 2.12. Courts have found that such "appearance requirements" are evidence of control over drivers. *Slayman*, 765 F.3d at 1043.

Defendants argue that Senvoy requires that drivers wear uniforms "only to the extent that the customer requires uniforms." Defs.' Resp. 11. Addressing a similar argument, the *Flores* court found that "the reasons behind the uniform requirement do not create a dispute regarding its existence." 250 F. Supp. 3d at 482 n.9 (citing *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013) ("The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control.")).

Defendants cite *Velocity Express*, in which this court concluded that disputed issues of material fact precluded granting the alleged employer-defendant's motion for summary judgment. I agree with Plaintiff that *Velocity Express* is legally and factually distinguishable. There, the drivers were allegedly able to negotiate rates of pay; could reject requests for on-demand deliveries without charge-backs; and were allowed to hire substitutes or assistants subject only to a background check. *Velocity Express*, at *2-4. I also note that this court decided *Velocity Express* before the Ninth Circuit issued its decisions in *Slayman* and *Alexander*. Considering the evidence of control in the light most favorable to Defendants, I find that the evidence weighs heavily in favor of Plaintiff's assertion that Defendants control the drivers' work. *See Flores*, 250 F. Supp. 3d at 486 (delivery drivers were employees under the FLSA when employer retained right to control all meaningful aspects of its delivery business, including driver and vehicle appearance, customer service expectations, timing of work, and the way work

was to be performed).

**B. Drivers' Ability to Profit Depending on Managerial Skill**

If a worker's opportunity for profit or loss depends more on the alleged employer's managerial skills than on the worker's own judgment and diligence, this factor weighs in favor of employee status. *Driscoll Strawberry*, 603 F.2d at 755; *Flores*, 250 F. Supp. 3d at 486. Here, Defendants argue that drivers can increase their profits by driving economical routes, using fuel-efficient vehicles, and hiring additional helpers. Defendants contend that the non-competition covenant in the DSA, DSA § 11, "merely prevents drivers from competing for Senvoy's customers." Defs.' Response 19.

I conclude, however, that drivers under Defendants' system have almost no ability to profit through their own managerial skills. As the district court observed in *Collinge*, "the drivers' opportunity for profit or loss depends more upon the jobs to which [the delivery service] assigns them than on their own judgment and industry." 2015 WL 1299369, at *4. For example, "'although selecting a fuel-efficient vehicle will likely reduce a driver's costs over the long run, there is little "managerial skill" involved in that decision.'" *Flores*, 250 F. Supp. 3d at 487 (quoting *Collinge*, 2015 WL 1299369, at *5). The drivers' ability to hire their own employees is strictly limited by Defendants' requirements that any person hired would be subject to Defendants' approval, and would be bound by the DSA. DSA § 4.2. *See Flores*, 250 F. Supp. 3d at 489 (courts "have rejected attempts to manufacture a dispute regarding employee status based on the fact that delivery drivers could hire helpers where it is undisputed that helpers must be approved by the alleged employer and are subject to all the same requirements as drivers") (citing *Alexander*, 765 F.3d at 994).

Page -16-   FINDINGS AND RECOMMENDATION

While the DSA allows drivers to work for other delivery services when not working for Senvoy, working for Senvoy on shifts of 10 or more hours a day would make working for another delivery service impractical at best. In addition, the prohibition on drivers carrying cargo during their shift for anyone other than Senvoy also limits the drivers' ability to work for another delivery service. Because Senvoy has a large customer base, with "hundreds of local retail, finance, and healthcare businesses" in the Portland area, the DSA's prohibition on drivers delivering to Senvoy's customers when the drivers are not working for Senvoy would make working for other delivery services difficult. Pl.'s Reply 6. In addition, the DSA includes a no-poach provision, which prohibits a driver from starting his or her own competing delivery service with other drivers for one year after termination of the driver's agreement. DSA § 11.1.

