# Exhibit 1



**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

MARTIN J. WALSH, SECRETARY OF LABOR,

      Petitioner,

Vs.                   CASE NO.: 3:16-CV-02293-HZ

SENVOY, LLC; DRIVER RESOURCES, LLC;
ZOAN MANAGEMENT, INC.; and
GERALD E. BRAZIE, JR.,

      Respondents.

_____





**DEPOSITION OF**

**GERALD E. BRAZIE, JR.**

**TAKEN ON**
**THURSDAY, OCTOBER 14, 2021**
**9:05 A.M.**

**620 SOUTHWEST MAIN STREET, ROOM 419**
**PORTLAND, OREGON  97205**



(800) 528-3335

NAEGELIUSA.COM

2

**APPEARANCES**

Appearing on behalf of the Petitioner:
NORMAN E. GARCIA, ESQUIRE
U.S. Department of Labor
90 Seventh Street, Suite 3700
San Francisco, CA  94103
(415) 625-7747
(415) 625-7772 (Fax)
Garcia.norman@dol.gov

Appearing on behalf of the Respondents.
CHARLES J. PATERNOSTER, ESQUIRE
Parsons Farnell and Grein LLP
1030 Southwest Morrison Street
Portland, OR  97205
(503) 222-1812
(503) 274-7979 (Fax)
cpaternoster@pfglaw.com

ALSO PRESENT:
Michael Mortland, U.S. Department of Labor

3

**INDEX**

| | Page |
|---|---|
| EXAMINATION BY MR. GARCIA | 8 |

4

**EXHIBITS**

| Exhibit | | Page |
|---|---|---|
| 1 | PERSONAL FINACIAL STATEMENT 06-30-2021 | 30 |
| 2 | DECLERATION OF FINANCIAL STATUS | 37 |
| 3 | STATEMENT SUMMARY | 41 |
| 4 | 06-30-2021 REAL PROPERTY TAX STATEMENT | 49 |
| 5.5 | OREGON PROPERTY RECORDS | 55 |
| 6 | POINTWEST CREDIT UNION ACCOUNT | 86 |
| 7 | CORPORATE BANKING STATEMENT | 106 |
| 8 | COLUMBIA BANK STATEMENT OF ACCOUNT | 110 |
| 9 | CORPORATE BANKING STATEMENT 04-30-2020 | 114 |

5

**EXHIBITS CONTINUED**

| Exhibit | | Page |
|---|---|---|
| 10 | PAYMENT INFORMATION 05-12-2020 | 117 |
| 11 | PAYMENT INFORMATION 05-14-2020 | 121 |
| 12 | PAYMENT INFORMATION 08-10-2021 | 125 |
| 13 | PAYMENT INFORMATION 09-10-2021 | 132 |
| 14 | CORPORATE BANKING STATEMENT DATED 06-30-2020 | 137 |
| 15 | DECLARATION OF GERALD E. BRAZIE | 142 |
| 16 | 12-31-2020 GENERAL LEDGER | 148 |
| 18 | 12-31-2020 GENERAL LEDGER | 152 |
| 17 | Exhibit 17 | 153 |
| 19 | 08-31-2021 GENERAL LEDGER | 154 |

**NAEGELI**
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
**(800)528-3335**
NAEGELIUSA.COM

6

```
1              EXHIBITS CONTINUED
2   Exhibit                         Page
3
4   20    08-31-2021 GENERAL LEDGER        155
5
6   22    PROPERTY ACCOUNT SUMMARY      52
7
8   23    12-31-2020 GENERAL LEDGER        176
9
10  24    08-31-2021 GENERAL LEDGER        181
11
12  100   SCAN OF CHECK             19
13
14
15
16
17
18
19
20
21
22
23
24
25
```

7

```
1               DEPOSITION OF
2              GERALD E. BRAZIE, JR.
3                  TAKEN ON
4          THURSDAY, OCTOBER 14, 2021
5                  9:05 A.M.
6
7        THE REPORTER:  The time is 9:05 a.m.  We
8   are now on the record.
9        Mr. Brazie, can I please have you raise
10  your right hand?
11       Do you solemnly swear or affirm under the
12  penalty of perjury that the testimony you're about
13  to give will be the truth, the whole truth, and
14  nothing but the truth?
15       MR. BRAZIE:  I do.
16       THE REPORTER:  Perfect.
17       And counsel, for the record, please state
18  your names and whom you represent.
19       MR. PATERNOSTER:  My name is Chip
20  Paternoster.  I represent all defendants in this
21  action.
22       MR. GARCIA:  My name is Norman Garcia,
23  Office of Solicitor for the Secretary of Labor,
24  United States Department of Labor.
25       THE REPORTER:  Counsel, you may proceed.
```

8

```
1   GERALD E. BRAZIE, JR., having been first duly sworn,
2   was examined and testified as follows:
3   EXAMINATION
4   BY MR. GARCIA:
5        Q.  Good morning, Mr. Brazie.
6        A.  Good morning.
7        Q.  Please state your full name for the
8   record.
9        A.  Gerald Edward Brazie, Jr.
10       Q.  Please spell your first and last name.
11       A.  G-E-R-A-L-D B-R-A-Z-I-E.
12       Q.  Please state your full legal name for the
13  record.
14       A.  Gerald Edward Brazie, Jr.
15       Q.  Mr. Brazie, what I'm going to do today is
16  I'm going to go over -- I know that you've taken --
17  we've taken your deposition before but it's been a
18  couple of years.  I will go over the rules of the
19  deposition and then we'll get into the questions.  I
20  will show you documents.  I will have the court
21  reporter mark the documents.  I will also give a
22  copy to your counsel and then I will ask you
23  questions about them.
24       Now, you've been sworn in by a court
25  reporter the same oath, and given an oath and taken
```

9

```
1   an oath, the same oath that you would do in the
2   court of law.  The court reporter is going to
3   transcribe everything you say.  Because this
4   testimony is being transcribed, it's important that
5   you answer orally with words as opposed to sounds
6   like uh-huh, unh-unh or gestures, like shaking your
7   head, shrugging your shoulders.
8        As the court reporter just identified,
9   because it's oral testimony that's being
10  transcribed, it's important that only one person
11  talk at a time.  Now, even though he said that and I
12  said that, inevitably during the course of the
13  deposition someone is going to do that because you
14  anticipate an answer or I thought you were done
15  answering, whatever.  So please try to keep that at
16  a minimum.
17       This is not an endurance contest.  I don't
18  have bright lights behind me, you know, shining in
19  your face trying to blind you.  If you need to take
20  a break, then please ask and we will take a break.
21  You can take a break because you need to go to the
22  restroom, smoke a cigarette, or you just need a
23  break.
24       The only exception to that is if I'm in
25  the middle of a question and there's a question
```

14

1    Q.   You said your assistant Brooke pays the
2  rent.
3    A.   Mm-hmm.
4    Q.   How did that come about?
5    A.   She pays all of my bills.
6    Q.   Your personal bills?
7    A.   Yes.
8    Q.   And from what accounts does she pay your
9  personal bills?
10    A.   I don't know.
11    Q.   Who is she employed by?
12    A.   ZoAn Management.
13    Q.   Does she have authority over your personal
14  bank accounts?
15    A.   I don't know.
16    Q.   You don't know if she has authority over
17  your personal bank accounts; is that a correct
18  understanding?
19    A.   Yes.
20    Q.   On August 24, there was a hearing held in
21  Portland; correct?
22    A.   Yes.
23    Q.   And at that hearing the court found you in
24  contempt; correct?
25    A.   Yes.

15

1    Q.   And at that court hearing the court
2  ordered the debtor's exam that we're in today;
3  correct?
4    A.   Yes.
5    Q.   And at that hearing the court ordered you
6  -- or strike that.
7         At the hearing the court ordered you to
8  produce documents and later that day it ordered them
9  to be produced by September 24th; correct?
10    A.   Yes.
11    Q.   And at that hearing the court admonished
12  you to give full and complete disclosure; correct?
13    A.   Yes.
14    Q.   And as you sit here today, you're saying
15  you don't know what account is used to pay your
16  personal bills; correct?
17    A.   Correct.
18    Q.   And is it all of your personal bills?
19    A.   Yes.
20    Q.   And how is it that she receives your
21  personal bills, Brooke?
22    A.   I don't know.
23    Q.   Do you personally pay any of your personal
24  bills?
25    A.   No.

16

1    Q.   Does Brooke pay your credit card bills?
2    A.   Yes.
3    Q.   Did you look at the documents that I
4  provided to the court?
5    A.   Yes.
6    Q.   And did you see that Senvoy was paying
7  your credit card bills?
8    A.   Yes.
9    Q.   Does that refresh your memory of what
10  account is used to pay your bills?
11    A.   I don't know which account is used to pay
12  what bill.
13    Q.   Does that refresh your memory as to what
14  company pays your bill?
15    A.   I can assume which company does.  I don't
16  know.
17    Q.   Well, if you looked at the documents I
18  provided, it identified that Senvoy was paying your
19  bills; correct?
20    A.   Yes.
21    Q.   And at the court, I identified that you
22  were using Senvoy as your piggybank -- strike that.
23         At the court hearing on August 24th, I
24  identified that Senvoy -- or correction.  Start over
25  again.

17

1         On August 24th, at the hearing, I
2  identified that Senvoy was being used as a piggybank
3  to pay your bills; correct?
4    A.   Yes.
5    Q.   Did you ever look into that?
6    A.   No.
7    Q.   Why not?
8    A.   I didn't.
9    Q.   And I'm asking you why?
10    A.   No reason.  I didn't.
11    Q.   Did you have any reason to doubt what I
12  said?
13    A.   No.
14    Q.   Did you look at the documents that were
15  provided to me since that hearing?
16    A.   Yes.
17    Q.   Did you look at the general ledgers?
18    A.   No.
19    Q.   What documents did you look at?
20    A.   I looked at most of what went,
21  specifically on the general ledgers, I didn't.  It
22  was just so voluminous.
23    Q.   Did you look at the credit card
24  statements?
25    A.   In detail?  No.

18

1    Q.  Did you look at the credit card statements
2  to identify who was paying your personal bills?
3    A.  No.
4    Q.  Is there any bills that Brooke does not
5  pay?
6    A.  Not that I'm aware of.  No.
7    Q.  And did you authorize Bill to pay -- or
8  strike that.
9        Did you authorize Brooke to pay your
10  personal bills?
11    A.  Yes.
12    Q.  Did you instruct her to pay your personal
13  bills?
14    A.  Yes.
15    Q.  Did you instruct her on what accounts to
16  use to pay your personal bills?
17    A.  No.
18    Q.  And you don't know whether -- strike that.
19        You had personal bank accounts; correct?
20    A.  Yes.
21    Q.  What banks do you have them in?
22    A.  Columbia Bank.  I believe they're at
23  Columbia Bank.
24    Q.  And do you know how much money has been in
25  Columbia Bank?

19

1    A.  No.
2    Q.  Do you know whether it's been more than
3  $1,000?
4    A.  I don't.
5    Q.  Have you written any checks in Columbia
6  Bank within the last two years?
7    A.  I have not.  No.
8    Q.  Have you signed any checks from Columbia
9  Bank within the last two years?
10    A.  I don't know.
11        MR. GARCIA:  I'm going to go out of order,
12  Court Reporter.
13        Can you mark this document as Exhibit 100?
14        THE REPORTER:  Yes, sir.
15        It's been marked as such, sir.
16        (WHEREUPON, Exhibit 100 was marked for
17  identification.)
18  BY MR. GARCIA:
19    Q.  Mr. Brazie, I want you to look at the
20  bottom check on Exhibit 100.
21        Do you recognize that check.
22    A.  Yes.
23    Q.  Did you sign that check?
24    A.  Yes.
25    Q.  What is the date of the check?

20

1    A.  5-20-20.
2    Q.  What is the amount of the check?
3    A.  $30,000.
4    Q.  So you signed a check from Columbia Bank
5  in the last two years; correct?
6    A.  I did.  Yes.
7    Q.  That's quite a big check, $30,000;
8  correct?
9    A.  Yes.
10    Q.  Why did you write that check?
11    A.  This is my insurance broker who loaned me
12  the money to -- a couple years ago to make my down
13  payment for my insurance.
14    Q.  Did you also buy a Ford Shelby from this
15  person?
16    A.  No.
17    Q.  Who is the B. Ludwick that you bought the
18  Ford Shelby from, or who is the second credit?
19    A.  That's this Brian Ludwick and he has the
20  Shelby as additional collateral.
21    Q.  Okay.  And how much of a loan did you take
22  from Mr. Ludwick?
23    A.  I'm sorry?
24    Q.  How much of a loan did you take from Mr.
25  Ludwick?

21

1    A.  I don't remember the exact amount.
2    Q.  Are you still paying on that loan?
3    A.  I am.
4        MR. GARCIA:  Counsel, the loan wasn't
5  provided to me.
6        Do you acknowledge that, counsel?
7        THE WITNESS:  I believe it's on there as
8  -- on the personal financial statement.  I believe
9  it's got an amount owed but I can't remember.
10  BY MR. GARCIA:
11    Q.  I'm talking about the actual document of
12  the loan --
13    A.  There is no document.  It's a handshake
14  agreement.
15    Q.  A handshake agreement?
16    A.  Correct.
17    Q.  And how much was this handshake agreement
18  for?
19    A.  Specifically, I don't remember.  I don't
20  know.
21    Q.  I see.  So you have a handshake agreement
22  that you paid $30,000 on and you don't remember what
23  the amount of the agreement was?
24    A.  I don't.
25    Q.  So how do you know you owe him more money?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

22

1    A.   It's -- we have it documented what we owe.
2    Q.   And where is it documented?
3    A.   I don't know.
4    Q.   So you're saying -- then why didn't you
5    produce the document of what you owe?
6    A.   I don't know why we would not.
7        MR. GARCIA:  Counsel this amount of this
8    loan, the document of this loan and how much is owed
9    has not been produced.
10       MR. PATERNOSTER:  I'm not sure there is a
11   document.
12       MR. GARCIA:  He just -- he just told me.
13       THE WITNESS:  There is no document for the
14   loan.
15       MR. GARCIA:  He just told me
16       THE WITNESS:  there is no document for the
17   loan.  There would be documentation for what I owe
18   him in the financials.
19   BY MR. GARCIA:
20       Q.   Is that in the personal financial
21   statement you produced; do you know?
22       So the Ford Shelby that you gave as
23   collateral, when did you give it as collateral?
24       A.   Probably around 2018.
25       Q.   And is there any document that's showing

23

1    that it's been given as collateral?
2        A.   No.
3        Q.   Does Mr. Ludwick have any ownership
4    interest in the Ford Shelby?
5        A.   No.
6        Q.   What's stopping you from taking the Ford
7    Shelby back?
8        A.   I still owe him however much I do.
9        Q.   Right.  But there's no documentary record
10   of that; correct?
11       A.   Correct.
12       Q.   Any other?
13       A.   Other than he holds the title I should
14   say.  He has the title.
15       Q.   He has the title?
16       A.   Yes.
17       Q.   Is the title in his name?
18       A.   No.
19       Q.   But you can go to a DMV and get another
20   copy of the title; correct?
21       A.   I could.
22       Q.   So him having the title has no legal of
23   consequence; correct?
24       A.   No.  Legally, no.  Functionally, yes;
25   legally, no.