Senvoy negotiates the rates that its customers pay for delivery services, and does not disclose these rates to the drivers. Brazie Dep. 145. Defendants reserve the right to impose charge-backs on drivers at any time. Although Defendants contend that drivers are free to negotiate higher rates with Defendants (but not with Senvoy's customers), the evidence indicates that drivers have generally agreed to similar rates. Defendants have not presented evidence that drivers have negotiated higher pay rates or better terms than those in the standard DSA. Pl.'s Reply 6. The economic reality test looks not to what workers could theoretically do, but what they actually do. *Velocity Express*, at *6 & n.5 (citing *Sureway Cleaners*, 656 F.2d at 1371). In any event, an employee may request higher pay from his or her employer, so that ability by itself is not evidence that a driver is an independent contractor. I conclude that this factor favors Plaintiff.

### C. Worker's Investment in Equipment

In considering the investment factor, the Ninth Circuit compares "the alleged employee's investment relative to the alleged employer's investment." *Flores*, 250 F. Supp. 3d at 488 (citing *Driscoll Strawberry*, 608 F.2d at 755). As in *Flores*, here the drivers must invest in a personal vehicle and a cell phone, and pay for a uniform, fuel, and insurance. These investments are minuscule compared to Defendants' investments. To run their delivery business, Defendants have acquired and maintain warehouses, and must pay employees, rent, and other expenses, all of which total about $1.2 million per year. Pl.'s Mot. Partial Summ. J. 23 (citing Exs. 33-38, Defendants' tax returns between 2013 and 2015). This factor favors Plaintiff.

### D. Services Requiring Special Skill

Defendants contend that although "the mere act of driving a vehicle may not, in isolation, be considered a special skill, drivers rely on their own experience and managerial skills in running their businesses which does require specialized skills." Defs.' Resp. 21. But Defendants do not require that drivers have any particular education, training, or special license. "Rather, he or she just needs a license, an appropriate vehicle, and a clean background check." Pl.'s Reply 11. As the *Flores* court noted, "The Ninth Circuit has repeatedly held that delivery drivers do not need special skills to perform their work." 250 F. Supp. 3d at 490 (citing *Alexander*, 765 F.3d at 995). This factor favors Plaintiff.

### E. Permanence of Working Relationship

In considering the permanence factor, the Ninth Circuit has examined whether the worker provides services to the alleged employer continuously for a long period of time; whether the worker had a fixed employment period; and whether the worker offered services to different

Page -18-  FINDINGS AND RECOMMENDATION

employers. *Flores*, 250 F. Supp. 3d at 491 (citing *Torres-Lopez v. May*, 111 F.3d 633, 644 (9th Cir. 1997); *Sureway Cleaners*, 656 F.2d at 1372).    Here, the DSA sets a one-year term that renews automatically for additional one-year terms unless either party gives notice. DSA §§ 8.1 - 8.2.  This court has held that such automatic contract renewals are evidence that a worker is an employee. *Murphy v. Tuality Healthcare*, 157 F. Supp. 3d 921, 927 (D. Or. 2016) (applying FLSA standards to the plaintiff's claim under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301-4335); *see also Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976) (one-year contracts with routine renewals showed permanence). Here, the drivers have worked for Defendants an average of more than one year, with "many having worked for the company since at least 2013." Pl.'s Mot. Partial Summ. J. 24.  In addition, because drivers are generally required to work 10 hours or more per day, simultaneously working in another delivery job would be difficult.[7] *See Slayman*, 765 F.3d at 1047 (working 9.5 to 11 hours per day showed permanence).  The permanence factor favors Plaintiff.

### F.  Service Rendered as an Integral Part of the Alleged Employer's Business

Defendants argue that "delivery drivers are not integral to Senvoy's business" because Senvoy merely "arranges for the transportation of customers' packages and freight, but does not provide actual delivery services itself." Defs.' Response 22.  But without drivers, Senvoy would have no business.  Paternoster Decl., Ex. B, Conkey Dep. 68 (agreeing that Senvoy "couldn't do [its] business without the driver").  In applying the FLSA, this court looks past corporate form to the economic reality of the worker's relationship with the putative employer.  Here, the economic reality is that drivers are integral to Defendants' business.

---

[7] A few drivers contract to work two or three days per week.  Kahut Dep. 55.

I conclude that under the economic reality test, Plaintiff has shown as a matter of law that the drivers at issue here are Defendants' employees, not independent contractors. Plaintiff should be granted partial summary judgment on this issue.