24

1        Q.   Have you written any other checks on
2    Columbia Bank?
3        A.   I don't know.
4        Q.   Do you write checks on Columbia Bank
5    often?
6        A.   I do not.  No.
7        Q.   And you don't know if Brooke has signatory
8    authority over your Columbia Bank account; right?
9        A.   I don't know if she does on my personal
10   account; correct.
11       Q.   So I understand -- I'm just going to
12   summarize what I understand that you just -- I'm
13   going to go back to the house or the location that
14   you're renting.
15       Is that a house, a townhouse, a
16   condominium?
17       A.   A house.
18       Q.   How many acres?
19       A.   It's on a lot.
20       Q.   Thank you.  And again, you can estimate
21   what it is.
22       So my understanding is you're renting a
23   house on a lot in Franklin, Tennessee.  You don't
24   know how much the rent is, you don't know who the
25   rent is being paid to, you don't know who is paying

25

1    the rent.  Is that a correct understanding?
2        A.   I believe the rent is $4,000.
3        Q.   Okay.  Is everything else correct in what
4    I just said?
5        A.   Yes.
6        Q.   When did you move to Tennessee?
7        A.   November of 2020.
8        Q.   Before or after you signed the declaration
9    of financial status that you provided to me through
10   your counsel?
11       A.   I don't know.
12       Q.   Now, when you moved to Tennessee, what
13   mode of transportation did you use?
14       A.   I drove.
15       Q.   Okay.  Were you working while you were
16   driving?
17       A.   Yes.
18       Q.   So how did that work?  Were you
19   dispatching drivers while you were driving?
20       A.   Much of what I do when I'm not dispatching
21   and when I am dispatching is on the phone.
22       Q.   So you --
23       A.   So on an average day I'll be on the phone
24   for five or six hours.
25       Q.   So you were driving -- so you were on the

26

1  phone while you were driving cross country from
2  Portland to Tennessee?
3      A.  Yes.
4      Q.  And is that your personal phone?
5      A.  No.
6      Q.  Is that a business phone?
7      A.  Yes.
8      Q.  What is the telephone number of that
9  phone?
10     A.  (503) 209-2000.
11     Q.  And you said that's a business phone.
12  Which company of yours controls that phone?
13     A.  Senvoy.
14     Q.  So Senvoy would have phone records for
15  that phone; correct?
16     A.  Yes.
17     Q.  And these records would show you being on
18  the phone five to six hours a day?
19     A.  I don't know that it would show five or
20  six hours in total minutes.  It would show sporadic
21  calls throughout the day.
22     Q.  Now, before we identified that there was a
23  court hearing on August 24 and the court ordered you
24  to produce documents; correct?
25     A.  Yes.

27

1      Q.  And the court admonished you to have full
2  and complete disclosure; correct?
3      A.  Yes.
4      Q.  And at the hearing I voiced concern that
5  documents would not be fully disclosed; correct?
6      A.  Yes.
7      Q.  And the court doubled down, if you will,
8  to admonish you to have full and complete
9  disclosure; correct?
10     A.  Yes.
11     Q.  And instructed you to provide all the
12  financial records; correct?
13     A.  Yes.
14     Q.  Okay.  And on, excuse me, do you know on
15  August -- correction.  And so the court in written
16  order gave you 30 days to produce documents;
17  correct?
18     A.  I believe so.  Yes.
19     Q.  And do you know how many pages of
20  documents were produced on September 24 by your
21  counsel to me?
22     A.  I don't.
23     Q.  Would it surprise you to know that it was
24  less than 800 pages?
25     A.  It would not.

28

1      Q.  And why is that?
2      A.  It would surprise me to know that it was
3  800 pages.
4      Q.  That much?
5      A.  Yes.
6      Q.  Okay.  It's less than that.
7      MR. PATERNOSTER:  Seven sixty five.
8      MR. GARCIA:  I just rounded.
9  BY MR. GARCIA:
10     Q.  And subsequent to that date you produced
11  over 6,000 or 6,300 more pages on September 30;
12  correct?
13     A.  Yes.
14     Q.  Why didn't you produce those -- strike
15  that.
16         And those pages were documents like
17  general disclosures and further bank statements,
18  things of that nature; correct?
19     A.  Yes.
20     Q.  Why didn't you -- strike that.
21         Why weren't these documents produced on
22  September 24th?
23     A.  Without clear instructions on exactly what
24  is being asked for, I gave you everything that in
25  any other insurance in my 25 years of business

29

1  experience when someone asks me for my financial
2  disclosures and information I provided all of that
3  to you.  That's my only experience providing
4  financial information so I went off of that from
5  that perspective.
6      Q.  But the court ordered you for all
7  financial documents, not just financial disclosure
8  documents; correct?
9      A.  Yes.  From a business perspective, I
10  provided you everything that we would call financial
11  information, from my perspective.
12     Q.  So you don't call general ledgers
13  financial information from your perspective?
14     A.  It wouldn't be -- it wouldn't be something
15  that I would -- that I would, that you would provide
16  when someone asks for a financial package.
17     Q.  Okay.  But you understand I wasn't -- the
18  court wasn't asking you for a financial package.
19  The court was ordering you to produce all financial
20  documents; correct?
21     A.  I do now.  Yes.
22     Q.  And subsequent to September 30th, you also
23  produced documents that were produced to me on
24  October 11th and October 12th; correct?
25     A.  Yes.

30

1    Q.   And those included American Express bank
2    statements?
3    A.   Yes.
4         MR. GARCIA:  Court Reporter, please mark
5    this next document as Exhibit 1.
6         THE REPORTER:  Exhibit 1, sir?
7         MR. GARCIA:  Yes.
8         THE REPORTER:  It's been marked as such.
9         MR. GARCIA:  Please provide it to the
10   witness.
11        THE REPORTER:  Yes, sir.
12        (WHEREUPON, Exhibit 1 was marked for
13   identification.)
14   BY MR. GARCIA:
15   Q.   Mr. Brazie, do you recognize that
16   document?
17   A.   Yes.
18   Q.   What is it?
19   A.   My personal financial statement.
20   Q.   Did you help to prepare that?
21   A.   Yes.
22   Q.   Is the information on it true and correct?
23   A.   I believe so.
24   Q.   Is the information on it complete?
25   A.   I believe so.

31

1    Q.   Now, I notice that TKM Investment
2    Properties is not located on it; correct?
3    A.   Correct.
4    Q.   Why?
5    A.   There is no value in TKM.
6    Q.   So no value in TKM Investment Properties?
7    A.   Excuse me.  I'm sorry.  There -- I'm
8    sorry.  When we did this there's no -- TKM
9    essentially has no assets, no longer has any value.
10   Q.   Well, you identified the other three
11   companies have zero assets and value; right?
12   A.   Correct.
13   Q.   So why wasn't TKM Investment Properties
14   listed?
15   A.   The other companies are still -- are still
16   operating.
17   Q.   Well, you just said it was not provided
18   because it had no assets.
19   A.   Correct.  No longer operating, doesn't
20   have any assets.
21   Q.   Oh, okay.
22   A.   There's no value.
23   Q.   So, okay.  So now you're changing it to no
24   longer operating and no assets; correct?
25   A.   Yes.

32

1    Q.   Who prepared Exhibit 1?
2    A.   Brooke Wiggins.
3    Q.   Did you verify the information in it?
4    A.   Yes.
5    Q.   How did you do so?
6    A.   We went through item by item.
7    Q.   And did you look at documents to verify
8    the information?
9    A.   I did not.
10   Q.   So how do you know it's true and accurate?
11   A.   I took her word for it.
12   Q.   So you actually don't know; correct?
13   A.   Correct.
14   Q.   So you produced a financial statement
15   based on a court order and you did not even take the
16   time to verify any of the information on it with
17   documents?
18   A.   No.
19   Q.   Is that a correct statement?
20   A.   That is a correct statement.
21   Q.   Why not?
22   A.   Brooke does all of this for me.
23   Q.   So --
24   A.   So she would know the number better than I
25   would.

33

1    Q.   People make mistakes; correct?
2    A.   They do.
3    Q.   And financials usually have documents
4    attached to them; correct?
5    A.   They do.
6    Q.   And yet you didn't look at any documents
7    and you put your total faith in Ms. -- is Brooke her
8    first name or last name?
9    A.   First name.  Yes, correct.
10   Q.   What is her last name?
11   A.   Wiggins.
12   Q.   Have all the documents that have been used
13   to come up with the figures at Exhibit 1, have they
14   been produced to me?
15   A.   I don't know.
16   Q.   Did you instruct Ms. Wiggins?
17        So for the record, since I found out
18   Brooke is the first name -- I should have asked it
19   before.  I apologize -- I will now refer to Brooke
20   as Ms. Wiggins.
21        Did you ask Ms. Wiggins if she provided to
22   you all the documents that would support the numbers
23   in Exhibit 1?
24   A.   Yes.
25   Q.   And what did she say?

34

1    A.   She said yes.
2    Q.   And when did you ask her about that?
3    A.   Over the last few weeks.
4    Q.   Did you ask her about that prior to when
5    you made the first production on September 24th?
6    A.   Specifically, I don't know.
7    Q.   How about before you made a subsequent
8    document production on September 30th?
9    A.   Again, specifically, I don't know.  The
10   conversation has always been we need to provide any
11   and everything that we have available.
12   Q.   And did you give her that instruction
13   before 9-24?
14   A.   I don't know.
15   Q.   You just said the instruction has always
16   been to provide everything that you have available.
17   A.   Yes.
18   Q.   So now you're walking that back and saying
19   you don't know if you gave that to her    before
20   9-24?
21   A.   No.  At 9:24, the definition of what we
22   thought was required changed.  So up until 9-24 I
23   gave her instructions to provide all of our
24   financial information as if -- like she normally
25   would, which is what she did.

35

1    Q.   Okay.
2    A.   Subsequent to that then, when we became
3    aware that it needed to be a deeper dive then those
4    instructions changed.
5    Q.   And you didn't understand from the court
6    that it had to be a deeper drive before you produced
7    the documents on 9-24?
8    A.   Correct.
9    Q.   Why is the document -- is it updated June
10   30, 2021 when you were producing the document on
11   September 24, 2021?
12   A.   I don't know.
13   Q.   Did you ask Ms. Wiggins why it was only up
14   to the end of the second calendar quarter of 2021?
15   A.   I believe I did.
16   Q.   Okay.  And what was her response?
17   A.   Specifically, I don't remember the
18   response so I'll say I believe this was the last
19   updated set of numbers that we had.  So that's what
20   we used.
21   Q.   And in terms of her updating numbers, she
22   knew what the value of your properties were?
23   A.   No.
24   Q.   Well, where did those numbers come from?
25   A.   She got them from me.

36

1    Q.   And how about the values of the cars?
2    Where did she get those numbers from?
3    A.   She would have got that from me.
4    Q.   And so were those values as of what date
5    for the homes, the real property?
6    A.   Probably, specifically, I don't know.
7    Prior to June 30th.
8    Q.   Where did you get those numbers from?
9    A.   Best guess.
10   Q.   Best?
11   A.   What I believe them to be worth.
12   Q.   Did you do any research about -- to try to
13   find out how much they were worth?
14   A.   No.  I work in the business.  I understand
15   -- I'm going to be close on what the value of these
16   are.
17   Q.   Did you look at any property tax records
18   or assessments to see --
19   A.   No.
20   Q.   -- what the counties value they to be
21   worth?
22   A.   No.
23   Q.   Instead you just relied on your gut as to
24   what you feel they were worth?
25   A.   I relied on my brain.

37

1    Q.   Okay.  So did you rely on any
2    documentation?
3    A.   No.
4    Q.   None whatsoever; correct?
5    A.   Correct.
6    Q.   So there's no way to evaluate how you came
7    up with these numbers; correct?
8    A.   Correct.
9    MR. GARCIA:  Court Reporter, could you
10   please mark the next document as Exhibit 2?
11   THE REPORTER:  It's been marked as such,
12   sir.
13   (WHEREUPON, Exhibit 2 was marked for
14   identification.)
15   BY MR. GARCIA:
16   Q.   Mr. Brazie, do you recognize this document
17   that's been marked as Exhibit 2?
18   A.   Yes.
19   Q.   What is it?
20   A.   A declaration of financial status.
21   Q.   And can you look at the second to the last
22   page, the signature page?  Do you recognize the
23   signature on that page?
24   A.   Yes.
25   Q.   Whose is it?



38

1      A.   Mine.
2      Q.   And did you sign this document on November
3  11, 2020?
4      A.   Yes.
5      Q.   Were all the statements on that document
6  true and correct?
7      A.   To the best of my knowledge, yes.
8      Q.   So there's financial information on this
9  statement.  Where did that financial information
10  come from?
11     A.   Brooke Wiggins.
12     Q.   So Ms. Wiggins filled this out?
13     A.   Yes.
14     Q.   The financial information?
15     A.   Yes.
16     Q.   And did you verify the information on it?
17     A.   We went through it.  Yes.
18     Q.   So I'm going to phrase my question a
19  little differently.  When I say verify, meaning did
20  you actually look at documents to verify that the
21  amounts in Exhibit 2 were true and correct?
22     A.   No.
23     Q.   Why not?
24     A.   Brooke did it for me.
25     Q.   So you're saying you're willing to put

39

1  yourself into her hands when you signed under
2  penalty of perjury that's true and correct?
3      A.   To the best of my knowledge; correct.
4      Q.   Right.  But you didn't do any due
5  diligence to check the numbers; correct?
6      A.   I wouldn't.  She would do that for me.
7      Q.   And you didn't do any due diligence to
8  check and compare the numbers in Exhibit 2 to actual
9  documents; correct?
10     A.   Correct.
11     Q.   And you didn't do any due diligence to
12  check the numbers in Exhibit 1 to actual documents;
13  correct?
14     A.   Correct.
15     Q.   Let's look at the last page of Exhibit 2.
16          Who determined the values for the --
17     A.   I did.  Oh, sorry.
18     Q.   That's okay.  I'm going to start over the
19  question again just to make sure we have a clear
20  record.
21          Who determined the values on the last page
22  of Exhibit 2 for the cars?
23     A.   I did.
24     Q.   What did you base that upon?
25     A.   My own knowledge.

40

1      Q.   Did you base it upon any documents?
2      A.   No.
3      Q.   Now, we previously discussed that you said
4  that TKM Investments had no assets.  Let me start
5  over.
6          You previously identified that TKM
7  Investment Properties, LLC had no assets; correct?
8      A.   Yes.
9      Q.   And the statement would be as of June 30,
10  2021; correct?
11     A.   Yes.  Correct.
12     Q.   So that's telling me that TKM Investment
13  Properties, LLC had no assets as of that date;
14  correct?
15     A.   Correct.
16     MR. PATERNOSTER:  Can we -- I'm sorry.
17  Just on record, just for the sake of clarity, is TKM
18  Investments in receivership right now?
19     THE WITNESS:  Yes.
20     MR. PATERNOSTER:  I believe everyone is
21  aware of that.  That receivership information has
22  been provided.
23     THE WITNESS:  Right.
24     MR. GARCIA:  Court Reporter, please mark
25  the next exhibit as Exhibit 3.

41

1          THE REPORTER:  It's been marked as such,
2  sir.
3          (WHEREUPON, Exhibit 3 was marked for
4  identification.)
5  BY MR. GARCIA:
6      Q.   Mr. Brazie, do you recognize the document
7  in Exhibit 3?
8      A.   Yes.
9      Q.   What is it?
10     A.   United Community Credit Union Bank
11  account.
12     Q.   And who opened that bank account?
13     A.   Brooke.
14     Q.   Okay.  And what is the date of that
15  statement at Exhibit 3?
16     A.   8-31-2021.
17     Q.   Right.  So it's the August statement from
18  August 1, 2021 to August 31, 2021; correct?
19     A.   Correct.
20     Q.   And it's a bank statement for TKM
21  Investment Properties, LLC; correct?
22     A.   Correct.  Yes.
23     Q.   And it shows a balance of $192,242.59;
24  correct?
25     A.   Correct.  Yes.