## III.  Three-Year Statute of Limitations Under the FLSA

Plaintiff seeks summary judgment on the applicable statute of limitations. The FLSA applies a two-year statute of limitations unless the employer willfully violated the FLSA, in which case a three-year statute of limitations applies. *See Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (FLSA's two-year statute of limitations "may be extended to three years if an employer's violation is deemed 'willful'") (citing 29 U.S.C. § 255(a)), *cert. denied*, , ___ U.S. ___, 137 S. Ct. 2117 (2017) . "A violation is willful if the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA].'" *Id.* (quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (further citation omitted)). "An employer need not violate the statute knowingly for its violation to be considered 'willful' under § 255(a), although 'merely negligent' conduct will not suffice." *Id.* (citations omitted). The determination of the applicable statute of limitations is a purely legal issue. *Hugler v. Westside Drywall, Inc.*, 3:15-cv-02411-BR, 2017 WL 1027026, at *4 (D. Or. Mar. 14, 2017) (citing *Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691, 694 (9th Cir. 2003)).

Here, Defendants argue that Plaintiff has not shown willfulness. Defendants contend that when Brazie drafted the DSA in 2010, "the case law at the time did not favor [the Secretary's] current interpretation of the FLSA." Defs.' Response 30 (citing *Velocity Express*, 2010 WL 3259917 (denying the defendant's motion for summary judgment on the employment status of delivery drivers under similar facts); *Slayman*, 763 F.3d at 1040-41 (noting that in litigation from

Page -20-   FINDINGS AND RECOMMENDATION

2003-09, the Judicial Panel on Multidistrict Litigation (MDL) had ruled in favor of FedEx on

driver classification)).

If Plaintiff had brought this action in 2011, Defendants' argument on the unsettled nature

of the case law might be more persuasive.  But by 2016, when Plaintiff brought this action, the

Ninth Circuit had issued *Slayman*, reversing the MDL and clarifying the law in Oregon.

Although *Slayman* did not address the FLSA, as noted above Oregon law is very similar to

federal law on this issue.  Furthermore, the Oregon Department of Employment, also applying

Oregon law, had issued decisions finding that Defendants' drivers were employees.  *See* Pilotin

Decl., Ex. 27 (2008 decision finding driver was an employee); Ex. 32 (2009 settlement

agreement between Senvoy and Employment Department in which Senvoy "acknowledges that

any delivery service drivers used by Senvoy LLC or Dispatch LLC after December 31, 2007 are

to be considered employees of Senvoy LLC for the sole purpose of Unemployment Insurance");

Ex. 28 (2014 decision finding driver  was not an independent contractor).  Brazie was aware of

*Slayman* and the Oregon Employment Department decisions, but did not seek legal advice on

how these rulings might affect Defendants' compliance with the FLSA.  Brazie Dep. 199-200.

Under the undisputed facts, I conclude that Plaintiff have shown as a matter of law that

Defendants acted with reckless disregard to whether they were violating the FLSA.  Because

Defendants acted willfully, FLSA's three-year statute of limitations applies.  *See Flores*, 250 F.

Supp. 3d at 495 (defendants acted willfully when they had inquiry notice of violations but failed

to take "affirmative action to assure compliance with FLSA's requirements") (citing *Flores v.*

*City of San Gabriel*, 824 F.3d at 906) .

Page -21-  FINDINGS AND RECOMMENDATION

## IV. Liquidated Damages

Plaintiff seeks summary judgment on his claim that Defendants are liable for liquidated

damages for violating the FLSA.  Defendants assert a good-faith defense to liquidated damages.

This court has explained the FLSA's liquidated damages provision:

> The FLSA allows a claim for liquidated damages in the amount of unpaid
> overtime.  29 U.S.C. § 216(b) (employers who fail to pay overtime are "liable to
> the employee or employees affected in the amount of . . . their unpaid overtime
> compensation . . . and in an additional equal amount as liquidated damages.").
> Liquidated damages are remedial, not punitive, because they compensate
> employees for losses they may have suffered by not receiving their wages on time.
> *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 941 (8th Cir. 2008).
> As the Ninth Circuit recently stated, "[d]ouble damages are the norm; single
> damages are the exception.  Liquidated damages are mandatory unless the
> employer can overcome the difficult burden of proving both subjective good faith
> and objectively reasonable grounds for believing that it was not violating the
> FLSA."  [*Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014)]
> (citation and internal quotation marks omitted).  To avoid liquidated damages, the
> employer must demonstrate it "had an honest intention to ascertain and follow the
> dictates of the Act and that it had reasonable grounds for believing that its conduct
> complied with the Act."  *Local 246 Util. Workers Un. of Am. v. S. Cal. Edison
> Co.*, 83 F.3d 292, 298 (9th Cir.1996) (internal quotation marks and brackets
> omitted).

*Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1265 (D. Or. 2014).

Based on my conclusion that Defendants acted willfully, I find that Defendants cannot

show that they acted with sufficient good faith to prevent the imposition of liquidated damages.

*See Flores*, 250 F. Supp. 3d at 496 ("'a finding of good faith is plainly inconsistent with a finding

of willfulness'") (quoting *A-One Med. Servs.*, 346 F.3d at 920).  Because Defendants have not

met their burden of showing both subjective good faith and objective reasonableness,

Defendants are liable for liquidated damages, in amount to be determined at trial.

## V. Brazie's Personal Liability for FLSA Violations

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An "individual may be personally liable for FLSA violations if he or she exercises control over the nature and structure of the employment relationship or economic control over the relationship," and a "corporate officer may qualify as an employer if he or she had a significant ownership interest in the corporation with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; the power to determine salaries; or the responsibility to maintain employment records." *Velocity Express*, 2010 WL 2990293, at *2 (internal quotation marks and brackets omitted).

Here, it is undisputed that Brazie owns and controls the Defendant businesses. Brazie also controls the relationship between the drivers and Defendants, setting payment rates and retaining the power to hire and fire drivers. I conclude that Brazie qualifies as an employer under the FLSA and is therefore individually liable for the FLSA violations here.

## VI. Retaliation

Plaintiff moves for summary judgment on his claim for retaliation claim under the FLSA, 29 U.S.C. § 215(a)(3). The FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee [.]" 29 U.S.C. § 215(a)(3). "To prevail on a retaliation claim under the FLSA, a plaintiff must first make a prima facie showing that: (1) he engaged in activity protected

Page -23-  FINDINGS AND RECOMMENDATION

by the FLSA; (2) defendant took an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Stewart v. Masters Builders Ass'n of King and Snohomish Ctys.*, 736 F. Supp. 2d 1291, 1295 (W.D. Wash. 2010). As Judge Hernandez explained,

> The statute "protect[s] persons who report illegal conduct to government agencies or complain about such conduct to their employers, even though they have not yet instituted a formal proceeding." *Leonard v. St. Rose Dominican Hosp.*, 310 F.3d 653, 655 (9th Cir. 2002). The anti-retaliation provision is to be interpreted broadly to "give effect to the statute's remedial purpose." *Id*. It is designed to encourage employees to report alleged violations of the FLSA's substantive provisions without fear of reprisal. *See Lambert v. Ackerley*, 180 F.3d 997, 1004, 1008 (9th Cir. 1999) (remarking that the FLSA protects "employees who turn to the Labor Department or the courts for a remedy").

*Oak Grove Cinemas*, 68 F. Supp. 3d at 1247.

Here, Plaintiff argues that for the FLSA to be an effective remedy, the drivers must be free from the threat of retaliation if they choose to testify about Defendants' practices. Plaintiff contends that by treating the drivers as independent contractors, "Defendants have chilled the ability of Drivers to make complaints and institute proceedings to protect their rights under the FLSA." Pl.'s Reply 15. Plaintiff also characterizes Defendants' conversion of drivers from employees to independent contractors as "precisely the type of intimidation that the FLSA's anti-retaliation provision was designed to prevent." Pl.'s Reply 15-16.

I conclude that Plaintiff is not entitled to summary judgment on the retaliation claim. Plaintiff has not presented evidence that Defendants have taken an adverse employment action against any driver because of protected activity. Defendants' decision in 2010 to convert drivers into independent contractors is not evidence by itself that Defendants now would retaliate against drivers who cooperate with Plaintiff in this litigation. I recommend denying Plaintiff's motion

for partial summary judgment on the retaliation claim.