42

1    Q.   And your statement is TKM Investment
2    Properties as of June 30, 2021 had no assets;
3    correct?
4    A.   Correct.  Yes.
5    Q.   But this document at Exhibit 3 shows
6    differently; correct?
7    A.   It does not.  I don't know what this
8    account -- I'm not familiar with how this account
9    was being used, so no, I will say that is not the
10   case.  When it's in receivership, we don't
11   necessarily have control of the bank accounts.  So
12   --
13   Q.   Okay.  I'm sorry; I didn't mean to
14   interrupt you.
15   A.   No.  On this one I don't know.
16   Q.   Okay.  So you testified earlier that it
17   had no assets.
18   A.   That's correct.
19   Q.   And now you're testifying that what's in
20   receivership you're not in control of the assets.
21   A.   That's correct.
22   Q.   And didn't the receivership file a motion
23   to terminate the receivership?
24   A.   After the assets were sold.  Yes.
25   Q.   And when was that motion filed?  Filed in

43

1    May or June; correct?
2    A.   I don't know.  Sometime this year.
3    Q.   It was filed before this statement;
4    correct?
5    A.   Oh, yeah, I'm sure.  Well, I don't know.
6    I don't know.  The last couple of months I would
7    guess.
8    MR. PATERNOSTER:  Do you know whether TKM
9    is still in receivership now, Mr. Brazie?
10   THE WITNESS:  I believe it's been
11   discharged.  I don't know.
12   MR. GARCIA:  Go off the record for a
13   second.
14   THE REPORTER:  Okay.  The time is 9:45
15   a.m. and we are now off the record.
16   (WHEREUPON, a recess was taken.)
17   THE REPORTER:  The time is 9:47 a.m. and
18   we are now back on the record.
19   BY MR. GARCIA:
20   Q.   Mr. Brazie, so I will get a document -- I
21   have it but I need another copy of it.  So we'll
22   discuss that document a little bit later.  So in
23   terms of -- but I just want to get the record
24   straight before we leave this area.
25   TKM Investments at one time was in

44

1    receivership and it's been discharged but you don't
2    know what month in 2021 that it was discharged?
3    A.   Correct.
4    Q.   And when it was in receivership, TKM
5    Investment Properties' assets were controlled by the
6    receiver; correct?
7    A.   Correct.
8    Q.   So then TKM Investment Properties, LLC may
9    have assets now; correct?
10   A.   No.  Their assets were sold.
11   Q.   The property was sold; correct?
12   A.   Correct.
13   Q.   But that doesn't mean all their assets are
14   gone; correct?
15   A.   Correct.  Yes.
16   Q.   And so we have at Exhibit 3 a document for
17   TKM Investment Properties, LLC that Ms. Wiggins
18   opened the account and it lists $192,242.59 as of
19   August 31, 2021 that you produced to me; correct?
20   A.   Yes.
21   Q.   Since you produced this document to me,
22   did you review the statement?
23   A.   No.
24   Q.   So you don't know whether TKM Investment
25   Properties, LLC actually has assets now; correct?

45

1    A.   Correct.
2    Q.   And did you do any due diligence to find
3    out whether TKM Investment Properties actually has
4    assets?
5    A.   No.
6    Q.   And as you sit here today you don't know
7    if TKM Investments has assets; correct?
8    A.   Correct.
9    Q.   I'm going to switch gears for a moment off
10   of that.
11   Now, Exhibit 1 identifies real property;
12   correct?
13   A.   Exhibit 1.  Yes.
14   Q.   And you identified earlier in your
15   testimony today that you did the valuation for the
16   real property located on Exhibit 1; correct?
17   A.   Yes.
18   Q.   Now, the property at 1448 SE Wy East is a
19   property that you personally own; correct?
20   A.   Yes.
21   Q.   Are you the sole owner of that property?
22   A.   No.
23   Q.   Who else owns that property?
24   A.   My wife, Kathy Brazie.
25   Q.   Anyone else?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

46

1     A.   No.
2     Q.   And you identified the value of that
3 property being $700,000; correct?
4     A.   Yes.
5     Q.   As I understood you earlier today, you
6 didn't do any due diligence to look at any
7 documents, access tax records to determine the value
8 of the property; correct?
9     A.   Correct.
10    Q.   You know that in the documents you
11 produced to me, property tax records were produced
12 for that property.  Do you know that?
13    A.   No.
14    Q.   Let's move over to the next property.
15 Lots 11, 12, 14, and 15.  How did you determine the
16 value of that property?
17    A.   Experience.
18    Q.   Did you consult any documents?
19    A.   No.
20    Q.   Did you check any property tax records?
21    A.   No.
22    Q.   Do you know that you subsequently produced
23 property tax records to me?
24    A.   Yes.
25    Q.   Have you looked at those property tax

47

1 records?
2     A.   No.
3     Q.   Why not?
4     A.   There would be no reason for me to.
5     Q.   Would you want to look at them to see if
6 your valuation was accurate?
7     A.   No.
8     Q.   Why not?
9     A.   The property tax records and the true
10 value many times are not the same thing.  So I'm
11 going off of what I believe them to be worth.
12    Q.   And are you saying that because the
13 property tax records in terms of the value that
14 taxes are assessed at is less than the true market
15 value of the property?
16    A.   That could be the case or some of these --
17 some of these lots are encumbered or they're not
18 prime or they have something the matter with them
19 but they are -- they might be viewed the same as
20 every other lot in a subdivision as an example.  So
21 the value of that lot while on paper may look to be
22 the same as another one next to it, it's going to
23 have a different value.  At least I believe that to
24 be the case.
25    Q.   And I noticed going back to your house at

48

1 14481, what was the present value based upon?
2     A.   What I believe it to be worth.
3     Q.   Did that property have an encumbrance?
4 Did you take into account encumbrances or other
5 things that would detract away from the value?
6     A.   Yeah, the house needs some significant
7 maintenance.
8     Q.   Okay.  So anything else?
9     A.   No.
10    Q.   Okay.  How about the lots for 11, 12, 14,
11 and 15?  Were there any encumbrances or anything on
12 the property or at the property that affected the
13 value, that would diminish the value?
14    A.   No.  For those I used what the lots sold
15 for when the subdivision was completed, or at least
16 what I understood what they sold for when the
17 subdivision was completed.
18    Q.   And when was the subdivision completed?
19    A.   2016 probably.
20    Q.   So your value of the lots is based on what
21 they were worth in 2016; is that correct?
22    A.   Yes.
23    Q.   Did you do any subsequent research or due
24 diligence to try to find out if there was other
25 documents or information that you could use to

49

1 ascertain their value?
2     A.   No.
3     Q.   Why not?
4     A.   I believe this is what they're worth.
5     Q.   And that's based upon what they were worth
6 in 2016?
7     A.   Yes.
8     Q.   Did you consult any documents that
9 identified their value in 2016?
10    A.   No.
11    Q.   Why not?
12    A.   I believe I know what the number was.
13    Q.   And how did you know what the number was?
14    A.   Going off of memory.
15        MR. GARCIA:  Court Reporter, can you
16 please mark the next document as Exhibit 4?
17        THE REPORTER:  Yes, sir.
18        It's been marked as such, sir.
19        (WHEREUPON, Exhibit 4 was marked for
20 identification.)
21 BY MR. GARCIA:
22    Q.   Mr. Brazie, do you recognize the document
23 marked as Exhibit 4?
24    A.   Yes.
25    Q.   What is it?

50

1    A.  A real property tax statement.
2    Q.  And for what piece of property is it for?
3    A.  14481 SE Wy East.
4    Q.  Have you seen this document before?
5    A.  Yes.
6    Q.  When did you see it?
7    A.  I don't know.
8    Q.  See it within the last -- let me rephrase.
9        Did you see it on or before August 31,
10   2021?
11   A.  I don't know.
12   Q.  So if you saw this document before, why
13   isn't this document reflected in Exhibit 1?
14   A.  How would it be?
15   Q.  Why isn't it?  Why isn't the values in
16   this document reflected in Exhibit 1?
17   A.  Because the Exhibit 1 document is what I
18   believe the value of the house to be.
19   Q.  And do you know what the real market value
20   of the house is identified in Exhibit 4?
21   A.  Yes.
22   Q.  What?
23   A.  $756,000 -- $754,000.
24   Q.  And you're paying property tax on that
25   value; right?

51

1    A.  Yes.
2    Q.  I'm going to rephrase.  The assessed
3    value.  You're paying property taxes on the assessed
4    value of $536,475; right?
5    A.  Correct.
6    Q.  Did you ever contest that value?
7    A.  No.
8    Q.  Okay.  Did you ever contest the real
9    market value total that Exhibit 4, the county found
10   for that property?
11   A.  No.
12   Q.  Did you ever try to inform the county that
13   the property is not worth that much?
14   A.  No.
15   Q.  Why not?
16   A.  There would be no reason to.  The numbers
17   fluctuate.  I'm not aware of anybody that does that,
18   actually.  So it would not be something that I would
19   have thought to do.
20   Q.  Now, Exhibit 4 is property tax records
21   from July 1, 2020 to June 30, 2021; correct?
22   A.  Yes.
23   Q.  But that's not really the current property
24   tax assessment as of today since today is after 6-
25   30-2021; correct?

52

1    A.  Yes.
2    Q.  have you ever gone on to the Clackamas
3    County website to see how your property is assessed
4    today?
5    A.  No.
6    Q.  Okay.  And you provided -- you or counsel
7    provided Exhibit 4 to me; correct?
8    A.  I'm sorry?
9    Q.  Exhibit 4 was provided to me through your
10   counsel; correct?
11   A.  Yes.
12       MR. GARCIA:  Court Reporter, please mark
13   the next document as Exhibit 22.  I'm going out of
14   order.
15       THE REPORTER:  It has been marked as such.
16       (WHEREUPON, Exhibit 22 was marked for
17   identification.)
18   BY MR. GARCIA:
19   Q.  I'm sorry, Mr. Brazie.  So I just want to
20   -- going back to Exhibit 4 -- can we go back to the
21   previous document?
22   A.  Yes.
23   Q.  So just confirming, the real market value
24   as of this tax year of 7-1-2020 to 6-30-2021 was
25   $754,892; correct?

53

1    A.  Yes.
2    Q.  Okay.  Please look at the document that's
3    been marked as Exhibit 5.
4        Do you recognize the document?
5    A.  Yes.
6    Q.  What is it?
7    A.  It is a property account summary.
8    Q.  And for what piece of property?
9    A.  Wy East.
10   Q.  14481?
11   A.  Yes.
12   Q.  Your property at that address; correct?
13   A.  Yes.
14   Q.  And so for 2021, it shows that the real
15   market value of the property is $853,111; correct?
16   A.  Yes.
17   Q.  And when I look at the AVR total or the
18   TVR total -- do you see that?
19   A.  Yes.
20   Q.  Okay.  For 2010, it's $536,475, which
21   matches the amount on Exhibit 4; correct?
22   A.  I'm sorry; ask me that again.
23   Q.  So you see the $536,475 figure?
24   A.  In 2020?
25   A.  Yes.

54

1    A.  Yes.
2    Q.  Okay.  That's also the same figure for
3 2020 in Exhibit 4; correct?
4    A.  Yes.
5    Q.  And so what I see, and going back into the
6 assessed value, it's going up steadily each year
7 from 2017 where it was $490,951 to $552,569;
8 correct?
9    A.  yes.
10    Q.  Do you know why Exhibit 5 was not provided
11 to me?
12    A.  I'm sorry?
13    Q.  You did not provide me Exhibit 5; correct?
14    A.  Exhibit 5?
15    Q.  Yeah.
16    A.  I don't think I --
17    Q.  Strike that.  Let me start over.
18       Do you see in the bottom right-hand corner
19 of Exhibit 4 there is an alphanumeric number?
20    A.  Yes.
21    Q.  That's called a Bates stamp number.  Your
22 counsel puts Bates stamp numbers on the documents it
23 produced to me to identify them as being produced to
24 me.
25       Do you see that?

55

1    A.  Yes.
2    Q.  And it also identifies each page as
3 individually marked so we can identify them by Bates
4 stamp number.
5       So Exhibit 5 doesn't have a Bates stamp
6 number; correct?
7    A.  Correct.
8    Q.  And you don't know if it was produced to
9 me by your counsel; correct?
10    A.  Correct.
11    Q.  And so in Exhibit 5, the amount listed in
12 Exhibit 5 of $853,111 is over $150,000 more than
13 what you assed the market value of the property to
14 be; correct?
15    A.  Correct.
16    Q.  Now, again, Exhibit 4 is a property tax
17 statement that your counsel produced for me.
18 However, your counsel did not produce property tax
19 statements for me.  Instead -- for the lots that you
20 received.  Instead, he pulled -- or strike that.
21       MR. GARCIA:  Court Reporter, please mark
22 the next document as Exhibit -- I'm going to say
23 Exhibit 5.5.
24       THE REPORTER:  Yes, sir.
25       (WHEREUPON, Exhibit 5.5 was marked for

56

1 identification.)
2       MR. GARCIA:  Please provide it to them.
3       THE REPORTER:  Yes, sir.
4 BY MR. GARCIA:
5    Q.  Mr. Brazie, do you recognize Exhibit 5.5?
6    A.  Yes.
7    Q.  What is it?
8    A.  Multnomah County Oregon Property Tax
9 Record.
10    Q.  And if you can go through and verify that
11 they're property tax records for the Lots 11, 12,
12 14, and 15.  It's right here.  It's by the legal
13 description where it identifies the lot.
14    A.  Haydens Meadow at Brookside.
15    Q.  No, I just want you to go through the
16 pages silently to yourself and verify to yourself
17 that they're the property tax records for 11, 12,
18 14, and 15.
19    A.  Yes.
20    Q.  Okay.  So these are property tax records.
21 Were you sent these property tax records or were
22 they pulled from a website?
23    A.  I don't know.
24    Q.  The property tax records in Exhibit 5.5
25 are different from the ones in Exhibit 4; correct?

57

1    A.  Yes.
2    Q.  Exhibit 4 is a real property tax statement
3 that you received in the mail; correct?
4    A.  I don't know.
5    Q.  Who handles the payment of your property
6 taxes?
7    A.  Brooke Wiggins.
8    Q.  So Exhibit 5.5 doesn't look like -- it's
9 not a real property tax statement; correct?
10    A.  It does not appear; correct.
11    Q.  And where are real property tax statements
12 sent for the property that you own?
13    A.  I don't know.
14    Q.  Would they be sent to Ms. Wiggins?
15    A.  I don't know where they would be sent.
16    Q.  Do you know where Exhibit 4 came from that
17 your counsel produced to me?
18    A.  I do not.
19    Q.  Do you ever look at the property tax
20 statements?
21    A.  Do I ever?
22    Q.  Yeah.
23    A.  Yes.
24    Q.  When is the last time you looked at a
25 property tax statement for any of the property that



58

1  you own?
2      A.  I don't know.
3      Q.  Has it been within the last year?
4      A.  I don't know.
5      Q.  Last two years?
6      A.  I couldn't tell you.  I don't know.
7      Q.  And again, some things may refresh your
8  memory.  Some things won't.  The last four years?
9      A.  You asked me if I've looked at property
10  tax records before.  I have.  When I did last time,
11  I wouldn't have any idea.
12      Q.  So it's conceivable that you haven't
13  looked at any property tax records in the last 10
14  years; correct?
15      A.  Probably not.
16      Q.  Probably not that you have not looked at
17  them?
18      A.  It's not conceivable.  I'm sure I've
19  looked at them in the last 10 years.
20      Q.  Okay.  How about the last five years?
21      A.  I would guess yes.
22      Q.  How about the last three years?
23      A.  I don't know.
24      Q.  Now, the real property and the lots 11,
25  12, 14, and 15 were not listed in the Declaration of

59

1  Financial Status that you provided me in Exhibit 2;
2  correct?
3      A.  Correct.
4      Q.  Why?
5      A.  We didn't realize that we still -- that we
6  were still the owners on paper of those.
7      Q.  Well, not only are you the owners on paper
8  but you've been assessed penalties, right, for
9  nonpayment of property taxes for those lots --
10      A.  Yes.  Correct.
11      Q.  Let me finish.  Let me start over.
12          Even though you are "technically" still
13  the owner, you've been assessed property tax
14  assessments and penalties because you have not owned
15  those lots -- or correction, that you have not paid
16  the property tax on these lots that you own;
17  correct?
18      A.  Correct.
19      Q.  And, in fact, a judgment was entered into
20  Monmouth County clerk regarding your nonpayment of
21  those; correct?
22      A.  Correct.
23      Q.  And did you get notice that the county was
24  taking action against you in Multnomah County?
25      A.  We did.  Yes.