## VII. Prospective Injunction

Plaintiff contends that Defendants have committed multiple violations of the FLSA, justifying prospective injunctive relief under 29 U.S.C. § 217. This court has explained the standards for granting injunctive relief under the FLSA:

> "In deciding whether to grant injunctive relief, a district court must weigh the finding of violations against factors that indicate a reasonable likelihood that the violations will not recur." *Brock v. Big Bear Mkt. No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987). The court "must give substantial weight to the fact that the Secretary seeks to vindicate a public, not a private, right." *Brock v. Shirk*, 833 F.2d 1326, 1331(9th Cir. 1987) (internal quotation marks omitted), *vacated on other grounds, Shirk v. McLaughlin*, 488 U.S. 806 (1988). Although "the district court has discretion to deny injunctive relief in appropriate cases, this discretion is limited by consideration of the importance of prospective relief as a means of ensuring compliance with the provisions of the FLSA." *Id.*

*Oak Grove Cinemas*, 68 F. Supp. 3d at 1234.

Plaintiff argues that although Defendants have agreed as of January 2018 to classify new drivers as employees, Defendants have not shown a "dependable, bona fide intent to comply" with the FLSA, or to prevent recurring FLSA violations as to drivers who began working for Defendants before 2018. Pl.'s Reply 19 (quoting *Big Bear*, 825 F.2d at 1383). Given Defendants' history of treating drivers as independent contractors since 2010, I find that a prospective injunction is justified, requiring that Defendants comply with the FLSA's requirements for eligible drivers, include the provisions on recordkeeping, minimum wage, and overtime. As Judge Hernandez has noted, repeated violations weigh "heavily in favor of granting a prospective injunction." *Oak Grove Cinemas*, 68 F. Supp. 3d at 1266 (quotation marks and citation omitted).

**A. FLSA's Recordkeeping Requirements**

The parties dispute whether Plaintiff has shown as a matter of law that Defendants have violated the FLSA's recordkeeping provisions. The FLSA provides that an employer subject to the FLSA "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records . . . ." 29 U.S.C. § 211(c).

Defendants argue that they have "provided an accurate accounting of all of the amounts paid to the drivers as well as the hours those drivers were actively engaged in work-related activities." Defs.' Response 25. Defendants state that they have "produced literally thousands of pages of precise information relating to the hours worked and amounts paid to their drivers." Defs.' Response 26. Plaintiff responds that Defendants' argument is misleading because the information Defendants produced shows the amount paid to each driver and the date and time of each delivery, but does not show the number of hours that drivers worked per day or per week. I conclude that Plaintiff has shown that Defendants should be required in the prospective injunction to comply with the FLSA's recordkeeping requirements.

**B. FLSA's Minimum Wage and Overtime Pay Requirements**

Plaintiff brings claims against Defendants for violations of the FLSA requirements to pay employees a one-half overtime premium for each hour over 40 hours per week, 29 U.S.C. § 207, and to pay employees a minimum wage, 29 U.S.C. § 206. "The FLSA's minimum wage and overtime provisions are central among the protections the Act affords to workers." *Adair v. City of Kirkland*, 185 F.3d 1055, 1059 (9th Cir. 1999). Here, the evidence indicates that many drivers have agreed to work 10-hour days, six days a week, for 51 weeks per year, and are being paid a

flat daily rate or per delivery regardless of the number of hours worked per week.

Plaintiff does not seek summary judgment on the amount of damages caused by Defendants' violations of the FLSA's overtime and minimum wages requirements, reserving the determination of damages for trial. In the current motion, Plaintiff seeks prospective relief requiring that Defendants comply with the FLSA's overtime and minimum wage requirements. I conclude that Plaintiff is entitled to a prospective injunction requiring that Defendants comply with the FLSA's requirements on overtime and minimum wage.

### C. Form of the Prospective Injunction

I conclude that Plaintiff should submit a modified proposed prospective injunction that omits provisions regarding the retaliation claim. Because the injunction will order Defendants to comply with FLSA requirements, Defendants must necessarily comply with the FLSA's provisions forbidding retaliation.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment and Prospective Injunction, ECF No. 28, should be granted except as to the retaliation claim. Plaintiff should be ordered to submit a modified form of prospective injunction in accordance with this Findings and Recommendation.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and

Page -27- FINDINGS AND RECOMMENDATION

Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 31st day of July, 2018.

_____
Honorable Paul Papak
United States Magistrate Judge