60

1      Q.  And when was that?
2      A.  I don't know.
3      Q.  You got notice before the judge issued an
4  order; correct?
5      A.  Yes.
6      Q.  Did you look -- and when was that?
7      A.  When was what?
8      Q.  That you received the notice?
9      A.  I don't know.
10      Q.  The judge issued an order in August of
11  2020; correct?
12      A.  I don't -- I don't know the exact date or
13  month.  I think so.
14      Q.  Okay.  And so if the judge entered an
15  order on August 20th -- or correction.  If the judge
16  issued an order in August of 2020, that would put
17  you on notice before you filed -- before you signed
18  the declaration of financial status in November of
19  2020 that you had ownership of that property;
20  correct?
21      A.  Yes.
22      Q.  And once you received notice that legal
23  action was being taken against you for the
24  nonpayment of property taxes for those lots, what
25  did you do?

61

1      A.  We set about trying to figure out -- we
2  didn't realize that we even owned them still so we
3  were surprised when we got the alert.  They're
4  actually held by -- to secure a loan.  We thought
5  the property had moved on when we did a deal back in
6  2017.  So when we got that, we assumed that the
7  courts -- or that the county had the wrong owners
8  and had not recorded that correctly.
9      Q.  Did you -- okay.  Did you do anything
10  other than assume?
11      A.  Yeah.  We -- it takes time, particularly
12  with COVID, but we followed up on it.
13      Q.  And what did you find out?
14      A.  That we still -- they're still in our
15  name.  We still own it.
16      Q.  And when did you find that out?
17      A.  A couple of months ago.
18      Q.  A judgment was entered a couple of months
19  ago.  That's not when -- and it takes time, as you
20  know, to go through legal proceedings to give people
21  due process.  So the judgment is not what alerted
22  you as to them because as you identified, you
23  received notice of them prior to.  So why is it that
24  you only found out a couple months after the court
25  had -- which is when the court rendered a decision?

62

1    A.  I don't know.
2    Q.  What have you done since you found out the
3  court has rendered a decision?
4    A.  Nothing.
5    Q.  Why?
6    A.  We've been busy doing other things.
7    Q.  So your own financial statement of Exhibit
8  1 identifies that you believe this property is worth
9  $300,000.
10    A.  Yes.
11    Q.  And your statement is updated June 30,
12  2021; correct?
13    A.  Yes.
14    Q.  So as of more than a couple months ago you
15  knew that this property was worth $300,000; right?
16    A.  Yes.
17    Q.  So you knew more than a couple months ago;
18  right?
19    A.  Well, okay.  A few months ago.  I don't
20  know the specific time.
21    Q.  Okay.  So if this property is worth -- if
22  you have an asset that you own, that you yourself
23  value of being $300,000, why haven't you taken any
24  action?
25    A.  I believe -- I don't know.

63

1    Q.  So let's try to look at the value of the
2  property.  Let's look at Exhibit 5.5.
3        You see there's a table towards the bottom
4  that has years 2016 to 2021?
5    A.  Yes.
6    Q.  And you see the column headings for that?
7  The fifth column heading from the right is real
8  market value of the property?
9    A.  Yes.
10    Q.  And so for -- when I say Bates stamp
11  number, I'm going to be referring to the number in
12  the lower right-hand column.
13    A.  Yes.
14    Q.  I'm only going to refer to the last
15  digits, whether it's three or four.  Okay?
16        So Exhibit 5 is property tax records for
17  Lots 11, 12, 14, and 15 that runs from Bates stamp
18  7145 to 7151.  I'm sorry, 714, yeah, I'm sorry, it's
19  7145, 7147, 7149, and 7151.  Only four pages.
20  They're not consecutive.  Just those numbers.
21        So the real market value for 2021 for Lot
22  11 at Bates stamp 7145 is $170,000; correct?
23    A.  Yes.
24    Q.  And to be clear, that's what's listed on
25  that page; correct?

64

1    A.  Yes.
2    Q.  If we turn to the next page, to Bates
3  stamp 7147, that's for Lot 12; correct?
4    A.  Yes.
5    Q.  And the real market value for that piece
6  of property is $162,250; correct?
7    A.  Yes.
8    Q.  If we turn to the next page it's Bates
9  stamp 7149.  And that's for Lot 14; correct?
10    A.  Yes.
11    Q.  And Bates stamp 7149 identifies the real
12  market value of that property to be $170,000;
13  correct?
14    A.  Yes.
15    Q.  And if we go to the last page of Exhibit
16  5.5, that's for Lot 15; correct?
17    A.  Yes.
18    Q.  And the real market value for that
19  property in 2021 at Bates stamp 7151 is $162,250?
20    A.  Yes.
21    Q.  And so if you would add up -- I'll just do
22  it simply, the $270,000, so $340,000; correct?
23    A.  I'm sorry?
24    Q.  So there were two assessments at $170,000;
25  right?  If I add them that's $340,000; right?

65

1    A.  Yes.
2    Q.  And there were three assessments, or two
3  assessments at $162,500; right?
4    A.  Yes.
5    Q.  And if I add them together that's
6  $325,000; correct?
7    A.  Yes.
8    Q.  So if I add the market values I would get
9  $665,000 as what's identified in 5.5 -- Exhibit 5.5
10  for Lots 11, 12, 14, and 15; correct?
11    A.  Yes.
12    Q.  And even though the county assesses them
13  at that value, you have not taken any action
14  regarding those lots; correct?
15    A.  Correct.
16    Q.  Why?
17    A.  We just haven't.
18    Q.  Do you own the company Delivery Express?
19    A.  I'm sorry?
20    Q.  Do you own the company called Delivery
21  Express?
22    A.  Senvoy, the name of Senvoy used to be
23  Delivery Express.
24    Q.  Have you changed the accounts that list
25  Delivery Express to Senvoy?



70

1   A.  Yes.
2   Q.  When was that?
3   A.  2010 would be a guess.
4   Q.  So before -- would it be correct to say
5   that you are estimating it before 2015?
6   A.  Yes, I believe so.
7   Q.  Okay.  How much would you have to pay off
8   so that car is no longer being used as collateral
9   for Sunstone Business Finance?
10   A.  Approximately $3.5 million.
11   Q.  And how much would you have to pay to
12   Umpqua Bank for the various cars that you have
13   listed on Exhibit 1 for it to no longer be a secured
14   creditor for those cars?
15   A.  Approximately $450,000.
16   Q.  And Umpqua Bank became a secured creditor
17   for those cars after the Secretary's 2018 judgment;
18   correct?
19   A.  Yes.
20   Q.  So, and how much money did you -- and then
21   after the Secretary's 2018 judgment, Umpqua Bank
22   filed suit against you in 2019; correct?
23   A.  Yes.
24   Q.  So the 2018 Secretary's judgment was prior
25   to the suit that Umpqua Bank filed against you;

71

1   correct?
2   A.  I believe that is correct.
3   Q.  Well, you just identified they filed suit
4   in 2019 and your judgment to the Secretary was
5   October 2018.
6   A.  Correct.
7   Q.  Okay.  So, and then after a suit was
8   filed, then what happened was that you entered into
9   a settlement agreement with Umpqua Bank; correct?
10   A.  Yes.
11   Q.  And then there were amendments to the
12   agreement where you put up those cars listed in
13   Exhibit 1 as collateral; correct?
14   A.  Yes.
15   Q.  And the actual documents that you signed
16   that were provided to me were dated December 2020 in
17   terms of filing a formal document with the State of
18   Oregon putting them up as collateral; right?
19   A.  I believe so.  Yes.
20   Q.  So why since you owed your debt to the
21   Department of Labor since October 2018 did you give
22   Umpqua Bank collateral of those cars?
23   A.  Because they asked for it in order to get
24   the deal done with them.  They have the first
25   position on my receivables.

72

1   (Interruption; phone ringing)
2   MR. GARCIA:  I apologize.
3   THE REPORTER:  Counsel, do you want me to
4   bring us off the record?
5   MR. GARCIA:  Yes.
6   THE REPORTER:  The time is 10:31 a.m.  We
7   are now off the record.
8   (WHEREUPON, a recess was taken.)
9   THE REPORTER:  The time is 10:32 a.m.  We
10   are now back on the record.
11   MR. GARCIA:  Okay, I apologize.  A call on my
12   computer.  I've got my cell phone silenced.  I
13   forgot to silence that.
14   BY MR. GARCIA:
15   Q.  Now, while Umpqua Bank as you're saying
16   had first priority in terms of your account
17   receivables, it did not have any priority on your
18   cars until you made these agreements for it to not
19   exercise the judgment against you; correct?
20   A.  Correct.
21   Q.  In the last four years, have you owned any
22   other vehicle that's not listed on Exhibit 1?
23   A.  I don't know.
24   Q.  I'm talking about -- just to be clear, I'm
25   talking about you personally, not what your

73

1   companies own.
2   A.  Yeah.  I don't -- I don't know if I have
3   owned and then sold something in the last four
4   years.  I can't remember.
5   Q.  How about in the last two years?
6   A.  I don't -- I bought a Mercedes in -- well,
7   last year, 2020.
8   Q.  Right.  I'm talking about vehicles that --
9   okay, and it's not just sell -- whether it's
10   transfer, gave, where you've continued -- wherein
11   you had the actual title to a vehicle.
12   Do you understand so far?
13   A.  Yes.
14   Q.  Okay.  I'm asking did you sell, transfer,
15   do anything that caused the ownership of a vehicle
16   to change in the last four years?
17   A.  Yes.
18   Q.  Okay.  What vehicle was that?
19   A.  I owned two old Buicks that I sold, oh,
20   three or four years ago, probably.
21   Q.  To whom?
22   A.  Private buyers.
23   Q.  Do you remember their names?
24   A.  No.
25   Q.  Do you know how much you sold them for?



74

1    A.  No.
2    Q.  Do you have bills of sale on them?
3    A.  Yes.
4    Q.  Does Ms. Wiggins know about these sales?
5    A.  Yes.
6    Q.  Where did the income from these sales go?
7    A.  I don't know.
8    Q.  Does your wife own any vehicles that are
9  not listed on Exhibit 1?
10   A.  I don't believe so.  No.
11   Q.  Now, I would ask you to keep Exhibit 1 out
12  and look at the last page of Exhibit 2.
13   A.  Okay.
14   Q.  So I want you to have both documents out
15  so you can review them.
16   A.  Okay.
17   Q.  I have one other question.  For the
18  vehicles that Umpqua Bank is the secured creditor,
19  can Umpqua Bank file documents changing the
20  ownership of the vehicles from you to them?  Do they
21  have -- did you give them permission to do that?
22   A.  I don't know.
23   Q.  So now I'm going to go back to Exhibit 1
24  and the last page of Exhibit 2.
25       Now, you see that Exhibit 2, last page,

75

1  Bates stamp 37, identifies the market value of the
2  various vehicles on that page; correct?
3    A.  Yes.
4    Q.  And all the vehicles on that page are also
5  on Exhibit 1; correct?
6    A.  That appears to be the case.  Yes.
7    Q.  Well, you've got both documents in front
8  of you.
9    A.  Yes, that appears to be.
10   Q.  When you say appears that means you don't
11  know for sure.
12   A.  There are 14 on this side and there's 14
13  on that side.
14   Q.  Right.  And it's the same vehicles; right?
15   A.  Yes, I believe so.
16   Q.  But you're saying from looking at the two
17  documents you cannot tell?
18   A.  Well, I can -- does somebody have a pen?
19  I can go mark the 14 documents off.  Yeah.
20       Yes.
21   Q.  So they're exactly the same; correct?
22   A.  Yes.  It appears to be.
23   Q.  You say it appears to --
24   A.  Yes.
25   Q.  Okay.  Thank you.

76

1       Now, you see in Exhibit 1 in the far
2  right-hand column for all the cars you have the
3  value; correct?
4    A.  Yes.
5    Q.  And I'm interpreting that to be the market
6  value?
7    A.  Yes.
8    Q.  And in Exhibit 1, you also have the market
9  value of these same vehicles; correct?
10   A.  Yes.
11   Q.  And so if you compare the market values
12  for all the vehicles except for the four -- strike
13  that.
14       If you compare the values listed in
15  Exhibit 1, the market values, to the values listed
16  in Exhibit -- the last page of Exhibit 2 for the
17  secured creditors, the market values are the same in
18  both exhibits except for the Ford Shelby; correct?
19   A.  Yes.
20   Q.  If you compare the vehicles above the
21  secured vehicles in Exhibit 1, their value, to the
22  value that's listed on the last page of Exhibit 2,
23  they're all less; right?
24   A.  Yes.
25   Q.  And so the vehicles that are not -- the

77

1  four vehicles, the Ford 150 Lightning, Ford Super
2  Snake -- that's the Mustang; right?
3    A.  Yes.
4    Q.  And the Ford 150 Raptor and the 2015
5  Mercedes, those are all vehicles that you own free
6  and clear; correct?
7       Let me strike that.
8    A.  Yeah.
9    Q.  Let me strike that.  Those four vehicles
10  that I just named are all vehicles that are not
11  being used as a collateral; correct?
12   A.  Correct.
13   Q.  So why is it that the four vehicles that
14  are not being used as collateral, the value declined
15  when you did Exhibit 1 dated as of June 30, 2021
16  from what you identified on November 11, 2020?
17   A.  A year ago what I thought they were worth
18  and what I thought they were worth in June, it
19  changed.
20   Q.  But it only -- but the Umpqua Bank and the
21  Sunstone business finance secured creditor vehicles,
22  they didn't change; correct?
23   A.  Correct.
24   Q.  So why did the ones that you don't have as
25  collateral get a reduction whereas the other ones



82

1     A.  Yes.  The payment's not connected to the
2  car though.
3     Q.  Understand.  It's just that a reduction in
4  value of $25,000 and the payment was $30,000;
5  correct?
6     A.  Yes.
7     Q.  Okay.  So on all these cars you have the
8  legal title to them; correct?
9     A.  Yes.
10    Q.  And on -- for the Ford Super Snake and the
11 Ford Raptor and the Mercedes you have car loans with
12 Point West Credit Union; correct?
13    A.  Yes.
14    Q.  And you are making monthly payments on
15 those cars; correct?
16    A.  Correct.
17    Q.  Strike that.  Who is making monthly
18 payments?  What entity?  What legal entity is making
19 monthly payments for those cars?
20    A.  Brooke does on my behalf.  Brooke Wiggins.
21 I'm not sure where from.
22    Q.  And -- okay.  So it could be that these
23 car payments are being paid by Senvoy; correct?
24    A.  Yes.
25    Q.  And because you don't know the status of

83

1  your payments, your private payments, all of your
2  private payments, it could be being made by one of
3  your companies; correct?
4     A.  Yes.
5     Q.  Why would you have your private payments
6  be making your personal payments?
7     A.  Why, well, it's either they pay the cash
8  to me directly or they make the payment and then we
9  account for it on the books.
10    Q.  How do you know they're accounted for in
11 the books?
12    A.  Again, because I have accountants that
13 take care of these things for me.
14    Q.  But you don't know personally whether they
15 are or not; correct?
16    A.  I have knowledge of how this is accounted
17 for.  Yes.
18    Q.  You do?  Please tell me that knowledge.
19    A.  We go through specifically to each line
20 item.  Not necessarily but at the end of the year we
21 have an accounting that we do.  So I would say I'm
22 confident that that's the case.  It's pretty typical
23 in companies of our size that somebody else deals
24 with those things directly as opposed to me doing it
25 but I understand having worked with her for 20 years

84

1  and trust her that it's being done and accounted for
2  correctly.
3     Q.  Is Ms. Wiggins an accountant?
4     A.  No.
5     Q.  Is she a certified CPA?
6     A.  No.
7     Q.  Does she have any accounting education?
8     A.  I don't know.
9     Q.  Prior to working with you or for you, did
10 she have any accounting prior experience?
11    A.  Yes, I believe so.
12    Q.  And what was that experience?
13    A.  I think she worked for a couple other
14 companies in their accounting departments.
15    Q.  Do you actually remember that?
16    A.  No.  It would be 20-plus years ago.
17    Q.  Okay.  So you're speculating; correct?
18    A.  Yes.
19    Q.  Don't speculate, please.
20       And while you have a general understanding
21 -- or strike that.
22       When is the last time you looked at your
23 general ledgers for any of your companies?
24    A.  I look at financials, not general ledgers.
25 So I couldn't tell you.

85

1     Q.  So you don't know what, in fact,
2  accounting-wise is taking place within your
3  companies; correct?
4     A.  Correct.
5     Q.  And have you ever had an audit of your
6  financial statements or general ledgers, a formal
7  audit?
8     A.  No.
9     Q.  Do you have a CPA?
10    A.  Yes.
11    Q.  Who?
12    A.  Ken Gustafson.
13    Q.  Did Ken Gustafson help you with the
14 preparation of Exhibit 2?
15    A.  No.
16    Q.  Now, before you signed Exhibit 2, did you
17 review everything?  Or strike that.
18       You signed Exhibit 2 under penalty of
19 perjury to -- strike that.
20       You signed Exhibit 2 under penalty of
21 perjury; correct?
22    A.  Yes.
23    Q.  And, but you never looked at any of the
24 actual documents that supported the numbers in
25 Exhibit 2; correct?

86

1    A.  I don't believe -- I don't know.

2    Q.  And you signed Exhibit 2 less than a year

3  ago; right?

4    A.  Yes.

5    MR. GARCIA:  Please mark this as Exhibit

6  6.

7    THE REPORTER:  It's been marked as such.

8    (WHEREUPON, Exhibit 6 was marked for

9  identification.)

10  BY MR. GARCIA:

11    Q.  Do you recognize Exhibit 6?

12    A.  Yes.

13    Q.  What is it?

14    A.  A Point West Credit Union statement.

15    Q.  And that statement is in your name;

16  correct?

17    A.  Yes.

18    Q.  And you have three car loans -- or strike

19  that.

20    Exhibit 6 identifies three car loans;

21  correct?

22    A.  Yes.

23    Q.  And the car loans on Exhibit 6 match three

24  of the vehicles that have nonsecured -- that don't

25  have any secured creditors on Exhibit 1; correct?

88

1    MR. GARCIA:  No, it was not.  I could have

2  pulled the one that you produced.  No, strike that.

3  It was -- to make the record clear, counsel, you did

4  not produce documents that I gathered through

5  subpoenas for statements.  This document is dated

6  April 20 -- the document is dated April 20, 2020.  I

7  obtained it in response to a subpoena because we

8  agreed that you would not produce documents that I

9  obtained through subpoena.

10    MR. PATERNOSTER:  Understood.  I didn't

11  know, nor would counsel, because there's a 12-15-20

12  number up top and so that's what was confusing me.

13    MR. GARCIA:  Right.  That was when it was

14  pulled I believe from the bank in response to a

15  subpoena.

16    MR. PATERNOSTER:  Fair enough.  This was

17  one of the subpoenaed documents?

18    MR. GARCIA:  Yes.

19    MR. PATERNOSTER:  Thank you, counsel.

20    MR. GARCIA:  And thank you for asking to

21  clarify the record.

22  BY MR. GARCIA:

23    Q.  Now, as we discussed today, Mr. Brazie,

24  you identified that all the vehicles listed on

25  Exhibit 1 you hold the legal title to; correct?

87

1    A.  Yes.

2    Q.  Do you see the Point West credit

3  statements or do they go directly to Ms. Wiggins?

4    A.  They go directly to Ms. Wiggins.

5    Q.  So when was the first time that you

6  actually viewed Exhibit 6?

7    A.  I don't know.

8    Q.  Did you review it prior to today?

9    A.  I'm sorry?

10    Q.  Did you review it prior to today?

11    A.  I don't know.  I looked at a lot of

12  documents over the last few months.  I don't know.

13    Q.  Okay.  Did you review it before July 1,

14  2021?

15    A.  I don't know.

16    Q.  Is it your custom and practice to review

17  these statements when they come in?

18    A.  No.

19    Q.  No meaning it's not your practice;

20  correct?

21    A.  Correct.

22    Q.  Thank you.

23    MR. PATERNOSTER:  I'm sorry, counsel, is

24  this a document that was produced by defendant?  I

25  don't see a Bates number on it.

89

1    A.  I believe so, yes.

2    Q.  And in terms of the financing, the

3  Mercedes, the Mercedes, you're paying a monthly

4  payment of $1,497.  That's on the second page of

5  Exhibit 6; correct?

6    A.  Yes.

7    Q.  And then for the Ford Mustang, which is

8  the Super Snake, you've been paying a monthly

9  payment of $750.24; correct?

10    A.  Yes.

11    Q.  And for the 2013 Ford F-150 Super Crew Cab

12  you've been making a monthly payment of $800.84;

13  correct?

14    A.  Yes.

15    Q.  And it's your understanding that one of

16  your businesses is actually making the payment to

17  Point West Credit Union; correct?

18    A.  I believe that to be the case.  Yes.

19    Q.  And to your knowledge, the payments --

20  strike that.

21    To your knowledge, all the payments have

22  been made for these three vehicles from April 20th

23  -- or April 2020 to the present time; correct?

24    A.  Two of the vehicles are for loans

25  that I got against -- I owned those cars originally

94

1    A.  The 2015 Mercedes.
2    Q.  Right.
3    A.  And the 2013 Ford Shelby.
4    Q.  I thought you said the Ford Shelby was
5 with Mr. Ludwick.
6    A.  No.  He holds the title on it.  I have the
7 car.
8    Q.  Okay.  I misunderstood that.  Thank you
9 for clarification.
10       Now, you bought the 2015 Mercedes as an
11 investment option; correct?
12    A.  Yes.
13    Q.  So if you're having it as an investment
14 option, why are you using it for everyday use?
15    A.  I'm not.
16    Q.  Is somebody else using it on an everyday
17 use?
18    A.  No.
19    Q.  So it's like in storage in Tennessee?
20    A.  It's in my garage.  It gets driven but
21 it's not a daily driver.
22    Q.  Okay.  Does your wife drive?
23    A.  She does.
24    Q.  What vehicles does she drive?
25    A.  She drives a -- what does she have?  A

95

1 Ford Expedition.
2    Q.  Are you an owner of that car?
3    A.  No.  I don't believe.  There's no debt
4 against it I don't believe.
5    Q.  I'm not asking that.  I'm asking are you
6 an owner of that car?
7    A.  I don't believe so.  No.
8    Q.  But you don't know; correct?
9    A.  Correct.
10    Q.  Do you know what year the Ford Expedition
11 is?
12    A.  2015.
13    Q.  Did you check to see for the purposes of
14 the judge's order and for you listing all your cars,
15 did you check to see whether you were an owner of
16 that car?
17    A.  Yeah.  I'm going to say I'm not since it's
18 not -- since it's not on here.  I will say I'm not
19 an owner.
20    Q.  Okay.  And what is that statement based
21 upon?
22    A.  Just going off it not being here I'm going
23 to say I'm not the owner.
24    Q.  So it's based solely on it not being
25 present on Exhibit 1, Bates --

96

1    A.  Yeah, I believe -- the more I think about
2 it, I believe originally it was owned by Senvoy.
3    Q.  And how is it that your wife is able to
4 drive a vehicle owned by Senvoy?
5    A.  Because it's owned by Senvoy.  I don't
6 understand the question.
7    Q.  Okay.  So you're confusing me a little so
8 I'm just going to ask a lot of clarifying questions.
9       Okay.  So to your knowledge the 2004 Ford
10 Expedition is a vehicle that is currently owned by
11 Senvoy?
12    A.  Yes.
13    Q.  And that your wife drives that vehicle?
14    A.  Yes.
15    Q.  And she uses it for her everyday use?
16    A.  Yes.
17    Q.  And on what authority does she have to
18 drive that vehicle?  I mean, did you -- did you
19 instruct Senvoy to give her use of that vehicle?
20    A.  Yes.
21    Q.  And does your wife pay any compensation to
22 Senvoy for the use of that vehicle?
23    A.  No.
24    Q.  Are there any other assets of Senvoy where
25 you and your wife have use of?

97

1    A.  I don't know.  I don't -- off the top of
2 my head I can't but I'll have to verify that.
3    Q.  Okay.  So why did you have -- why did you
4 authorize Senvoy to allow your wife to drive the
5 2015 Ford Expedition for her everyday use?
6    A.  Because she needed a car to drive.
7    Q.  So she needed -- so what I'm understanding
8 you to say is she needed a car to drive.  You had an
9 asset of Senvoy that would solve that problem and
10 therefore, you authorized her to drive it; correct?
11    A.  Yes.
12    Q.  Okay.  And as you sit here today, you
13 don't know if there's any other assets of Senvoy
14 that you have authorized for either yourself or your
15 wife to use personally; correct?
16    A.  Correct.
17    Q.  Do you have any children?
18    A.  I do.
19    Q.  What are the names of the children?
20    A.  Tristen, Max, and Kyra.
21    Q.  How old are they?
22    A.  Twenty-four, 22, and 20.
23    Q.  So it's Kristen, Mack, and Kyra?
24    A.  Tristen, Max, and Kyra.
25    Q.  Thank you.  Are they using any of --

98

1  strike that.
2      Did you authorize Senvoy to provide them
3  with any assets for their personal use?
4      A.  No, I don't believe so.
5      Q.  Are they driving any vehicles of Senvoy?
6      A.  Yes.
7      Q.  Well, how is it that they're able to drive
8  vehicles of Senvoy if you did not authorize them --
9  or strike that.
10      Are they employed by Senvoy?
11      A.  Yes.
12      Q.  All three of them?
13      A.  Yes.  Well, no, two of them now.
14      Q.  Okay.  Have all three of them been
15  employed by Senvoy in the last two years?
16      A.  Yes.
17      Q.  Do they use the vehicles of Senvoy for
18  their personal use?
19      A.  Yes.
20      Q.  Do they provide any compensation to Senvoy
21  for using those vehicles for their personal use?
22      A.  No.
23      Q.  Why not?
24      A.  Because they didn't.
25      Q.  Because it's just a perk as having you as

99

1  their father; correct?
2      A.  Yes.
3      Q.  The insurance.  Each one of these -- or
4  strike that.
5      Each one of these vehicles are licensed;
6  correct?
7      A.  Yes.
8      Q.  Are they all licensed in Oregon except for
9  the Ford Shelby and Mercedes?
10      A.  All of them are licensed in Oregon still.
11      Q.  Okay.  So you have not changed the
12  licensing for the Mercedes or Ford Shelby;
13  correct?
14      A.  Correct.
15      Q.  Now, you said the Ford -- strike that.
16      Is the Ford Shelby -- you said it's in
17  Tennessee; correct?
18      A.  Yes.
19      Q.  Is it being driven or is it in a garage?
20      A.  Both.
21      Q.  Okay.  So you're saying that Mr. Ludwick,
22  even though the car is used as collateral, is
23  allowing you to use the collateral?
24      A.  Yes.
25      Q.  Why?

100

1      A.  That's how -- that's the nature of
2  collateral.
3      Q.  And so if you get -- if you totaled the
4  car --
5      A.  It's insured and he would get paid.
6      Q.  Well, even though it's insured, you know
7  that if cars are totaled they look at the market
8  value and they have to make a determination of the
9  market value; correct?
10      A.  Yes.
11      Q.  Okay.  I'm assuming that all these
12  vehicles are insured?
13      A.  Yes.
14      Q.  To include the one that your wife drives,
15  the Ford Expedition?
16      A.  Yes.
17      Q.  Do you know what insurance company you
18  use?
19      A.  Progressive, I believe.
20      Q.  Do you know how Progressive Insurance is
21  accounted for, the payments for Progressive
22  Insurance in your general ledger and your finances?
23      A.  I think the same way as the car payments
24  are.  I believe they're made on my behalf.
25      Q.  And do you know if the accounting

101

1  separates your insurance payments for your vehicles
2  from the insurance payments for the vehicles that
3  Senvoy uses?
4      A.  I do not.
5      Q.  Okay.  And, okay.
6      Now, maintenance is performed on these
7  vehicles when needed; correct?
8      A.  Yes.
9      Q.  And there would be, in fact, yearly
10  maintenance on these vehicles; right?
11      A.  Yes.
12      Q.  And Senvoy is paying for that maintenance?
13      A.  Yes.
14      Q.  Okay.  Let's switch gears.  We're going to
15  go back to Exhibit 1.
16      So Exhibit 1 identifies that you have a
17  Northwestern Mutual Life Insurance policy; correct?
18      A.  Yes.
19      Q.  Face value is $2,800; correct?
20      A.  $2,800,000.
21      Q.  I misspoke.  Thank you for the correction.
22      And the cash value is $72,199; correct?
23      A.  Correct.
24      Q.  How did you determine that cash value?
25      A.  I believe we pulled that off of the web, I

102

1  believe.
2      Q.  And who pulled it off of the web?
3      A.  Brooke.
4      Q.  Did you, just like your counsel provided
5  me what you pulled off the web for the property tax
6  assessments for Lots 11, 12, 14, and 15, did you
7  pull the page or print the page from the web?
8      A.  I don't know if she did or not.
9      MR. GARCIA:  Counsel, as you know, that
10  page has not been provided to me as we previously
11  discussed.
12  BY MR. GARCIA:
13      Q.  Why wasn't that page or why wasn't that
14  information provided to me so that we can evaluate
15  what you have listed on Exhibit 1 for the cash value
16  of that policy?
17      A.  You know, she had some issue being able to
18  get that information.  I believe she reached out to
19  the insurance --
20      Q.  Do you know when she did that?
21      A.  -- provider.  Oh, in the last 10 days, I
22  think.  There was some issue they had with getting
23  her that.
24      Q.  Could you have made a screenshot of what
25  you saw when you pulled this value off?

103

1      A.  No.
2      Q.  Why not?
3      A.  I didn't.
4      Q.  I know you didn't but my question is could
5  you have?
6      A.  I assume I could have.  Yes.
7      Q.  Because without any information, it's hard
8  for us to evaluate whether that is a correct figure;
9  correct?
10      A.  Yes.
11      Q.  Have you taken any loans out against your
12  insurance policy?
13      A.  Yes.
14      Q.  When?
15      A.  I don't know the dates.  It is -- our de
16  facto line of credit over the last four or five has
17  been my insurance company -- has been my insurance
18  money for Senvoy.
19      Q.  Do you have any documentation to show
20  that?
21      A.  No.
22      Q.  But if you've taken out loans you would
23  have that documentation; right?
24      A.  We would have the money moving back and
25  forth electronically.  There's no formal

104

1  documentation.
2      Q.  So are you saying that Northwestern Mutual
3  Insurance doesn't send you statements?
4      A.  I don't know.
5      Q.  Because how do you know how much you own
6  then?
7      A.  well, again there's going to be history
8  probably in the general ledger as money moves in and
9  out.
10      Q.  Right.  But the general ledger is not --
11  the general ledger is based on other documents
12  usually; right?  You have a bill, you pay a bill.
13  You have a loan payment, you pay a loan payment.
14      A.  Yeah.
15      Q.  So you're saying that you don't know if
16  you -- if Northwestern Mutual Life Insurance sent
17  you any statements regarding any of these loans?
18      A.  Correct.
19      Q.  Do you think it would be important to have
20  documents identifying loans?
21      A.  Yes.
22      Q.  Do you think it's important for me to have
23  documents identifying the liability to all the
24  defendants in all of your companies?
25      A.  Yes.

105

1      Q.  Well, then why weren't they produced?
2      A.  I don't -- again, there was something with
3  Northwestern Mutual, I don't remember what it was,
4  that she was still working on that.
5      Q.  Did you ask Ms. Wiggins if there were any
6  statements?
7      A.  No.
8      Q.  Did Ms. Wiggins know the importance of
9  providing all documents to me?
10      A.  Yes.
11      Q.  How did she know that importance?
12      A.  As I said earlier, it was a common
13  conversation over the last 30-40 days.
14      Q.  And did Ms. Wiggins know to give me all
15  the financial documents related to your assets and
16  liabilities of all the defendants?
17      A.  Yes.
18      Q.  Do you have any investments with
19  Northwestern Mutual?
20      A.  No.
21      Q.  So only the life insurance policy;
22  correct?
23      A.  Correct.
24      Q.  When did you take out this life insurance
25  policy?



106

1     A.  Oh, they've been in place 20 years.
2     Q.  And what is your month -- do you have
3  monthly premiums for this policy?
4     A.  Yes.
5     Q.  How much?
6     A.  I don't know.
7     Q.  And you don't know if Northwest Mutual
8  provided you any statements; correct?
9     A.  No.
10     Q.  How do you know -- or strike that.  Strike
11  that.
12        MR. GARCIA:  Court Reporter, can you
13  please mark the next document as Exhibit 7?
14        THE REPORTER:  Yes, sir.
15        It's been marked as such.
16        (WHEREUPON, Exhibit 7 was marked for
17  identification.)
18  BY MR. GARCIA:
19     Q.  Mr. Brazie, do you recognize Exhibit 7?
20     A.  Yes.
21     Q.  It's the main checking account for Senvoy;
22  correct?
23     A.  Yes.
24     Q.  Before the last 60 days have you ever seen
25  Exhibit 7 before?

107

1     A.  No.
2     Q.  But you have seen it since; correct?
3     A.  Yes.
4     Q.  Please turn to page five of Exhibit 7.
5  And that is going to be Bates stamp 872.
6        Are you there?
7     A.  Yes.
8     Q.  The top of the page identifies $102,000
9  going to Northwestern Mutual MU but I assume that's
10  Northwestern Mutual; correct?
11     A.  Yes.
12     Q.  And it shows another -- and that payment
13  was on -- it's an electronic payment made on May 10,
14  2021; correct?
15     A.  Yes.
16     Q.  And then another payment on May 10th,
17  Northwestern Mutual for over $15,000; correct?
18     A.  Yes.
19     Q.  And then if you go down to 5-11, it
20  identifies three payments to Northwest Mutual that
21  if you add up is over $6,500; correct?
22     A.  Yes.
23     Q.  Okay.  Do you know which payments are for
24  what?
25     A.  I believe the two top, the first two, 102

108

1  and the 15 were payments back on the debt.
2     Q.  Do you know how much debt you currently
3  have to Northwestern Mutual?
4     A.  I don't.
5     Q.  So you have not identified to me the
6  liability that you have to Northwestern Mutual?
7     A.  Correct.
8     Q.  Do you know how much money you can borrow
9  from Northwestern Mutual?
10     A.  I don't.
11     Q.  Now, you're identifying to me that you're
12  doing borrowing like for Northwestern Mutual to pay
13  bills; correct?
14     A.  Yes.
15     Q.  So why haven't you borrowed from
16  Northwestern Mutual to pay any of your debt to the
17  Secretary?
18     A.  I'm sorry?
19     Q.  Why haven't you borrowed from Northwestern
20  Mutual to pay any of your debt to the Secretary?
21     A.  There's not that -- I mean, we'll have to
22  get -- and I don't know what the holdup was with
23  getting those documents so we'll jump on that so
24  that we can have a better idea.  My understanding is
25  there's not that much money in there.  We borrow

109

1  against it, put it back, borrow against it, put it
2  back.
3     Q.  Well, what I'm identifying from May 10,
4  2021 is that you put back $117,000.
5     A.  Yes.
6     Q.  So that means you had $117,000 in your
7  bank account to pay down your loan to Northwestern
8  Mutual.
9     A.  Yes.
10     Q.  Instead of paying down that loan by
11  $117,000, why didn't you pay your debt to the
12  Secretary?
13     A.  Because if I paid the debt to my -- if I
14  paid that debt rather than have kept the money where
15  I had it to use for the company, the company would
16  cease to exist.
17     Q.  No, but you paid it back to Northwestern
18  Mutual.
19     A.  Correct.  It's a lien of credit.  It goes
20  back and forth, in and out.
21     Q.  Okay.  So you have this line of credit
22  that you didn't provide me any documentation for?
23     A.  Well, we use it as a line of credit.
24     Q.  I understand.
25     A.  Yeah.

110

1    THE REPORTER:  Can you take those papers
2 off the microphone, please?  Thank you, sir.
3 BY MR. GARCIA:
4    Q.  Do you have any other insurance policies?
5    A.  No.  I don't believe so.
6    Q.  Let me rephrase.  My question was not
7 complete.
8    Do you have any other life insurance
9 policies?
10    A.  I don't believe so.  I think just with
11 Northwest Mutual.
12    MR. GARCIA:  Please mark the next exhibit
13 as Exhibit 8.
14    (WHEREUPON, Exhibit 8 was marked for
15 identification.)
16 BY MR. GARCIA:
17    Q.  Do you recognize the document at Exhibit
18 8?
19    A.  Yes.
20    Q.  What is it?
21    A.  A Columbia Bank statement for my personal
22 checking account.
23    Q.  Please look at -- and it's Bates stamped
24 812 to 813.  Please look at the very bottom of that
25 page on page one, Bates stamp 812.

111

1    You see there's a life insurance premium;
2 correct?
3    A.  Yes.
4    Q.  Do you know who that life insurance
5 premium is being paid for?
6    A.  I do not.
7    Q.  Could it be you?
8    A.  It could be.
9    Q.  And could it have -- could that insurance
10 have cash value?
11    A.  You know, I don't know what $18.83, I
12 can't imagine what that is for.  I don't know.
13    Q.  Now, you also see there are two -- or
14 strike that.
15    So the bank statement at Exhibit 8 is a
16 bank statement from Columbia Bank that has a
17 statement date of 9-15-2021; correct?
18    A.  Yes.
19    Q.  Okay.  And it also has two deposits on the
20 first page Bates stamp number 812, Exhibit 8;
21 correct?
22    A.  Yes.
23    Q.  Is that -- and you previously stated that
24 the rental of your 14481 SE Wy East property were
25 deposited directly into your Columbia Bank account;

112

1 correct?
2    A.  Yes.
3    Q.  Are those those payments?
4    A.  I believe so.  Yes.
5    Q.  Okay.  And so each one of those payments
6 is $4,950; correct?
7    A.  Yes.
8    Q.  Now, the life insurance premium at Exhibit
9 8 is paid out of your personal banking account,
10 Columbia Bank; right?
11    A.  Yes.
12    Q.  It's not paid by Senvoy; correct?
13    A.  Correct.
14    Q.  So why is that life insurance premium paid
15 out of your personal bank account and your other
16 life insurance premiums are not?
17    A.  I don't know.  I haven't done business
18 with Farmers in a long time so my guess is that --
19    Q.  I don't want you to speculate.
20    A.  Well, it would be an educated speculation.
21    Q.  An estimate.  When you say guess, my radar
22 antennae goes (indiscernible).
23    MR. PATERNOSTER:  If you think you have
24 some insight into --
25    THE WITNESS:  We used to use Farmers

113

1 Insurance as our insurance carrier 15-20 years ago.
2 BY MR. GARCIA:
3    Q.  Okay.
4    A.  And so we probably set it up that way all
5 those years ago and it just stood the test of time.
6 Honestly, I don't think I even knew about it so I
7 don't -- that would be my answer to that question
8 why Senvoy doesn't pay it.
9    Q.  Okay.  Thank you for your explanation.
10    You've heard of the Payroll Protection
11 Act?
12    A.  Yes.
13    Q.  Or Payroll Protection Program.  Did any of
14 your companies receive any monies from those?
15    A.  Yes.
16    Q.  Which ones?
17    A.  Senvoy and --
18    Q.  ZoAn?  I'm sorry, go ahead.
19    A.  Senvoy and ZoAn.
20    Q.  Do you know how much they received?
21    A.  No.
22    Q.  Can you estimate how much they received?
23    A.  Probably a million dollars.
24    Q.  Okay.  And Senvoy received its Payroll
25 Protection Program payment last year and ZoAn

114

1   Management, Inc. received it this year; correct?
2       A.   I don't know the dates.
3       Q.   Do you know the years?
4       A.   Well, obviously in the last 2020 and 2021.
5       Q.   Okay.  But I'm asking do you know which
6   year Senvoy received it and which year ZoAn received
7   it?
8       A.   No.
9       Q.   Do you know where this money was
10  deposited?
11      A.   No.
12          MR. GARCIA:  Court Reporter, please mark
13  the next exhibit as Exhibit 9.
14          THE REPORTER:  Yes, sir.
15          It has been marked as such.
16          (WHEREUPON, Exhibit 9 was marked for
17  identification.)
18  BY MR. GARCIA:
19      Q.   Mr. Brazie, do you recognize Exhibit 9?
20      A.   Yes.
21      Q.   What is it?
22      A.   Key Bank checking account statement.
23      Q.   For Senvoy; correct?
24      A.   Yes.
25      Q.   And it's for April of 2020; correct?

115

1       A.   Yes.
2       Q.   And the Bates stamp number is -- I'm not
3   going to ask you a question.  I'm just going to say
4   it for the record.  The Bates numbers go from 638 to
5   644.
6           I'm going to ask you to turn to page two.
7           Are you at that page?
8       A.   Yes.
9       Q.   Okay.  So I'm only going to show you this
10  one for Senvoy.  But, so it shows a receipt of the
11  Payroll Protection Program (PPP) Cares Program of
12  $616,760 on April 22, 2021.
13      A.   Yes.
14      Q.   What did you use that money for?
15      A.   Well, payroll specifically.  And then
16  there were, you know, bills also that had to get
17  paid.
18      Q.   And so this money was provided into your
19  corporate checking account; correct?
20      A.   Yes.
21      Q.   And so those bills that needed to be paid
22  were all the bills for the corporate checking
23  account?
24      A.   Yes.
25      Q.   Okay.  So please turn to page four of

116

1   Exhibit 9, Bates stamp 641.
2           Do you see how there are credit cards
3   listed on that page?
4       A.   Yes.
5       Q.   So this Payroll Protection Program funds
6   went into a general checking account that paid for
7   your personal credit cards; correct?
8       A.   The checking account did pay for my
9   personal credit cards.  Yes.
10      Q.   Right.  And we don't know if part of the
11  money that was used that you received from the
12  Payroll Protection Program paid for your credit
13  cards because you just comingled the funds; correct?
14      A.   Yes.
15      Q.   I'll just ask you a general question, so
16  we'll go through.  So on the -- I'm sorry, let's go
17  to the next page of Exhibit 1.  That would be page
18  five, Bates stamp 642.
19          You see that there are Point West Credit
20  Union payments; correct?  Page five, Bates stamp
21  642.  I'll wait for you to get there.
22      A.   Yes.  Okay.
23      Q.   Okay.  So if we go down, we see Point West
24  Credit Union payment of -- on April 13th for
25  $800.84.

117

1           Do you see that?
2       A.   No.  Tell me where.  I'm sorry.
3       Q.   Okay.  You're on page five?
4       A.   Oh, yes.  $800.84.  Yes.
5       Q.   And when we previously reviewed the Point
6   West bank statement you identified that one of the
7   vehicles you were paying off was $884; right?
8       A.   Correct.
9       Q.   I mean, $800.84; right?
10      A.   Yes.
11      Q.   Okay.  So I can go to your credit card
12  statements or things to show that but essentially --
13  or strike that.
14          So you have an American Express credit
15  card payments like on page five, Bates stamp 642 of
16  Exhibit 9 like for $2,500 and you have Capital One.
17  You have Citibank.  Those different statements.
18  Those are your private personal credit cards that
19  Senvoy is paying; correct?
20      A.   Yes.
21      Q.   Okay.
22          THE REPORTER:  What would you like this
23  marked at, sir?
24          MR. GARCIA:  Exhibit 10.  I'm sorry, my
25  apologies.

138

1         MR. GARCIA:  Thank you, counsel, for
2  reminding me.
3  BY MR. GARCIA:
4     Q.   Mr. Brazie, do you recognize the document,
5  Exhibit 14?
6     A.   Yes.
7     Q.   What is it?
8     A.   Key Bank statement for Senvoy.
9     Q.   Right.  And it is for -- it's the June
10  statement.  So it's June 1 to June 30; correct?
11    A.   Yes.
12    Q.   And for the record, the Bates stamp
13  numbers are 0 -- correction, are 706 to 712.
14        Mr. Brazie, I'm going to direct your -- so
15  this -- or strike that.
16        So turn to page four.  Turn to page four,
17  Bates stamp 709.  So this bank statement continues
18  to list the credit card payments to your credit card
19  companies at Capital One and American Express and
20  Cabela's; correct?
21    A.   Yes.
22    Q.   And Point One; correct?
23    A.   Yes.
24    Q.   Okay.  I specifically want you to look at
25  page five.

139

1         Do you see on June 10th there a
2  significant electronic transfer of $325,000 to a
3  Bank of America account 5389?
4     A.   Yes.
5     Q.   And you see two days later on June 12th
6  there's another withdrawal of $85,000 to also
7  account 5389?
8     A.   Yes.
9     Q.   What were those for?
10    A.   I don't know.
11    Q.   Those are pretty significant withdrawals;
12  correct?  They're over $400,000.
13    A.   Yes.
14    Q.   Okay.  Did you have any loans with Bank of
15  America?
16    A.   No.  Not that I'm aware of.
17    Q.   When Ms. Wiggins does, you know, approves
18  wire transfers or issues checks, does she have a
19  limit on how much money that she has the authority
20  to write checks for or approve wire transfers for?
21    A.   No.
22    Q.   So it's unlimited; correct?
23    A.   Yes.
24    Q.   Do you ever follow up and review?
25    A.   No.

140

1     Q.   Do you ever tell her words to the effect
2  of -- giving her a limit, say like $200,000,
3  $100,000, say you have to get my approval first
4  before you do any distribution or spending of money
5  above that amount?
6     A.   No.
7     Q.   So what check and balance is there on Ms.
8  Wiggins, if any?
9     A.   None.
10    Q.   Does your CPA audit the books?  Strike
11  that.
12        How often does your CPA audit your
13  financials of Senvoy?
14    A.   Not very often.  I couldn't tell you the
15  last time.
16    Q.   That was going to be my next question.
17  But let me formally ask it.
18        When was the last time your CPA audited
19  the books of Senvoy?
20    A.   Yeah, I can't remember.
21    Q.   Thank you.
22    A.   It's not something we do very often.
23    Q.   Would it be not in the last couple of
24  years?  Would that be a fair statement?
25    A.   No, I wouldn't think so.

141

1     Q.   So you're saying, correct, not in the last
2  couple of years?
3     A.   Correct.  Yeah.
4     Q.   Thank you.
5         Actually, let me just check and see if I
6  have anything on the next page.
7         I do have two more questions.  Or one of
8  my questions.
9         Do you know of any of your legal entities,
10  any of the companies you own, plus yourself, have
11  any dealings with Bank of America?
12    A.   To the best of my knowledge, no.
13    Q.   Have any of your legal entities to include
14  yourself had any dealings with Bank of America in
15  the last five years?
16    A.   Have any what?  I'm sorry.
17    Q.   Dealings?
18    A.   Not that I'm aware of.
19        MR. GARCIA:  Okay.  Counsel, we can break
20  for lunch now.
21        THE REPORTER:  Do you want me to call us
22  off the record?
23        MR. GARCIA:  I'm sorry; let's go off the
24  record.
25        THE REPORTER:  The time is 12:01 p.m. and

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

146

1  or the procedures that we've done and the way that
2  we have -- from a financial perspective, you know,
3  has all been done working with him. So did he
4  specifically come out and help me in writing this
5  up? No. Did he -- have we talked and does he
6  believe what is in here is true and was I able to
7  place or get some advice from him about what this
8  might look at? Yes.
9      Q.  Okay. So let me back up to my question.
10      So paragraph 72 refers to document Exhibit
11  2.
12      Do you understand that?
13  A.  Yes.
14  Q.  So it's not this as in Exhibit 15 --
15  A.  Correct.
16  Q.  -- that paragraph 72 is in reference to.
17  It's in reference to Exhibit 2.
18      Do you understand that?
19  A.  Yes.
20  Q.  Okay. So what I hear you saying is when
21  you wrote, "I prepared this in conjunction with my
22  accountant," what I understand you to be saying is
23  you prepared Exhibit 2 with your understanding of
24  the accountant's policies and that's what you meant
25  in conjunction with?

147

1      A.  Yeah. No. My accountant and I -- I've
2  had the same accountant for 15 years. And so as we
3  have worked together over the years, the basis of
4  our financials are based on what we've done together
5  historically. So the systems that have been put in
6  place working with him are the ones that I counted
7  on to provide you the information.
8      Q.  So what I'm understanding you to say is
9  you put in conjunction with my accountant based on
10  your previous interactions about the systems that
11  were in place for your financials but you didn't
12  specifically communicate or interact with your
13  accountant for anything in Exhibit 2.
14      Is that a correct understanding?
15  A.  Correct.
16  Q.  Okay. Turn to Exhibit 14, please.
17      Okay. Page three. Can you turn to page
18  three of Exhibit 14? Do you see a $150,000 check
19  there?
20      MR. PATERNOSTER:  Counsel, would you mind
21  identifying the dates if you have that?
22      MR. GARCIA:  Yes. It's at the very bottom
23  of the middle column. It's June 5th, Bates stamp
24  708.
25  BY MR. GARCIA:

148

1  Q.  Do you see that, Mr. Brazie?
2  A.  Yes.
3  Q.  Do you know who that check was made out
4  to?
5  A.  I do not.
6      MR. GARCIA:  Please mark the next document
7  as Exhibit 16, please.
8      THE REPORTER:  It has been marked as such.
9      (WHEREUPON, Exhibit 16 was marked for
10  identification.)
11  BY MR. GARCIA:
12  Q.  Do you recognize what Exhibit 16 is?
13  A.  Yes.
14  Q.  What is it?
15  A.  This is our general ledger for ZoAn
16  Management.
17  Q.  Okay. Okay. So Exhibit 15 identified the
18  date of the check was 6-5; correct? The previous
19  exhibit, Exhibit 15.
20  A.  Yes.
21  Q.  Okay. Please turn to -- I just had it.
22  Please turn to page -- the Bates stamp 5639 of
23  Exhibit 16.
24  A.  Okay.
25  Q.  And that shows $150,000 being deposited

149

1  for ZoAn Management on the date -- or transferred to
2  ZoAn Management on June 8th.
3  A.  Yes.
4  Q.  Does that ring a bell?
5  A.  No, not specifically. But in my educated
6  opinion it looks like it's transfers to cover ZoAn's
7  -- to cover any outflow that ZoAn had, possibly
8  payroll.
9  Q.  ZoAn's payroll is not $150,000; right?
10  A.  What's that?
11  Q.  ZoAn's payroll is not $150,000; right?
12  A.  Well, no, among other things would be my
13  guess.
14  Q.  Okay. Still on that same page -- I don't
15  want you to guess though. But I thank you for --
16  A.  Or my educated guess I should say.
17  Q.  Okay. So on the same page, you see after
18  ZoAn got a check for $150,000, then there is a
19  shareholder distribution for $50,000.
20      Do you see that?
21  A.  Mm-hmm. Yes.
22  Q.  So if I understand it, Senvoy gives or
23  sends $150,000 to ZoAn and a couple days later after
24  ZoAn gets that then makes a $50,000 distribution;
25  correct?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

150

1    A.  Yes.
2    Q.  And who's the shareholder for ZoAn?
3    A.  Me.
4    Q.  So ZoAn sends -- correct.  Senvoy sends
5  $150,000 to ZoAn and then a couple days later ZoAn
6  makes a distribution of $50,000 to you; correct?
7    A.  Yes.
8    Q.  So then the money that Senvoy sent to ZoAn
9  was not just to pay their payroll, it's also to make
10  a distribution to you; correct?
11    A.  I don't know but that distribution did
12  take place.
13    Q.  Right.  Within days of that money being
14  sent from Senvoy to ZoAn; correct?
15    A.  Yes.
16    Q.  Now, I'm going to go back to your
17  declaration, Exhibit 15.  And I want you to go to
18  page nine, paragraph 56.
19       Are you there?
20    A.  Yes.
21    Q.  I'm going to read paragraph 56.  It says,
22  "To keep the company going, I have contributed my
23  own money, for the most part, everything I have, to
24  keep the company afloat over the last four years."
25       Did I read that correctly?

151

1    A.  Yes.
2    Q.  Okay.  So here we have Senvoy sending ZoAn
3  $150,000 and then shortly thereafter, literally
4  within days, ZoAn is making a distribution of
5  $50,000 to you; correct?
6    A.  Yes.
7    Q.  So is that statement in paragraph 56 true?
8    A.  One hundred percent, absolutely.  We don't
9  know where this money went.  Well, I'd have to find
10  that out whether it went to pay back debt, whether
11  or not it moved onto somewhere else.  I don't know.
12    Q.  But it's --
13    A.  So --
14    Q.  I'm sorry; I didn't mean to interrupt.
15    A.  And there had been money going in and
16  going out now for four years as I've been covering
17  the expenses and the shortfall, particularly over
18  the last -- or in particular in '19 and '20.  So did
19  I put this money in my pocket?  I doubt it but I
20  don't have the history on that but I stand by my
21  statement 100 percent.
22    Q.  So let me ask you this then because I'm a
23  little confused.  Yeah, I'm confused.  Why would
24  Senvoy have to send money to ZoAn so ZoAn can make a
25  shareholder's distribution?

152

1    A.  That's, like I said, I don't know.  I'll
2  have to find that out.
3    Q.  This is not the first time, nor the only
4  time that that has been done.
5    A.  No, it happens all the time.
6       MR. GARCIA:  Would you please mark the
7  next document as Exhibit 18, please?
8       THE REPORTER:  It's been marked as such.
9       (WHEREUPON, Exhibit 18 was marked for
10  identification.)
11  BY MR. GARCIA:
12    Q.  So one thing, I'm just going to go on the
13  record back to Exhibit 16.  Exhibit 16 is a general
14  ledger for ZoAn Management.  It's from Bates stamp
15  5635 to Bates stamp 5644.  And it's a general ledger
16  of the Key Bank Checking for ZoAn Management for the
17  year of 2020.
18       Exhibit 18 is also ZoAn Management General
19  Ledger as of December 31, 2020 from Bates stamp 5712
20  to Bates stamp 5713.
21       Do you recognize Exhibit 18?
22    A.  Yes.
23    Q.  Okay.  Exhibit 18, at the bottom of
24  Exhibit 18, the first page, continuing on to the
25  second page is Shareholder Distributions by ZoAn

153

1  Management; correct?
2       MR. PATERNOSTER:  Counsel, can we just
3  confirm for the record, I think you said Exhibit 18.
4  Are we working off of Exhibit 17 still?  We may not
5  have a copy of Exhibit 18.
6       MR. GARCIA:  If you do not have a copy, I
7  apologize.
8       MR. PATERNOSTER:  No.  It's numbered.  It
9  could have been a lot of different things.  All
10  right, I think we're good.
11       MR. GARCIA:  Okay.
12       MR. PATERNOSTER:  Thank you.  Sorry.
13       MR. GARCIA:  No problem.
14  BY MR. GARCIA:
15    Q.  So at the bottom of Exhibit 18, the first
16  page of Bates stamp 5712, continuing on to Bates
17  stamp 5713, it identifies the shareholder
18  distributions that ZoAn Management, Inc. has made
19  for 2020; correct?
20    A.  Yes.
21    Q.  And on the second page of Exhibit 18,
22  Bates stamp 5713, identifies a total of $209,950.39
23  of shareholder distributions; correct?
24    A.  Yes.
25    Q.  And again, you're the only shareholder of

154

1  ZoAn Management, Inc.; correct?
2      A.   Correct.
3          MR. GARCIA:  Counsel, I apologize -- no,
4  okay.
5          MR. PATERNOSTER:  Did I mess up your
6  numbers?
7          MR. GARCIA:  Yeah.
8          Go off the record for a second.
9          THE REPORTER:  The time is 1:21 p.m. and
10  we are now off the record.
11          (WHEREUPON, a recess was taken.)
12          THE REPORTER:  The time is 1:22 p.m. and
13  we are now back on the record.
14          MR. GARCIA:  So I just want to correct the
15  record.  There is no Exhibit 17.
16          I'm going to ask you to mark this document
17  as Exhibit 19.
18          THE REPORTER:  It has been marked as such.
19          (WHEREUPON, Exhibit 19 was marked for
20  identification.)
21  BY MR. GARCIA:
22      Q.   Mr. Brazie, Exhibit 19 is ZoAn Management,
23  Inc. general ledger as of August 31, 2021 with a
24  Bates stamp 7030; correct?
25      A.   Yes.

155

1      Q.   And this document identifies the
2  shareholder distribution for year to date up until
3  August 31, 2021 is a total of $291,000 year to date
4  August 31, 2021; correct?
5      A.   Correct.
6      Q.   And you don't know where the shareholder
7  distribution went; correct?
8      A.   I don't have the details for that.  No.
9          MR. GARCIA:  Please mark the next document
10  as Exhibit 20.  But don't give it to him yet.
11          THE REPORTER:  Okay.
12          (WHEREUPON, Exhibit 20 was marked for
13  identification.)
14  BY MR. GARCIA:
15      Q.   So Mr. Brazie, what are the expenses or
16  the costs that ZoAn Management has?
17      A.   Mostly employee.
18      Q.   Employee-related costs, like benefits,
19  pay?
20      A.   Yes.
21      Q.   Things of that nature?  Have any other
22  costs besides employee-related costs?
23      A.   I'm sure it has some overhead, rent,
24  things of that nature.
25          MR. GARCIA:  You may now give him Exhibit

156

1  20.
2  BY MR. GARCIA:
3      Q.   Mr. Brazie, do you recognize Exhibit 20?
4      A.   Yes.
5      Q.   What is it?
6      A.   General ledger again from ZoAn Management
7  through August 31, 2021.
8      Q.   Right.  And for this particular one it's
9  Bates stamped 7057 to 7058.  Now, I'm focusing on
10  the utilities for ZoAn Management.
11          Do you recognize any of the bills
12  underneath that?
13      A.   I can -- I don't but they're clearly mine
14  from my house in Tennessee.
15      Q.   Correct.  So, and it's just the bills that
16  are being paid each month.
17      A.   Correct.
18      Q.   I'm just going to go through them.  Not
19  the amounts but the, excuse me, the types of bills.
20          Do you know what Microfton Utility
21  District, do you know what utilities that provides?
22      A.   No.
23      Q.   It provides water.
24          And Franklinton is in Williamson County;
25  correct?

157

1      A.   Yes.
2      Q.   City of Franklin.  Do you know what those
3  payments were for?
4      A.   No.
5      Q.   Do you know whether they were payments for
6  garbage?
7      A.   I don't know.
8      Q.   Okay.  Do you see there's also Atmos
9  Energy.
10          Do you know what services Atmos Energy
11  provides?
12      A.   No.
13      Q.   You don't know whether it provides natural
14  gas, like on its website?
15      A.   I do not.
16      Q.   Okay.  And then Comcast Tennessee.  And do
17  you have cable and TV service at your home in
18  Tennessee?
19      A.   Yes.
20      Q.   Do you know who provides it?
21      A.   Comcast.
22      Q.   And so if you look on the second page of
23  Exhibit 20, Bates stamp 7058, it identifies year to
24  date that it's over $10,000 that's been paid for
25  your utilities in Tennessee; correct?

162

1  that and so I can get you the answer to that
2  question.  It's just that wouldn't be the type of
3  thing that I would concentrate on.
4     Q.  I understand that.  But I guess do you
5  also know that a corporation needs an attorney to
6  represent it in a court of law, in the Federal
7  District Courts?
8     A.  I'm sorry?
9     Q.  Do you know that a corporation needs an
10  attorney to represent it?  It cannot represent
11  itself pro se?
12    A.  No.
13    Q.  So you don't know of the extra issues that
14  are involved with a company being a corporation as
15  opposed to a limited liability company; would that
16  be correct?
17    A.  Off the top of my head, no.
18    Q.  And I hate to repeat myself and I
19  apologize if I said this earlier.  You see no issue
20  in consolidating the functions that ZoAn Management,
21  Inc. performs into Senvoy, LLC; correct?
22    A.  Correct.
23    Q.  Now, we're going to go back to Exhibit 1.
24  You should always keep Exhibit 1 separate.
25    A.  And of course I didn't.

163

1     Q.  That's okay.
2        Is that my personal financial statement?
3     A.  Yes.
4     Q.  That's why I made it number one.
5     A.  There it is.
6     Q.  Okay.  Now, in that you said that your
7  companies are Senvoy, LLC; TKM Land, LLC; and ZoAn
8  Management, Inc. all have a value of zero.
9     A.  Yes.
10    Q.  How was that determination made?
11    A.  The companies are all currently either
12  under water or losing money and the debt that they
13  have.
14    Q.  And who made that determination?
15    A.  Me
16    Q.  Did you look at financials to make that
17  determination?
18    A.  Yes.
19    Q.  What did you look at?
20    A.  It would have been financials, you know,
21  through June 30.  It's pretty straightforward.  Just
22  looking at the debt that the companies would
23  tell you that there's very little -- there's very
24  little value there.
25    Q.  So I'd really like to know what you

164

1  specifically looked at to make that determination.
2     A.  I don't have to look at it.  In fact,
3  whatever I looked at, I don't have to look at
4  anything.  I know what the companies are worth.  I
5  work in it every day.  So the revenue is down almost
6  60 percent since 2018.  ==And the land is about $3.5==
7  ==million in debt against what might be $1.2 million==
8  ==asset.==  It's a development that hasn't been able to
9  get off the ground, nor will it obviously any time
10  soon.  So you take the loss of revenue, the
11  additional expenses that are combined, that are
12  added because of the cost of operating today in the
13  world of COVID.  Costs have gone through the roof.
14  So both companies are unprofitable.  We'll say all
15  three companies, but really, the two operating
16  companies, Senvoy and to a smaller extent, TKM Land,
17  hold zero value if I were to try to sell them.
18    Q.  So what I'm hearing you saying is they
19  have no value based on your experience based on the
20  debts and the loan.
21    A.  And the operations.
22    Q.  And the operations.
23    A.  Yes.
24    Q.  But you have not looked at any particular
25  documents showing the value of those companies;

165

1  correct?
2     A.  The document would just tell me what I put
3  on the document so I wouldn't look at a document.  I
4  know without looking at it.
5     Q.  Right.  But you don't put the figures in
6  the document, right, because Ms. Wiggins does;
7  correct?
8     A.  Well, I don't do the financials if that's
9  your question.
10    Q.  Right.
11    A.  Yeah; correct.
12    Q.  Right.  Because, so therefore, you don't
13  do the financials in the document; correct?
14    A.  I don't do the financials.  That's
15  correct.  I just look at them.
16    Q.  Right.  And so what I'm asking you is did
17  you actually look at the financials before you made
18  that determination of zero?
19    A.  Yes.
20    Q.  And what financial documents did you look
21  at?
22    A.  I don't remember the months specifically
23  but pretty much any month would tell me the same
24  thing.
25    Q.  So what I'm understanding you to say is



166

1 really if I looked at the documents, the documents
2 would show me, but you can't remember what you
3 looked at.  Is that what you're telling me?
4     A.  Well, it doesn't change what I looked at.
5 I said it's either, any month that I happen to look
6 at is going to tell me what I need to know which is
7 that the companies are -- have zero value.  Add on
8 top of it that I have independent -- or I don't use
9 independent contractors which is what 90 percent of
10 the market does and it makes the company even less
11 marketable.  So you have to take that into account.
12 So you have a company with negative cash flow.
13 You've got a company that's not making a net profit
14 when you look at ZoAn and Senvoy and TKM Land
15 together.
16     Q.  But these companies that have zero value
17 and a have a loss in revenue and are not making any
18 money are paying your personal bills; right?
19     A.  Well, again, the question there is, yeah,
20 if they didn't pay my personal bills I would then
21 have to shut this company down and go --
22     Q.  Right.
23     A.  -- do something else.
24     Q.  Right.  So the function of Senvoy is to
25 remain open to pay your bills; right?

167

1     A.  Well, that, and I have, you know, 75-80
2 employees, many of which have worked for me for 20
3 years.
4     Q.  Right.
5     A.  So I feel a responsibility for them,
6 obviously.
7     Q.  But you also have employees that worked
8 with you that are part of that $3.2 million
9 judgment; correct?
10     A.  Correct.
11     Q.  And --
12     A.  That doesn't change the fact that 85
13 people will be out of business if I close down.
14     Q.  Right.  But let's look at your expenses;
15 right?
16     A.  Okay.
17     Q.  You're making personal expenses of going
18 out and your wife is charging for massages and nails
19 and your wife is buying wine and your boss -- if I
20 said your boss I made a mistake.  That's your wife.
21 And your wife is going to Calhoun's.  And I'll get
22 into some of the other expenses shortly.  But if a
23 company is in dire financial straits as you say,
24 then why are you making those type of expenditures?
25     A.  Again, I have to -- I have to live.

168

1     Either I'm able to pay myself a salary, pay myself
2 money in order to do that or I have to go do that
3 somewhere else.  So if I can do that inside of the
4 company the way that I have, we keep everybody
5 employed, that's a win-win for everybody.  If I'm
6 not going to pay myself, why would I work?
7     Q.  So let me say it a different way.  You
8 are, as I noted in the documents that were filed
9 with the court for contempt, there was a three-month
10 timespan in 2020 where you and your wife were
11 incurring over $80 in one sitting in a bill that was
12 used on the credit card every other day in a three-
13 month period.  There's a difference between I have
14 to live and I have to go buy groceries as opposed to
15 going out and living that type of lifestyle.  So if
16 a company is in dire financial straits, why are you
17 spending so much money on what you're spending money
18 on?
19     A.  My value is whatever I think it is.  So
20 either my time is worth it for me to pay myself or
21 it's not.  And if it's not, and if I can't get what
22 I think I'm worth, then I simply will bankrupt that,
23 shut it down, and go do something else.  I try not
24 to -- I've avoided doing that because I, like I
25 said, I have 85 employees in a business that have

169

1 been around for 25 years.
2     But the reality is, the question you're
3 really getting at is paying the Department of Labor
4 back and paying those employees back and what I
5 spend every month has never had an impact on whether
6 or not I'm able to pay those people.  The reality is
7 that they were going to get paid out of real estate
8 sales that I was doing and that would have been --
9 that was the only way that they were going to get
10 the $3.2 million.  That obviously blew up for a
11 myriad of reasons in the intervening two and a half
12 years, and that's the reason that we're sitting
13 here.
14     How much my wife spends at Bed Bath &
15 Beyond isn't going to get the $3.2 million paid
16 back, nor is it going to get the millions that are
17 owed to the other entities also.  They're not going
18 to get paid back.  Had I been able to close the real
19 estate like we were working on then the feds were
20 the first ones to get paid.  That didn't happen.
21     Q.  Okay.  But what I understand you to say,
22 and again, you know, like I've done throughout the
23 deposition, I tried to summarize what I understand
24 you to say and ask you to correct.  I understand
25 that you are a sophisticated businessman.  That

186

1  of those -- or guaranteed payments -- as you go
2  through those credit card payments, those are then
3  taken in the aggregate and what belonged to me, it
4  comes to me as a guaranteed payment, flows through
5  my tax returns as income and then what is company
6  expenses gets expensed.
7      Q.  Okay.  But we have no -- but you have not
8  filed 2019 and 2020 tax returns?
9      A.  Correct.
10     Q.  So that has not happened yet of what you
11  just said; correct?
12     A.  Correct.  But it's happened in previous
13  years, so you can look to 2018 as an example.
14     Q.  But I've not received the 2018 general
15  ledger.
16     A.  Okay.
17     MR. PATERNOSTER:  Did we only provide '19
18  through '21?
19     MR. GARCIA:  Yeah.  That's my predicament.
20     THE WITNESS:  I don't remember what your
21  original question was, sorry, but that was -- when
22  you said Senvoy pays the bills, I wanted to make
23  sure that --
24  BY MR. GARCIA:
25     Q.  Okay.  So I understand what you're

187

1  testifying.  What I understand you saying, and I
2  think you said this earlier, but your companies, be
3  it ZoAn or Senvoy, pay your private personal bills
4  and that you believe that at the end of the year
5  there's a reconciliation of those payments.
6      A.  Yes.
7      Q.  Okay.  Such that the payments for you get
8  charged to you?
9      A.  Yes.
10     Q.  Okay.  And one statement I will make to
11  you is you have all this transfers of money going
12  between one account or one business to another
13  business.  We walked through one of them.  That was
14  the $150,000 from Senvoy to ZoAn and then a couple
15  days later there was a $50,000 shareholder
16  distribution.  And so usually when I see that
17  happening like that where it bounces around to
18  different companies, it's to cause confusion and to
19  hide things because then you literally have to
20  follow the money and then I tracked back.  That's
21  how I found out that Senvoy was paying for your
22  credit cards is because I got the credit card
23  statement from Capital One and then I tracked back
24  the routing number and the account number and found
25  out it was Senvoy.  So that's what happens when you

188

1  have money and payments going through several
2  different accounts to do that.  And usually, like I
3  said, I'm not casting any dispersions against you.
4  Usually I find out that's when people are trying to
5  hide money to do that.
6      So long story short, that's why I'm
7  expressing concern, partially why I'm asking you
8  these questions because I have serious concerns when
9  we're told that, well, at the end of the year we
10  reconcile because I've seen many times where that
11  does not occur.
12     Okay.  So I actually have a couple
13  statements to go through that would show that you
14  made charges at like at Universal Men's Clinic;
15  correct?
16     A.  Yes.
17     Q.  And you've made multiple charges at that?
18     A.  Yes.
19     Q.  And I won't go into detail and ask you
20  what that is for.
21     So let me, in lieu of that, let me just
22  ask you this.  Other than that State Farm Insurance
23  policy premium that we saw on Columbia Bank less
24  than $20 appears to be made on a monthly basis, is
25  it safe to say that all of the personal expenses of

189

1  your wife and you, be it medical, dental, groceries,
2  eating out, entertainment, vehicle related are paid
3  by one of your companies, either Senvoy or ZoAn?
4      A.  Yes.
5      Q.  Okay.  And then you have the expectation
6  at the end of the year that those would be
7  reconciled; correct?
8      A.  Yes.
9      Q.  Okay.  I want to go back to Exhibit 2.
10  That's your declaration of financial status.
11     A.  Okay.
12     Q.  Okay.  So on page five of that -- I've got
13  to find where -- okay.  Page five, Bates stamp 28.
14     A.  Okay.
15     Q.  At the top you show a total monthly income
16  of $20,928.  Do you see that?
17     A.  Yes.
18     Q.  And under declarant it's $3,928.  That's
19  for wages; right?
20     A.  Yes.
21     Q.  And then other income from all sources is
22  $17,000; correct?
23     A.  Yes.
24     Q.  What is your source of income?  How much
25  income do you get from whom to make up that $17,000



190

1 figure?
2     A.  That's largely going to be -- for -- I
3 think for 2018 as an example back to our last
4 question, I think it was about $210,000 was the
5 amount of money that had been -- that I paid taxes
6 on that I had taken from the company for my
7 different bills.
8     Q.  So you're saying that you used the
9 personal income that you received in 2018 to
10 identify the income you were receiving from other
11 sources for the November 11, 2020 declaration at
12 Exhibit 2?
13     A.  No.  I was just -- as an example of how
14 that money gets accounted for, and I was making the
15 point that the $20,000 in total monthly income is
16 roughly reflected in the 2018 number which I believe
17 was like $209,000.
18     Q.  Okay.
19     A.  Of income from me.  So that would be
20 income from Senvoy, largely from Senvoy and then TKM
21 Investment Properties.
22     Q.  Okay.  So I understand that you're
23 offering up the income that you made in 2018 as a
24 comparison.  But I want to know specifically how you
25 derived that $17,000 by you identifying where the

191

1 income came from and how much income did you receive
2 from each entity that provided that entity to you.
3     A.  I don't know but I can give an educated
4 answer in that most of that is going to come from
5 Senvoy.
6     Q.  Then I'm a little confused.  So if we go
7 back to the previous page of Exhibit 2, if you look
8 at item K, it identifies your take-home pay per pay
9 period is $3,928.75, which to me is the wages that
10 you earned.
11     A.  Yes.
12     Q.  And who did you earn those wages from?
13     A.  Senvoy.
14     Q.  Okay.  So are you saying it would be
15 shareholder distribution that would form that
16 $17,000?
17     A.  Yes.
18     Q.  Okay.  So let me ask you another question.
19 Of course, I'm going to do so, more than one.  When
20 you were renting when you had full control over your
21 buildings TKM Investments, was one of your renters a
22 cannabis company, cannabis related?
23     A.  Two of them.
24     Q.  Two of them.  Okay.  And as I understand
25 it, cannabis-related companies don't put their money

192

1 in banks because of fear of it being seized by the
2 federal government.  So did they pay you in cash or
3 did they pay you -- how did they pay you?
4     A.  They paid us in checks for the last
5 probably -- I don't remember specifically but we got
6 three or four months of cash before we cut that off
7 and got -- then they started paying us in checks.
8     Q.  So they did actually deposit their money
9 in a bank account?
10     A.  Correct; yes.
11     Q.  Okay.  That's a surprise for me.  Thank
12 you.
13     A.  Usually credit unions.  State chartered
14 credit unions, not federally funded banks.
15     Q.  Okay.  I learn something every day.
16         And as I understood you before, Brooke
17 helped -- Ms. Wiggins helped you to fill out Exhibit
18 2?
19     A.  Yes.
20     Q.  And Ms. Wiggins is the one paying all your
21 credit cards; right?
22     A.  Yes.
23     Q.  So here's what I can't understand.  Let's
24 go to Bates stamp 30 on Exhibit 2.
25         So that lists your credit card balance at

193

1 $12,000.  And when I looked at your three -- or just
2 two of your Capital One credit cards it was over
3 $20,000.  And in fact, we stipulated to a
4 spreadsheet that we gave you for the court, that was
5 the same spreadsheet that we filed in the contempt
6 motion that the numbers in there were true and
7 correct because they were just simply copied from
8 the bank statements in terms of balances, monthly
9 payments, and purchases.  So when I see numbers on
10 your credit card statements don't match the numbers
11 you put in your declaration, it causes me concern.
12         So do you know why that number is so less
13 than what your actual credit card balances were?
14     A.  No, I do not.  It should be whatever it
15 was as of this date would be what it is.  It's
16 fairly straightforward, so.
17     Q.  Right.  And it's not.
18     A.  Yeah.  I don't know why it wouldn't be.
19     Q.  And the other thing it showed was if you
20 look back -- so let's stay on debts.  Okay?  You're
21 a guarantor to a lot of debts; right?
22     A.  Yes.
23     Q.  But the only debt listed under section
24 seven on page seven, Bates stamp 30 is that credit
25 card debt.  Given your position on promissory notes



194

1 and whatnot, you would know that that's incorrect;
2 correct?
3     A.  Yeah, absolutely.  I'm going to assume she
4 saw credit card debts but I don't know.
5     Q.  It says debts to include credit card
6 debts; right?
7     A.  Yeah, I don't -- clearly that's not even
8 remotely --
9     Q.  Okay.
10    A.  -- when you're talking about all debt.
11    Q.  Now, I'm going to go to the next page,
12 page eight.  Bates stamp 31.  Do you see the real
13 property listed under that?
14    A.  Yes.
15    Q.  We've already talked about why lots 11,
16 12, 14, and 15 were not included.  And I see that
17 there's a $3.5 million Sunstone business finance
18 debt there if you will; right?
19    A.  Yes.
20    Q.  And what I understood is that's not a real
21 property debt; correct?
22    A.  It's not -- it's collateral for a chunk of
23 land in Southeast Portland that is -- or that has
24 been trying to be developed for years.
25    Q.  Right.  And TK Investments -- who owns

195

1 that land?
2     A.  TKM Land.
3     Q.  TKM Land?
4     A.  Yes.
5     Q.  Okay.  Does TKM Land still own that?
6     A.  Yes.
7     Q.  Okay.  So why is that investment listed on
8 this declaration of financial status?
9     A.  Why isn't it?
10    Q.  Why is it?  This $3.5 -- so now I'm
11 changing gears.  I'm sorry.  To why is this $3.5
12 million listed under real property for you and your
13 spouse on Exhibit 2?
14    A.  I don't -- I don't know.  I think the
15 assumption was made -- I'm trying to think -- that
16 we have the amount of the mortgages and then you
17 have a guarantee, if you will.
18    Q.  Okay.  Now, the document that Mr.
19 Paternoster provided, or actually the two documents
20 that he provided to me for that debt, it does not
21 have -- it only has TKM Land as a debtor.  And so I
22 asked him why and he thought maybe you were debt but
23 he hasn't provided me anything.
24    A.  I'm sorry; the TKM Land?  I got lost
25 there.

196

1     Q.  Okay.  So I'm going to start it over.
2         So I asked Mr. Paternoster, I said I first
3 thought this was related to your house, right,
4 because it's located under real property.
5     A.  Yes.
6     Q.  So I said, well, did you pay it off?
7 Because you didn't provide me any documents.  He
8 said, no, let me provide you the documents for that
9 $3.5 million debt.  When he provided me the
10 documents, I believe two promissory notes, they
11 total $3.5 million debt but the only debtor is TKM
12 Land.
13        MR. GARCIA:  Is that correct, Mr.
14 Paternoster?
15        MR. PATERNOSTER:  I think that's right.
16 And then just to finish my thought, and counsel
17 certainly can follow up with a question, I think the
18 question then was, okay, well, if it's only -- if
19 the documents only show TKM Land, why is it listed
20 on this document?  And I said I didn't know but I
21 think I offered what was the speculation that it may
22 have been because you were a guarantor on that
23 property or something along those lines.  I could be
24 long.
25        MR. GARCIA:  But no documents were

197

1 provided to me.
2         MR. PATERNOSTER:  Yeah.
3         MR. GARCIA:  Showing that circumstance.
4         MR. PATERNOSTER:  And so again, maybe you
5 can --
6 BY MR. GARCIA:
7     Q.  So my question is, is the $3.5 million
8 lien, because of the two promissory notes, is that
9 totally a debt of TLK (sic) Land?
10    A.  It's a debt of TKM Land within a guarantee
11 from me.
12    Q.  Okay.
13    A.  Personally, that includes a lien on my
14 primary residence.
15    Q.  Okay.  Do you have a document to that
16 effect?
17    A.  It wasn't in the promissory notes?
18        MR. PATERNOSTER:  I'll have to look.
19        THE WITNESS:  I thought we provided -- I
20 mean, why would we give the notes and not -- that
21 doesn't make any sense.  Yeah, I mean, I would have
22 thought it would be -- we would have made the
23 assumption it was inside of those promissory notes.
24 BY MR. GARCIA:
25    Q.  Well, I want back to Mr. Paternoster with

206

1                  CERTIFICATE
2
3      I, Jordan Weems, do hereby certify that I reported all
4  proceedings adduced in the foregoing matter and that the
5  foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9      I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand this
14  28th day of October, 2021.
15
16
17
18
19
20  /S/  Jordan Weems
21
22
23
24
25

208

1                  DECLARATION
2  Deposition of: Gerald E. Brazie, Jr.    Date: 10/14/21
3  Regarding:    Secretary of Labor vs. Senvoy, LLC
4  Reporter:    Weems/Morrison
5  _____
6
7  I declare under penalty of perjury the following to
8  be true:
9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2021.
16
17
18
19
20
21
22
23
24      Signature_____
25          Gerald E. Brazie, Jr.

207

1              CORRECTION SHEET
2  Deposition of: Gerald E. Brazie, Jr.    Date: 10/14/21
3  Regarding:    Secretary of Labor vs. Senvoy, LLC
4  Reporter:    Weems/Morrison
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page.  Sign this sheet on the line provided.
10  Page   Line  Reason for Change
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24      Signature_____
25          Gerald E. Brazie, Jr.