MARC PILOTIN
Regional Solicitor
ANDREW J. SCHULTZ
Counsel for Wage and Hour
NORMAN E. GARCIA
Senior Trial Attorney
Office of the Solicitor
United States Department of Labor
90 Seventh St., Rm. 3-700
San Francisco, California 94103
Telephone: (415) 625-7747
Facsimile:  (425) 625-7772
Email: garcia.norman@dol.gov

Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARTIN J. WALSH,<br>    Secretary of Labor,<br>    United States Department of Labor,<br><br>                         Plaintiff,<br><br>                    v.<br><br>SENVOY, LLC; DRIVER RESOURCES,<br>LLC; ZOAN MANAGEMENT, INC.; and<br>GERALD E. BRAZIE, JR.,<br><br>                         Defendants. | Case No. 3:16-cv-2293-HZ<br><br>Declaration of Norman E. Garcia |

I, Norman E. Garcia, make this declaration, under the penalty of perjury, in support of the Secretary's request to lift contempt stay for Defendant Senvoy given its non-liquidation status and impending sale and request to immediately order all proceeds from its sale be given to the Secretary to pay towards the consent judgment and contempt order.

1.     I possess personal knowledge of the matters set forth in this declaration and I am competent to testify to the same, and if called to testify my testimony would be as stated in this declaration.

2.    I am employed as a Senior Trial Attorney in the Office of the Solicitor, Region IX, an Agency of the United States government.  My business address is 90 Seventh St. Rm. 3-700, San Francisco, California 94103.

3.    I am one of the Office of the Solicitor's attorneys assigned to the Senvoy, LLC; Driver Resources, LLC; Zoan Management, Inc.; and Gerald E. Brazie, Jr.'s, also known as Jerry Brazie ("Defendant Brazie"), Fair Labor Standards Act ("FLSA") case.

4.    Paragraph 8 of this Court's November 16, 2021, Contempt Order ("Contempt Order") was included in the Contempt Order because Brazie admitted, during his October 14, 2021, Debtor's Exam, that "all of the personal expenses of [his] wife and [him], be it medical, dental, groceries, eating out, entertainment, vehicle related are paid by one of [his] companies, either Senvoy or ZoAn."  Attached hereto at Exh. 1 is a true and correct copy of excerpts from Defendant Brazie's Debtor's Exam.  The cite of this quotation is 188:21-189:4.

5.    Defendant Brazie's Debtor Exam testimony and the documents that Defendants produced related to it showed that at the time the Secretary's November 4, 2021, notice was filed, the debts of Defendant Brazie and his companies exceeded their assets by millions of dollars.

6.    At the November 9, 2021, Contempt Hearing, Defendants, after consultation with their attorney, committed to paying $100,000.00 to the Secretary within 30-days of this hearing.  Because of this commitment, this Court stated that it was not going to incarcerate Defendant Brazie.  Also at this hearing, this Court ordered Defendants to pay another $100,000.00 by December 31, 2021, and for Defendants to pay monthly payments of $15,000.00 starting in 2022.

7.    On November 15, 2021, the Secretary filed a revised contempt order that was jointly drafted by Charles Paternoster for Defendants and myself for the Secretary.

8.    At the February 2, 2022, Contempt Hearing Defendant Senvoy's counsel, Nick Henderson, told this Court that Defendant Senvoy was being liquidated.

9.    On February 4, 2022, when providing a link to the documents that this Court ordered Defendants to produce, Defendant Senvoy's counsel *for the very first time* by any Defendant, stated in an e-mail: "we've identified some transactions in which Senvoy paid expenses that

were for Mr. Brazie, personally." Attached hereto at Exh. 2 is a true and correct copy of this February 4, 2022, e-mail from Nick Henderson.

10.    An examination of the February 4, 2022, document production identified that Defendant Brazie's companies (*e.g.*, Defendants Senvoy and ZoAn) paid his bills from November 9, 2021, to January 26, 2022, and that these payments included, inter alia: payments for insurance of his personally owned cars, car loan payments, payments to five different credit cards for his and his family's personal expenses, to a utility company in Tennessee, to pay back loans for Defendant Brazie's life insurance policies. Moreover, Defendant ZoAn violated the Contempt Order's paragraph 8 by making $79.000.00 in shareholder distributions from November 16, 2021, to January 3, 2022, when Defendant Brazie's bankruptcy filings showed he was its sole shareholder. Furthermore, some of these payments were made over several months to the same companies.

11.    On February 18, 2022, Senvoy's counsel provided the first accounting by any Defendant for *some* of the payments that Defendant Senvoy made for Defendant Brazie's personal expenses. These payments concerned car loan payments, credit card payments for four credit cards and progressive insurance payments. Attached hereto at Exh. 3 is a true and correct copy of this February 18, 2022, e-mail from Nick Henderson without exhibits.

12.    On February 18, 2022, I informed Senvoy's counsel that his accounting was incomplete to include, inter alia, not addressing payments that Senvoy made to Northwestern Mutual for Defendant Brazie's insurance payments. Garcia. Decl. at ¶ 12; Exh. 4 thereto. Attached hereto at Exh. 4 is a true and correct copy of my February 18, 2022, e-mail to Nick Henderson.

13.    On February 26, 2022, Defendant Senvoy's counsel provided evidence that Defendant Senvoy reversed these Northwestern Mutual payments. Garcia. Decl. at ¶ 13; Exh. 5 thereto. Attached hereto at Exh. 5 is a true and correct copy of this February 26, 2022, e-mail from Nick Henderson.

14.    On February 28, 2022, I notified the counsels of Defendants Senvoy and Brazie that their accounting is still incomplete because, inter alia, there are other payments that were made to

Northwestern Mutual for Defendant Brazie and they had not addressed any payments that Defendant ZoAn made on his behalf.  Garcia. Decl. at ¶ 14; Exh. 6 thereto.  Attached hereto at Exh. 6 is a true and correct copy of my February 28, 2022, e-mail to Nick Henderson and Doug Ricks.

15.  On February 25, 2022, in Part 2 of the Statement of Financial Affairs ("SoFA") that Defendant Brazie filed in the bankruptcy court (Case no. 22-30180-dwh, Dkt. 27) Defendant Brazie reported that he paid Senvoy $31,600.31 after the bankruptcy petition was filed.  At Defendant Brazie's 341 creditor's meeting held on March 9, 2022, he reported that this amount was to reimburse Defendant Senvoy for paying his personal bills prior to his bankruptcy filing.

16.  On March 4, 2022, Defendant Brazie's counsel responded to this February 28th, e-mail.  This counsel identified that ZoAn made a utility payment for Defendant Brazie, but made no mention of any reimbursement for it.  He also identified that there was another payment that Defendant Senvoy made for Defendant Brazie's insurance for over $1,900.00 that had not been previously accounted for and that Defendant Senvoy made payments to Northwestern Mutual to repay loans without stating the amounts of these loan payments nor who owned the insurance policies that they were made on.  He further admitted that ZoAn made $79,000.00 in shareholder distributions.  Lastly, he stated that he "asked Ms. Wiggins [Defendants' Bookkeeper] to undertake such a review of the financials and have discussed her findings from that review in detail."  Attached hereto at Exh. 7 is a true and correct copy of this March 4, 2022, e-mail from Doug Ricks.

17.  On March 7, 2022, I responded to this March 4th e-mail and identified many problems with it.  Despite the alleged detailed review by Defendant's bookkeeper, Ms. Wiggins, I identified that there were still payments that Defendant Brazie's companies made for him that have not been accounted for.  I further identified that even though Defendant Brazie listed "Cabela's" as a creditor in his bankruptcy schedules, Defendant Senvoy, on four separate occasions, paid Cabela's a total of $6,500.00 from November 9, 2022, through and including December 19,

2021.  Attached hereto at Exh. 8 is a true and correct copy of my March 7, 2022, e-mail to Doug Ricks.

18.    The documents that Defendant Senvoy's counsel produced on February 4, 2022, showed that Defendant Brazie and his wife made charges on this Cabela's credit card for: many different restaurants and eating establishments in Tennessee and Las Vegas, NV; many shops in Las Vegas, NV; medical such as Kaiser and 1-800 contacts; Uber for Mrs. Brazie who does not work for Defendants, Nashville Zoo; different movie theaters in Tennessee or shows in Las Vegas such as Excalibur; many stores in Tennessee including Target, Walmart, Krogers, AT Homestore, Mid-South Mowing, Publix, XL Destination, Nike POS, WM Superstore, Aide and Oak, Amy's Hallmark; gas stations in Tennessee; lodging in Kentucky; stores exclusively for Mrs. Brazie like Hand and Stone Message, Loma Beauty, Dime Beauty, L'ange Hair, Salon Social, Southern Boutiques, Sun Tan City, Bath and Body works; MJS Pool Hall; You Tube Premium; Google for Fox News; Amazon web services.  Attached hereto at Exh. 9 are true and correct copies of the three Cabala's credit card statements for Defendant Brazie that Defendant Senvoy produced on February 4, 2022, to the Secretary for the months of November 2021 to January 2022.

19.    I further identified in my March 7, 2022, e-mail to Defendant Brazie's counsel that the only loans that Defendant Brazie identified during his Debtor's exam that were taken from Northwestern Mutual Life Insurance policies were Defendant Brazie's life insurance policies and therefore it was a violation of the Contempt Order for Defendant Senvoy to pay back Defendant Brazie's loans.

20.    I still further identified in my March 7, 2022, e-mail to Defendant Brazie's counsel that it was a violation of the Contempt Order for ZoAn to make shareholder distributions to Defendant Brazie because it was prohibited from doing so under paragraph 8 of the Contempt Order.

21.    Defendant Brazie's bankruptcy findings identified that he was the sole/100% shareholder for ZoAn.

22. Defendant Brazie checked "no" to the following question in his SoFA filed on February 25, 2022: "Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?" even though this statement defined an insider as "partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor." Attached hereto at Exh. 10 is a true and correct copy of Dkt. 27, Statement of Financial Affairs evidencing this question and response.

23. On March 9, 2022, Defendant Brazie's 341 Creditor's Meeting was held.  At this Creditor's meeting, Defendant Brazie identified, *inter alia*: (1) Defendant Senvoy was not being liquidated and it was continuing to operate; (2) he changed his mind about liquidating Senvoy after the February 2, 2022, Contempt Hearing; and (3) he had a letter of intent to buy Senvoy for $300,000.00.  Also at this creditor's meeting, Defendant Brazie's counsel, *inter alia*, stated (1) he could not identify any attorney who was representing ZoAn to seek Defendant Brazie's repayment because Defendant ZoAn had ceased operations at the end of 2021, and (2) he admitted that ZoAn made shareholder distributions to Defendant Brazie.

24. On March 10, 2022, I sent Defendant Brazie's counsel an e-mail that questioned his representation that Defendant ZoAn ceased operating in 2021 given that its "Jan. 2022 GL shows that it was still operating in at least Jan 2022 wherein it paid out over $30K in payroll expenses, paid dental insurance, paid $9K in shareholder distributions, etc.  How could it be doing these activities, especially employee payroll, if it ceased operations in 2021?"  While Defendant Brazie's counsel recognized that this $9,000.00 shareholder distribution was made, he has not addressed how these actions could have taken place in January 2022 if ZoAn had, in fact, ceased operations at the end of 2021.  Attached hereto at Exh. 11 is a true and correct copy of my March 10, 2022, e-mail to Doug Ricks.

25. To date, while Senvoy has continued operations in 2022, neither it nor any of the other Defendants have made any of the required $15,000.00 monthly payments that are due on the

28th of each month under paragraph 3 of the Contempt Order even though paragraph 4 of this Order made all Defendants jointly and severally liable for all of the required payments.  This means that as of the date of this filing, Defendant Senvoy has not made two of the required $15,000 payments totaling $30,000.00 even though Defendant Brazie reimbursed it over $31,600 for payments that Defendant Senvoy made to it in violation of the Contempt Order.

26.   The sum of Defendant Senvoy's and Defendant ZoAn's prohibited payments of Defendant Brazie's personal bills and Defendant ZoAn's shareholder distributions total over $150,000.00 given that Defendant Brazie's counsel admitted that Defendant ZoAn made $79.000.00 in shareholder distributions from November 16, 2021, to January 3, 2022.

27.   Defendant Brazie admitted at his Debtor's Exam that he was a guarantee for a $3,500,000.00 lien for TKM Land and that the value of TKM Land on his personal financial statement should have been negative.  The Exh.1 attached hereto contains Exh. 1 from the Debtor's Exam which is the Personal Financial Statement that Defendant Brazie submitted in his Court ordered document production prior to the exam.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed:  March 14, 2022

    /s/  Norman E. Garcia
NORMAN E. GARCIA

# Exhibit 1



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



(800) 528-3335

NAEGELIUSA.COM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**


MARTIN J. WALSH, SECRETARY OF LABOR,

          Petitioner,

Vs.                              CASE NO.: 3:16-CV-02293-HZ

SENVOY, LLC; DRIVER RESOURCES, LLC;
ZOAN MANAGEMENT, INC.; and
GERALD E. BRAZIE, JR.,

          Respondents.

_____


**DEPOSITION OF**

**GERALD E. BRAZIE, JR.**


**TAKEN ON**
**THURSDAY, OCTOBER 14, 2021**
**9:05 A.M.**


**620 SOUTHWEST MAIN STREET, ROOM 419**
**PORTLAND, OREGON  97205**

30

1    Q.   And those included American Express bank
2 statements?
3    A.   Yes.
4        MR. GARCIA:  Court Reporter, please mark
5 this next document as Exhibit 1.
6        THE REPORTER:  Exhibit 1, sir?
7        MR. GARCIA:  Yes.
8        THE REPORTER:  It's been marked as such.
9        MR. GARCIA:  Please provide it to the
10 witness.
11        THE REPORTER:  Yes, sir.
12        (WHEREUPON, Exhibit 1 was marked for
13 identification.)
14 BY MR. GARCIA:
15    Q.   Mr. Brazie, do you recognize that
16 document?
17    A.   Yes.
18    Q.   What is it?
19    A.   My personal financial statement.
20    Q.   Did you help to prepare that?
21    A.   Yes.
22    Q.   Is the information on it true and correct?
23    A.   I believe so.
24    Q.   Is the information on it complete?
25    A.   I believe so.

31

1    Q.   Now, I notice that TKM Investment
2 Properties is not located on it; correct?
3    A.   Correct.
4    Q.   Why?
5    A.   There is no value in TKM.
6    Q.   So no value in TKM Investment Properties?
7    A.   Excuse me.  I'm sorry.  There -- I'm
8 sorry.  When we did this there's no -- TKM
9 essentially has no assets, no longer has any value.
10    Q.   Well, you identified the other three
11 companies have zero assets and value; right?
12    A.   Correct.
13    Q.   So why wasn't TKM Investment Properties
14 listed?
15    A.   The other companies are still -- are still
16 operating.
17    Q.   Well, you just said it was not provided
18 because it had no assets.
19    A.   Correct.  No longer operating, doesn't
20 have any assets.
21    Q.   Oh, okay.
22    A.   There's no value.
23    Q.   So, okay.  So now you're changing it to no
24 longer operating and no assets; correct?
25    A.   Yes.

32

1    Q.   Who prepared Exhibit 1?
2    A.   Brooke Wiggins.
3    Q.   Did you verify the information in it?
4    A.   Yes.
5    Q.   How did you do so?
6    A.   We went through item by item.
7    Q.   And did you look at documents to verify
8 the information?
9    A.   I did not.
10    Q.   So how do you know it's true and accurate?
11    A.   I took her word for it.
12    Q.   So you actually don't know; correct?
13    A.   Correct.
14    Q.   So you produced a financial statement
15 based on a court order and you did not even take the
16 time to verify any of the information on it with
17 documents?
18    A.   No.
19    Q.   Is that a correct statement?
20    A.   That is a correct statement.
21    Q.   Why not?
22    A.   Brooke does all of this for me.
23    Q.   So --
24    A.   So she would know the number better than I
25 would.

33

1    Q.   People make mistakes; correct?
2    A.   They do.
3    Q.   And financials usually have documents
4 attached to them; correct?
5    A.   They do.
6    Q.   And yet you didn't look at any documents
7 and you put your total faith in Ms. -- is Brooke her
8 first name or last name?
9    A.   First name.  Yes, correct.
10    Q.   What is her last name?
11    A.   Wiggins.
12    Q.   Have all the documents that have been used
13 to come up with the figures at Exhibit 1, have they
14 been produced to me?
15    A.   I don't know.
16    Q.   Did you instruct Ms. Wiggins?
17        So for the record, since I found out
18 Brooke is the first name -- I should have asked it
19 before.  I apologize -- I will now refer to Brooke
20 as Ms. Wiggins.
21        Did you ask Ms. Wiggins if she provided to
22 you all the documents that would support the numbers
23 in Exhibit 1?
24    A.   Yes.
25    Q.   And what did she say?

150

1    A.  Yes.
2    Q.  And who's the shareholder for ZoAn?
3    A.  Me.
4    Q.  So ZoAn sends -- correct.  Senvoy sends
5  $150,000 to ZoAn and then a couple days later ZoAn
6  makes a distribution of $50,000 to you; correct?
7    A.  Yes.
8    Q.  So then the money that Senvoy sent to ZoAn
9  was not just to pay their payroll, it's also to make
10  a distribution to you; correct?
11    A.  I don't know but that distribution did
12  take place.
13    Q.  Right.  Within days of that money being
14  sent from Senvoy to ZoAn; correct?
15    A.  Yes.
16    Q.  Now, I'm going to go back to your
17  declaration, Exhibit 15.  And I want you to go to
18  page nine, paragraph 56.
19      Are you there?
20    A.  Yes.
21    Q.  I'm going to read paragraph 56.  It says,
22  "To keep the company going, I have contributed my
23  own money, for the most part, everything I have, to
24  keep the company afloat over the last four years."
25      Did I read that correctly?

151

1    A.  Yes.
2    Q.  Okay.  So here we have Senvoy sending ZoAn
3  $150,000 and then shortly thereafter, literally
4  within days, ZoAn is making a distribution of
5  $50,000 to you; correct?
6    A.  Yes.
7    Q.  So is that statement in paragraph 56 true?
8    A.  One hundred percent, absolutely.  We don't
9  know where this money went.  Well, I'd have to find
10  that out whether it went to pay back debt, whether
11  or not it moved onto somewhere else.  I don't know.
12    Q.  But it's --
13    A.  So --
14    Q.  I'm sorry; I didn't mean to interrupt.
15    A.  And there had been money going in and
16  going out now for four years as I've been covering
17  the expenses and the shortfall, particularly over
18  the last -- or in particular in '19 and '20.  So did
19  I put this money in my pocket?  I doubt it but I
20  don't have the history on that but I stand by my
21  statement 100 percent.
22    Q.  So let me ask you this then because I'm a
23  little confused.  Yeah, I'm confused.  Why would
24  Senvoy have to send money to ZoAn so ZoAn can make a
25  shareholder's distribution?

152

1    A.  That's, like I said, I don't know.  I'll
2  have to find that out.
3    Q.  This is not the first time, nor the only
4  time that that has been done.
5    A.  No, it happens all the time.
6      MR. GARCIA:  Would you please mark the
7  next document as Exhibit 18, please?
8      THE REPORTER:  It's been marked as such.
9      (WHEREUPON, Exhibit 18 was marked for
10  identification.)
11  BY MR. GARCIA:
12    Q.  So one thing, I'm just going to go on the
13  record back to Exhibit 16.  Exhibit 16 is a general
14  ledger for ZoAn Management.  It's from Bates stamp
15  5635 to Bates stamp 5644.  And it's a general ledger
16  of the Key Bank Checking for ZoAn Management for the
17  year of 2020.
18      Exhibit 18 is also ZoAn Management General
19  Ledger as of December 31, 2020 from Bates stamp 5712
20  to Bates stamp 5713.
21      Do you recognize Exhibit 18?
22    A.  Yes.
23    Q.  Okay.  Exhibit 18, at the bottom of
24  Exhibit 18, the first page, continuing on to the
25  second page is Shareholder Distributions by ZoAn

153

1  Management; correct?
2      MR. PATERNOSTER:  Counsel, can we just
3  confirm for the record, I think you said Exhibit 18.
4  Are we working off of Exhibit 17 still?  We may not
5  have a copy of Exhibit 18.
6      MR. GARCIA:  If you do not have a copy, I
7  apologize.
8      MR. PATERNOSTER:  No.  It's numbered.  It
9  could have been a lot of different things.  All
10  right, I think we're good.
11      MR. GARCIA:  Okay.
12      MR. PATERNOSTER:  Thank you.  Sorry.
13      MR. GARCIA:  No problem.
14  BY MR. GARCIA:
15    Q.  So at the bottom of Exhibit 18, the first
16  page of Bates stamp 5712, continuing on to Bates
17  stamp 5713, it identifies the shareholder
18  distributions that ZoAn Management, Inc. has made
19  for 2020; correct?
20    A.  Yes.
21    Q.  And on the second page of Exhibit 18,
22  Bates stamp 5713, identifies a total of $209,950.39
23  of shareholder distributions; correct?
24    A.  Yes.
25    Q.  And again, you're the only shareholder of



154

1 ZoAn Management, Inc.; correct?
2    A.   Correct.
3        MR. GARCIA:  Counsel, I apologize -- no,
4 okay.
5        MR. PATERNOSTER:  Did I mess up your
6 numbers?
7        MR. GARCIA:  Yeah.
8        Go off the record for a second.
9        THE REPORTER:  The time is 1:21 p.m. and
10 we are now off the record.
11       (WHEREUPON, a recess was taken.)
12       THE REPORTER:  The time is 1:22 p.m. and
13 we are now back on the record.
14       MR. GARCIA:  So I just want to correct the
15 record.  There is no Exhibit 17.
16       I'm going to ask you to mark this document
17 as Exhibit 19.
18       THE REPORTER:  It has been marked as such.
19       (WHEREUPON, Exhibit 19 was marked for
20 identification.)
21 BY MR. GARCIA:
22    Q.   Mr. Brazie, Exhibit 19 is ZoAn Management,
23 Inc. general ledger as of August 31, 2021 with a
24 Bates stamp 7030; correct?
25    A.   Yes.

155

1    Q.   And this document identifies the
2 shareholder distribution for year to date up until
3 August 31, 2021 is a total of $291,000 year to date
4 August 31, 2021; correct?
5    A.   Correct.
6    Q.   And you don't know where the shareholder
7 distribution went; correct?
8    A.   I don't have the details for that.  No.
9        MR. GARCIA:  Please mark the next document
10 as Exhibit 20.  But don't give it to him yet.
11       THE REPORTER:  Okay.
12       (WHEREUPON, Exhibit 20 was marked for
13 identification.)
14 BY MR. GARCIA:
15    Q.   So Mr. Brazie, what are the expenses or
16 the costs that ZoAn Management has?
17    A.   Mostly employee.
18    Q.   Employee-related costs, like benefits,
19 pay?
20    A.   Yes.
21    Q.   Things of that nature?  Have any other
22 costs besides employee-related costs?
23    A.   I'm sure it has some overhead, rent,
24 things of that nature.
25       MR. GARCIA:  You may now give him Exhibit

156

1 20.
2 BY MR. GARCIA:
3    Q.   Mr. Brazie, do you recognize Exhibit 20?
4    A.   Yes.
5    Q.   What is it?
6    A.   General ledger again from ZoAn Management
7 through August 31, 2021.
8    Q.   Right.  And for this particular one it's
9 Bates stamped 7057 to 7058.  Now, I'm focusing on
10 the utilities for ZoAn Management.
11       Do you recognize any of the bills
12 underneath that?
13    A.   I can -- I don't but they're clearly mine
14 from my house in Tennessee.
15    Q.   Correct.  So, and it's just the bills that
16 are being paid each month.
17    A.   Correct.
18    Q.   I'm just going to go through them.  Not
19 the amounts but the, excuse me, the types of bills.
20       Do you know what Microfton Utility
21 District, do you know what utilities that provides?
22    A.   No.
23    Q.   It provides water.
24       And Franklinton is in Williamson County;
25 correct?

157

1    A.   Yes.
2    Q.   City of Franklin.  Do you know what those
3 payments were for?
4    A.   No.
5    Q.   Do you know whether they were payments for
6 garbage?
7    A.   I don't know.
8    Q.   Okay.  Do you see there's also Atmos
9 Energy.
10       Do you know what services Atmos Energy
11 provides?
12    A.   No.
13    Q.   You don't know whether it provides natural
14 gas, like on its website?
15    A.   I do not.
16    Q.   Okay.  And then Comcast Tennessee.  And do
17 you have cable and TV service at your home in
18 Tennessee?
19    A.   Yes.
20    Q.   Do you know who provides it?
21    A.   Comcast.
22    Q.   And so if you look on the second page of
23 Exhibit 20, Bates stamp 7058, it identifies year to
24 date that it's over $10,000 that's been paid for
25 your utilities in Tennessee; correct?

162

1 that and so I can get you the answer to that
2 question. It's just that wouldn't be the type of
3 thing that I would concentrate on.
4    Q. I understand that. But I guess do you
5 also know that a corporation needs an attorney to
6 represent it in a court of law, in the Federal
7 District Courts?
8    A. I'm sorry?
9    Q. Do you know that a corporation needs an
10 attorney to represent it? It cannot represent
11 itself pro se?
12    A. No.
13    Q. So you don't know of the extra issues that
14 are involved with a company being a corporation as
15 opposed to a limited liability company; would that
16 be correct?
17    A. Off the top of my head, no.
18    Q. And I hate to repeat myself and I
19 apologize if I said this earlier. You see no issue
20 in consolidating the functions that ZoAn Management,
21 Inc. performs into Senvoy, LLC; correct?
22    A. Correct.
23    Q. Now, we're going to go back to Exhibit 1.
24 You should always keep Exhibit 1 separate.
25    A. And of course I didn't.

163

1    Q. That's okay.
2       Is that my personal financial statement?
3    A. Yes.
4    Q. That's why I made it number one.
5    A. There it is.
6    Q. Okay. Now, in that you said that your
7 companies are Senvoy, LLC; TKM Land, LLC; and ZoAn
8 Management, Inc. all have a value of zero.
9    A. Yes.
10    Q. How was that determination made?
11    A. The companies are all currently either
12 under water or losing money and the debt that they
13 have.
14    Q. And who made that determination?
15    A. Me
16    Q. Did you look at financials to make that
17 determination?
18    A. Yes.
19    Q. What did you look at?
20    A. It would have been financials, you know,
21 through June 30. It's pretty straightforward. Just
22 looking at the debt that the companies have would
23 tell you that there's very little -- there's very
24 little value there.
25    Q. So I'd really like to know what you

164

1 specifically looked at to make that determination.
2    A. I don't have to look at it. In fact,
3 whatever I looked at, I don't have to look at
4 anything. I know what the companies are worth. I
5 work in it every day. So the revenue is down almost
6 60 percent since 2018. And the land is about $3.5
7 million in debt against what might be $1.2 million
8 asset. It's a development that hasn't been able to
9 get off the ground, nor will it obviously any time
10 soon. So you take the loss of revenue, the
11 additional expenses that are combined, that are
12 added because of the cost of operating today in the
13 world of COVID. Costs have gone through the roof.
14 So both companies are unprofitable. We'll say all
15 three companies, Senvoy and to a smaller extent, TKM Land,
16 companies, Senvoy and to a smaller extent, TKM Land,
17 hold zero value if I were to try to sell them.
18    Q. So what I'm hearing you saying is they
19 have no value based on your experience based on the
20 debts and the loan.
21    A. And the operations.
22    Q. And the operations.
23    A. Yes.
24    Q. But you have not looked at any particular
25 documents showing the value of those companies;

165

1 correct?
2    A. The document would just tell me what I put
3 on the document so I wouldn't look at a document. I
4 know without looking at it.
5    Q. Right. But you don't put the figures in
6 the document, right, because Ms. Wiggins does;
7 correct?
8    A. Well, I don't do the financials if that's
9 your question.
10    Q. Right.
11    A. Yeah; correct.
12    Q. Right. Because, so therefore, you don't
13 do the financials in the document; correct?
14    A. I don't do the financials. That's
15 correct. I just look at them.
16    Q. Right. And so what I'm asking you is did
17 you actually look at the financials before you made
18 that determination of zero?
19    A. Yes.
20    Q. And what financial documents did you look
21 at?
22    A. I don't remember the months specifically
23 but pretty much any month would tell me the same
24 thing.
25    Q. So what I'm understanding you to say is



166

1  really if I looked at the documents, the documents
2  would show me, but you can't remember what you
3  looked at.  Is that what you're telling me?
4      A.  Well, it doesn't change what I looked at.
5  I said it's either, any month that I happen to look
6  at is going to tell me what I need to know which is
7  that the companies are -- have zero value.  Add on
8  top of it that I have independent -- or I don't use
9  independent contractors which is what 90 percent of
10  the market does and it makes the company even less
11  marketable.  So you have to take that into account.
12  So you have a company with negative cash flow.
13  You've got a company that's not making a net profit
14  when you look at ZoAn and Senvoy and TKM Land
15  together.
16      Q.  But these companies that have zero value
17  and a have a loss in revenue and are not making any
18  money are paying your personal bills; right?
19      A.  Well, again, the question there is, yeah,
20  if they didn't pay my personal bills I would then
21  have to shut this company down and go --
22      Q.  Right.
23      A.  -- do something else.
24      Q.  Right.  So the function of Senvoy is to
25  remain open to pay your bills; right?

167

1      A.  Well, that, and I have, you know, 75-80
2  employees, many of which have worked for me for 20
3  years.
4      Q.  Right.
5      A.  So I feel a responsibility for them,
6  obviously.
7      Q.  But you also have employees that worked
8  with you that are part of that $3.2 million
9  judgment; correct?
10      A.  Correct.
11      Q.  And --
12      A.  That doesn't change the fact that 85
13  people will be out of business if I close down.
14      Q.  Right.  But let's look at your expenses;
15  right?
16      A.  Okay.
17      Q.  You're making personal expenses of going
18  out and your wife is charging for massages and nails
19  and your wife is buying wine and your boss -- if I
20  said your boss I made a mistake.  It's your wife.
21  And your wife is going to Calhoun's.  And I'll get
22  into some of the other expenses shortly.  But if a
23  company is in dire financial straits as you say,
24  then why are you making those type of expenditures?
25      A.  Again, I have to -- I have to live.

168

1      Either I'm able to pay myself a salary, pay myself
2  money in order to do that or I have to go do that
3  somewhere else.  So if I can do that inside of the
4  company the way that I have, we keep everybody
5  employed, that's a win-win for everybody.  If I'm
6  not going to pay myself, why would I work?
7      Q.  So let me say it a different way.  You
8  are, as I noted in the documents that were filed
9  with the court for contempt, there was a three-month
10  timespan in 2020 where you and your wife were
11  incurring over $80 in one sitting in a bill that was
12  used on the credit card every other day in a three-
13  month period.  There's a difference between I have
14  to live and I have to go buy groceries as opposed to
15  going out and living that type of lifestyle.  So if
16  a company is in dire financial straits, why are you
17  spending so much money on what you're spending money
18  on?
19      A.  My value is whatever I think it is.  So
20  either my time is worth it for me to pay myself or
21  it's not.  And if it's not, and if I can't get what
22  I think I'm worth, then I simply will bankrupt that,
23  shut it down, and go do something else.  I try not
24  to -- I've avoided doing that because I, like I
25  said, I have 85 employees in a business that have

169

1  been around for 25 years.
2      But the reality is, the question you're
3  really getting at is paying the Department of Labor
4  back and paying those employees back and what I
5  spend every month has never had an impact on whether
6  or not I'm able to pay those people.  The reality is
7  that they were going to get paid out of real estate
8  sales that I was doing and that would have been --
9  that was the only way that they were going to get
10  the $3.2 million.  That obviously blew up for a
11  myriad of reasons in the intervening two and a half
12  years, and that's the reason that we're sitting
13  here.
14      How much my wife spends at Bed Bath &
15  Beyond isn't going to get the $3.2 million paid
16  back, nor is it going to get the millions that are
17  owed to the other entities also.  They're not going
18  to get paid back.  Had I been able to close the real
19  estate like we were working on then the feds were
20  the first ones to get paid.  That didn't happen.
21      Q.  Okay.  But what I understand you to say,
22  and again, you know, like I've done throughout the
23  deposition, I tried to summarize what I understand
24  you to say and ask you to correct.  I understand
25  that you are a sophisticated businessman.  That

186

1  of those -- or guaranteed payments -- as you go
2  through those credit card payments, those are then
3  taken in the aggregate and what belonged to me, it
4  comes to me as a guaranteed payment, flows through
5  my tax returns as income and then what is company
6  expenses gets expensed.
7      Q.  Okay.  But we have no -- but you have not
8  filed 2019 and 2020 tax returns?
9      A.  Correct.
10     Q.  So that has not happened yet of what you
11  just said; correct?
12     A.  Correct.  But it's happened in previous
13  years, so you can look to 2018 as an example.
14     Q.  But I've not received the 2018 general
15  ledger.
16     A.  Okay.
17     MR. PATERNOSTER:  Did we only provide '19
18  through '21?
19     MR. GARCIA:  Yeah.  That's my predicament.
20     THE WITNESS:  I don't remember what your
21  original question was, sorry, but that was -- when
22  you said Senvoy pays the bills, I wanted to make
23  sure that --
24  BY MR. GARCIA:
25     Q.  Okay.  So I understand what you're

187

1  testifying.  What I understand you saying, and I
2  think you said this earlier, but your companies, be
3  it ZoAn or Senvoy, pay your private personal bills
4  and that you believe that at the end of the year
5  there's a reconciliation of those payments.
6      A.  Yes.
7      Q.  Okay.  Such that the payments for you get
8  charged to you?
9      A.  Yes.
10     Q.  Okay.  And one statement I will make to
11  you is you have all this transfers of money going
12  between one account or one business to another
13  business.  We walked through one of them.  That was
14  the $150,000 from Senvoy to ZoAn and then a couple
15  days later there was a $50,000 shareholder
16  distribution.  And so usually when I see that
17  happening like that where it bounces around to
18  different companies, it's to cause confusion and to
19  hide things because then you literally have to
20  follow the money and then I tracked back.  That's
21  how I found out that Senvoy was paying for your
22  credit cards is because I got the credit card
23  statement from Capital One and then I tracked back
24  the routing number and the account number and found
25  out it was Senvoy.  So that's what happens when you

188

1  have money and payments going through several
2  different accounts to do that.  And usually, like I
3  said, I'm not casting any dispersions against you.
4  Usually I find out that's when people are trying to
5  hide money to do that.
6      So long story short, that's why I'm
7  expressing concern, partially why I'm asking you
8  these questions because I have serious concerns when
9  we're told that, well, at the end of the year we
10  reconcile because I've seen many times where that
11  does not occur.
12     Okay.  So I actually have a couple
13  statements to go through that would show that you
14  made charges at like at Universal Men's Clinic;
15  correct?
16     A.  Yes.
17     Q.  And you've made multiple charges at that?
18     A.  Yes.
19     Q.  And I won't go into detail and ask you
20  what that is for.
21     So let me, in lieu of that, let me just
22  ask you this.  Other than that State Farm Insurance
23  policy premium that we saw on Columbia Bank less
24  than $20 appears to be made on a monthly basis, is
25  it safe to say that all of the personal expenses of

189

1  your wife and you, be it medical, dental, groceries,
2  eating out, entertainment, vehicle related are paid
3  by one of your companies, either Senvoy or ZoAn?
4      A.  Yes.
5      Q.  Okay.  And then you have the expectation
6  at the end of the year that those would be
7  reconciled; correct?
8      A.  Yes.
9      Q.  Okay.  I want to go back to Exhibit 2.
10  That's your declaration of financial status.
11     A.  Okay.
12     Q.  Okay.  So on page five of that -- I've got
13  to find where -- okay.  Page five, Bates stamp 28.
14     A.  Okay.
15     Q.  At the top you show a total monthly income
16  of $20,928.  Do you see that?
17     A.  Yes.
18     Q.  And under declarant it's $3,928.  That's
19  for wages; right?
20     A.  Yes.
21     Q.  And then other income from all sources is
22  $17,000; correct?
23     A.  Yes.
24     Q.  What is your source of income?  How much
25  income do you get from whom to make up that $17,000

194

1  and whatnot, you would know that that's incorrect;
2  correct?
3      A.  Yeah, absolutely.  I'm going to assume she
4  saw credit card debts but I don't know.
5      Q.  It says debts to include credit card
6  debts; right?
7      A.  Yeah, I don't -- clearly that's not even
8  remotely --
9      Q.  Okay.
10     A.  -- when you're talking about all debt.
11     Q.  Now, I'm going to go to the next page,
12  page eight.  Bates stamp 31.  Do you see the real
13  property listed under that?
14     A.  Yes.
15     Q.  We've already talked about why lots 11,
16  12, 14, and 15 were not included.  And I see that
17  there's a $3.5 million Sunstone business finance
18  debt there if you will; right?
19     A.  Yes.
20     Q.  And what I understood is that's not a real
21  property debt; correct?
22     A.  It's not -- it's collateral for a chunk of
23  land in Southeast Portland that is -- or that has
24  been trying to be developed for years.
25     Q.  Right.  And TK Investments -- who owns

195

1  that land?
2      A.  TKM Land.
3      Q.  TKM Land?
4      A.  Yes.
5      Q.  Okay.  Does TKM Land still own that?
6      A.  Yes.
7      Q.  Okay.  So why is that investment listed on
8  this declaration of financial status?
9      A.  Why isn't it?
10     Q.  Why is it?  This $3.5 -- so now I'm
11  changing gears.  I'm sorry.  To why is this $3.5
12  million listed under real property for you and your
13  spouse on Exhibit 2?
14     A.  I don't -- I don't know.  I think the
15  assumption was made -- I'm trying to think -- that
16  we have the amount of the mortgages and then you
17  have a guarantee, if you will.
18     Q.  Okay.  Now, the document that Mr.
19  Paternoster provided, or actually the two documents
20  that he provided to me for that debt, it does not
21  have -- it only has TKM Land as a debtor.  And so I
22  asked him why and he thought maybe you were debt but
23  he hasn't provided me anything.
24     A.  I'm sorry; the TKM Land?  I got lost
25  there.

196

1      Q.  Okay.  So I'm going to start it over.
2      So I asked Mr. Paternoster, I said I first
3  thought this was related to your house, right,
4  because it's located under real property.
5      A.  Yes.
6      Q.  So I said, well, did you pay it off?
7  Because you didn't provide me any documents.  He
8  said, no, let me provide you the documents for that
9  $3.5 million debt.  When he provided me the
10  documents, I believe two promissory notes, they
11  total $3.5 million debt but the only debtor is TKM
12  Land.
13     MR. GARCIA:  Is that correct, Mr.
14  Paternoster?
15     MR. PATERNOSTER:  I think that's right.
16  And then just to finish my thought, and counsel
17  certainly can follow up with a question, I think the
18  question then was, okay, well, if it's only -- if
19  the documents only show TKM Land, why is it listed
20  on this document?  And I said I didn't know but I
21  think I offered what was the speculation that it may
22  have been because you were a guarantor on that
23  property or something along those lines.  I could be
24  long.
25     MR. GARCIA:  But no documents were

197

1  provided to me.
2      MR. PATERNOSTER:  Yeah.
3      MR. GARCIA:  Showing that circumstance.
4      MR. PATERNOSTER:  And so again, maybe you
5  can --
6  BY MR. GARCIA:
7      Q.  So my question is, is the $3.5 million
8  lien, because of the two promissory notes, is that
9  totally a debt of TLK (sic) Land?
10     A.  It's a debt of TKM Land within a guarantee
11  from me.
12     Q.  Okay.
13     A.  Personally, that includes a lien on my
14  primary residence.
15     Q.  Okay.  Do you have a document to that
16  effect?
17     A.  It wasn't in the promissory notes?
18     MR. PATERNOSTER:  I'll have to look.
19     THE WITNESS:  I thought we provided -- I
20  mean, why would we give the notes and not -- that
21  doesn't make any sense.  Yeah, I mean, I would have
22  thought it would be -- we would have made the
23  assumption it was inside of those promissory notes.
24  BY MR. GARCIA:
25     Q.  Well, I want back to Mr. Paternoster with



198

1 that question and he was not able to answer it so
2 that's why I'm asking you it today to try to
3 understand what it is because --
4 A. So TKM Land has the deal with the lender.
5 I'm the owner of TKM Land.
6 Q. I understand that.
7 A. Okay.
8 Q. But here's the issue. Why is -- because
9 the first thing that brought it up is why is that
10 $3.5 million not listed on Exhibit 1 for your house?
11 A. I don't know.
12 Q. Okay.
13 A. Yeah, because it's in here as zero and it
14 should be a negative.
15 Q. Well, that's what I'm trying to
16 understand.
17 A. Yeah.
18 Q. Is when I don't have two documents match,
19 it's like my little radar goes off and I start
20 asking questions. And I've been asking questions
21 for several weeks now and so far I have not received
22 a definitive answer that I can look back at
23 documentation to do it because obviously, $3.5
24 million debt, there's going to be documentation if
25 someone's on the hook for that or some legal entity

199

1 is on the hook for that. So I'm seeking to have
2 that.
3     MR. PATERNOSTER: I'm sorry; you think
4 that would have been with the promissory note?
5     THE WITNESS: Yeah. I would have -- I
6 mean, I don't know why we would send promissory
7 notes, it wouldn't be in there in total. So that
8 doesn't make sense.
9 BY MR. GARCIA:
10 Q. And, you know, I may have missed it but
11 usually it's right at the beginning on the first
12 page.
13 A. Yeah, trust me. There's documentation --
14     MR. PATERNOSTER: We will certainly --
15 it's certainly not something we're trying to hide.
16 And I will also represent that we have produced
17 every document that we received and not withheld any
18 so we may have --
19     MR. GARCIA: Well, I have issues with that
20 because we've already discussed things like the
21 Northwestern Mutual that it's within his control to
22 acquire.
23 BY MR. GARCIA:
24 Q. Do you know someone, and I'm terrible with
25 names so I'll spell it, first name G-U-I-L-H-E-R-M-

200

1 E, last name B-E-S-B-A-T-I?
2 A. You lost me on that spelling.
3 Q. Do you know anyone name Mr. Besbati,
4 B-E-S-B-A-T-I?
5 A. It doesn't sound familiar at all.
6 Q. Because there are several -- there are
7 lots of charges for him. And you don't know who
8 that is?
9 A. It doesn't sound familiar at all.
10 Q. Okay. Let me bring up another name that
11 appears a lot. Maybe I'm looking at the wrong one.
12     This first one says -- or I'm sorry, it's
13 a hyphenated last name, N-E-W-R-E-Z hyphen
14 S-H-E-L-L-P-O-I-N-A-C-H.
15     Do you know that person?
16 A. No.
17 Q. Okay. Because this person gets a sizeable
18 amount, thousands and thousands of dollars multiple
19 times. They're getting, it seems like every month,
20 2021, $2,067.01.
21     Are you the holder of any other credit
22 card statement -- or correction. Any other credit
23 card accounts that we haven't identified today?
24 A. I don't believe so. No.
25 Q. Now, there's a Key Bank Visa account, last

201

1 four 3673.
2     Do you know anything about that account?
3 A. A Key Bank Visa you said?
4 Q. Yes. 3673.
5 A. I don't know other than it's a credit
6 card.
7 Q. Do you have a company named S-A- -- or do
8 you know of a company S-A-I-F Corporation?
9 A. Yeah, that's SAIF. That's workers' comp.
10 Q. Okay.
11 A. Here in the State of Oregon.
12 Q. And e-Courier. Do you do business with
13 e-Courier?
14 A. Yeah, that's our operating system.
15 Q. Okay. How many vehicles does Senvoy have?
16 A. Oh, I don't know. Maybe six or eight.
17 Q. Okay. So who drives the vehicles? We
18 know that your three daughters drive three and your
19 wife drives one. What are the other four -- who
20 drives the other four vehicles?
21 A. They're -- we have three or four transit
22 vehicles that are driven by employees for transit.
23 You know, vans.
24 Q. And what are the transit vans used --
25 A. For transit. It's a van. You know, a



206

1                    CERTIFICATE
2
3        I, Jordan Weems, do hereby certify that I reported all
4    proceedings adduced in the foregoing matter and that the
5    foregoing transcript pages constitutes a full, true,
6    and accurate record of said proceedings to the best of
7    my ability.
8
9        I further certify that I am neither related to
10    counsel or any part to the proceedings nor have any
11    interest in the outcome of the proceedings.
12
13        IN WITNESS HEREOF, I have hereunto set my hand this
14    28th day of October, 2021.
15
16
17
18
19
20    /S/  Jordan Weems
21
22
23
24
25

208

1                    DECLARATION
2    Deposition of: Gerald E. Brazie, Jr.    Date: 10/14/21
3    Regarding:    Secretary of Labor vs. Senvoy, LLC
4    Reporter:    Weems/Morrison
5    _____
6
7    I declare under penalty of perjury the following to
8    be true:
9
10    I have read my deposition and the same is true and
11    accurate save and except for any corrections as made
12    by me on the Correction Page herein.
13
14    Signed at _____, _____
15    on the _____ day of _____, 2021.
16
17
18
19
20
21
22
23
24        Signature_____
25            Gerald E. Brazie, Jr.

207

1        CORRECTION SHEET
2    Deposition of: Gerald E. Brazie, Jr.    Date: 10/14/21
3    Regarding:    Secretary of Labor vs. Senvoy, LLC
4    Reporter:    Weems/Morrison
5    _____
6    Please make all corrections, changes or clarifications
7    to your testimony on this sheet, showing page and line
8    number.  If there are no changes, write "none" across
9    the page. Sign this sheet on the line provided.
10    Page   Line  Reason for Change
11    _____  _____  _____
12    _____  _____  _____
13    _____  _____  _____
14    _____  _____  _____
15    _____  _____  _____
16    _____  _____  _____
17    _____  _____  _____
18    _____  _____  _____
19    _____  _____  _____
20    _____  _____  _____
21    _____  _____  _____
22    _____  _____  _____
23    _____  _____  _____
24        Signature_____
25            Gerald E. Brazie, Jr.

**Personal Financial Statement**
**Gerald & Kathrynne Brazie**
Updated June 30th, 2021

| Assets | | Liabilities | |
|---|---|---|---|
| Life Insurance-Cash Value (Section 4) | $72,199.00 | Notes to Banks (Section 1) | $613,925.04 |
| Real Estate (Section 2) | $1,000,000.00 | Mortgages (Section 2) | $797,153.51 |
| Automobiles-Present Value (Section 5) | $166,500.00 | | |
| Other Personal Property & Assets (Section 3) | $150,000.00 | | |
| **Total Assets** | **$1,388,699.00** | **Total Liabilities** | **$1,411,078.55** |
| | | **Net Worth** | **-$22,379.55** |

**Sources of Income**

| | |
|---|---|
| Net Income - Owned Entities | $250,000.00 |
| Total | $250,000.00 |

**Section 1.  Notes Payable to Banks & Others.**

| Name & Address of Noteholder | Original Amount | Current Amount | Payment | Frequency |
|---|---|---|---|---|
| Suntrust-Home Equity (WyEast House) | $112,000.00 | $49,197.51 | $445.00 | Monthly |
| Compass Group, LLC (Gresham - lots) | $493,234.45 | $475,592.10 | $10,000.00 | Monthly |
| 2010 Ford SuperSnake | $82,918.45 | $6,643.68 | $750.24 | Monthly |
| 2013 Ford Raptor | $40,093.00 | $18,120.01 | $750.97 | Monthly |
| 2015 Mercedes | $79,816.00 | $64,371.74 | $1,497.30 | Monthly |
| Totals | $808,061.90 | $613,925.04 | $13,443.51 | |

**Section 2.  Real Estate Owned**

| Type of Property | Property A Residence | Property B Land |
|---|---|---|
| Address | 14481 SE WyEast | 4242 SW Eleven Mile Ave |
| | Clackamas, Oregon 97015 | Gresham, Oregon 97080 |
| Acres | 4.62 | Lot 11, 12, 14 & 15 |
| Date Purchased | 2005 | 2017 |
| Original Cost | $480,000.00 | $493,234.45 |
| Present Value | $700,000.00 | $300,000.00 |
| Mortgage Holder | Suntrust | Compass Group, LLC |
| Account Number | 143087070 | Note |
| Current Balance | $321,561.41 | $475,592.10 |
| Monthly Payment (PITI) | $3,384.61 | $10,000.00 |
| Monthly Rental Income | $4,550.00 | $0.00 |
| Status | Current | Current |

**Section 3.  Other Personal Property & Assets**

| | |
|---|---|
| Household Furniture, Clothing, Jewelry & Equipment | $150,000.00 |
| Value of Senvoy, LLC | $0.00 |
| Value of TKM Land, L.L.C. | $0.00 |
| Value of ZoAn Management Inc | $0.00 |
| Value of Owned Entities | $0.00 |
| Total | $150,000.00 |

**Section 4.  Life Insurance Held**

| | Face Value | Cash Value |
|---|---|---|
| Northwestern Mutual Life | $2,800,000.00 | $72,199.00 |
| Total | $2,800,000.00 | $72,199.00 |

**Section 5.  Automobiles.**

| | Original Debt | Current Debt | Value |
|---|---|---|---|
| 2002 Ford F150 Lightning | $30,000.00 | $0.00 | $8,000.00 |
| 2010 Ford SuperSnake | $82,918.45 | $6,643.68 | $48,500.00 |
| 2013 Ford F150 Raptor | $40,093.00 | $18,120.01 | $20,000.00 |
| 2015 Mercedes | $79,816.00 | $64,371.74 | $90,000.00 |
| Total | $232,827.45 | $89,135.43 | $166,500.00 |

| | | | |
|---|---|---|---|
| 1965 Buick Gran Sport (Custom Show Car) | $0.00 | Secured (Sunstone Business Finance) | $125,000.00 |
| 1972 Buick GS Stage 1 Convertible (Custom Show Car) | $30,577.00 | Secured (Umpqua Bank) | $50,000.00 |
| 2001 Triumph Sprint 955 (Motorcycle) | $12,700.00 | Secured (Umpqua Bank) | $5,000.00 |
| 2003 Harley Davidson | $10,155.60 | Secured (Umpqua Bank) | $8,000.00 |
| 2003 Triumph Sprint ST (Motorcycle) | $11,000.00 | Secured (Umpqua Bank) | $5,000.00 |
| 2006 Mercedes | $123,400.00 | Secured (Umpqua Bank) | $35,000.00 |
| 2006 Triumph Speed Four (Motorcycle) | $8,800.00 | Secured (Umpqua Bank) | $6,000.00 |
| 2007 Harley Davidson | $17,065.00 | Secured (Umpqua Bank) | $10,000.00 |
| 2008 Honda (Motorcycle) | $8,900.00 | Secured (Umpqua Bank) | $5,000.00 |
| 2013 Ford Shelby Convertible | $72,732.00 | Secured (B. Ludwick) | $45,000.00 |



EXHIBIT

1

DEPONENT NAME: G. Brazie    DATE: 10/14/21

SENVOY_DOL2021_000023

# Exhibit 2

From:     Nick Henderson
To:       Garcia, Norman - SOL
Cc:       "doug@vbcattorneys.com"; Terry Coble
Subject:  Walsh v. Senvoy, LLC, et al.; Documents
Date:     Friday, February 4, 2022 3:31:11 PM

> CAUTION – The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Norm,

Below is a link you can use to download the documents that were ordered to be produced by the defendants. I apologize, I was unable to Bates label these documents, as some of the credit card statements have security settings that prevent the document from being modified. My assistant is out of the office today, and I didn't have time to try to figure out a workaround for the security setting. If you would like these produced with Bates labels, I can have that done on Monday.

Also, we've identified some transactions in which Senvoy paid expenses that were for Mr. Brazie, personally. I'm told that Mr. Brazie and his staff have reversed some of the transactions, and Mr. Brazie has cut checks to Senvoy for transactions that could not be reversed. I have asked Mr. Brazie for details about the transactions, the steps taken to reverse or undo those transactions, and confirmation that the transactions have been resolved. I'm expecting to receive these details from Mr. Brazie shortly. I will send you the information when I receive it.

Regards,



Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204-3029
Direct Tel: 503-417-0508; Direct Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged. If you are not the intended recipient, any use, distribution or copying is prohibited. If received in error, please contact the sender.

**From:** Nick Henderson <fileshare@portlaw.com>
**Sent:** Friday, February 4, 2022 2:48 PM
**To:** Nick Henderson <nhenderson@portlaw.com>
**Subject:** Senvoy

Here.

## Files attached to this message

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| ZoAn Mgt Inc - 01 January 2022 savings statement (00501173xE9B64).PDF | 205 KB | 4b87a0b79759e01b8b4e717c7d9697ed28373c39a2265876c341939ae177f560 |
| | | 8301edaaf5fb40070043ca67f9e90a7180843743006dabff98984d4e2734e8b9 |

| | | |
|---|---|---|
| Senvoy LLC Sep thru Dec 2021 GL (00501178xE9B64).PDF | 989 KB | |
| ZoAn Mgt Inc - 12 December 2021 savings statement (00501172xE9B64).PDF | 204 KB | 707a877c8228214ad9e6bef5ac98c4652f7730eb8b22d9cfed719cd908b0669d |
| TKM Properties Sep thru Dec 2021 GL (00501177xE9B64).PDF | 68.7 KB | 0db16167f0cb6b304491e9960278ef168bc27e25ab9b9d7ea2a5b788e7aa5150 |
| American Express 2021-12-16 (00501171xE9B64).PDF | 576 KB | a5b33680ae289f205e3c7e7c2ce4e90585cc7acbb9ea65dfd48dbdf4d8d20613 |
| Senvoy corp_stmt_2021-Nov-01_2021-Dec-01 (00501176xE9B64).PDF | 611 KB | dadbcaa1c6dd08508aa6bebaa6e08ed80f9c740e323f9c8ab9bf56a3ea4f8c21 |
| Cabela's CC Statement_122021_4904 (00501170xE9B64).PDF | 986 KB | fbd93855d5c7594145accd86608bc12b0c0de301b24503c6e256b6d2c03ee6fe |
| TKM Investment Prop - 12.2021 Unitus Statement (00501175xE9B64).PDF | 1.48 MB | a4fc24d134b439095c7dc1e1ca2d3fa10d2e0be071e70ae6828c9812904d55f5 |
| Cabela's CC Statement_012022_4904 (00501174xE9B64).PDF | 404 KB | b409b4215b152f42bf30f58558840807047fd78279e54b49b4c50f5e424140b7 |
| Senvoy corp_stmt_2021-Dec-01_2022-Jan-01 (00501162xE9B64).PDF | 215 KB | 90c353af875416b9d3996664761f277cec2ae0fa7c93027bb0d471687376055b |
| Cabela's CC Statement_112021_4904 (00501167xE9B64).PDF | 437 KB | 94ec46b71cd4263b8a5a0d360c001081d19353a2070fb98010ef60e6ee42a390 |
| Capital One Statement_112021_8287 (00501156xE9B64).PDF | 468 KB | 32feb782721da3e9509d694bba6b3584fe32e4a002aaa09b49432d3550805803 |
| Costco Citi card - 12.15.21 Stmt (Brazie, Kathrynne) (00501161xE9B64).PDF | 298 KB | 2ec81dd873612e8d51d85d2bb907860963458c43647ae986b7357b87a2d1aa65 |
| MC 10.10.21 - 11.09.21 (00501166xE9B64).PDF | 164 KB | a0ed1f88ae4959305269d737861eac15c123bc34ee10135ee88dc8cedd158590 |
| Senvoy LLC Jan 2022 GL (00501155xE9B64).PDF | 273 KB | 6e6566e3b53154ed27c6679072d5924b8c6a3671bde9421b0403de1d4b392a65 |
| Capital One Statement_122021_8287 (00501160xE9B64).PDF | 479 KB | 5fb071fd3f1e426341cb6b9042c2f92dfa151115283ce16e6796293118e3af5a |
| ZoAn Mgt Sep thru Dec 2021 GL (00501165xE9B64).PDF | 144 KB | 320d3337e06bdd51684a1160db10990b05916e0901289fd17ad5ac771b3055e7 |
| TKM Investment Prop - | 1.45 | ef53ac6f79622ad1a49f1c510ffe9f2e6e8598cc04607fe123e29e32b933ff39 |

| File | Size | Hash |
|---|---|---|
| 01.2022 Unitus Statement (00501159xE9B64).PDF | MB | |
| Capital One Statement_012022_8287 (00501164xE9B64).PDF | 464 KB | dc92be3374b2ceea67ca31ce08c243da96c69528e66c1b4eedb18c03dd48d2a2 |
| TKM Properties Jan 2022 GL (00501169xE9B64).PDF | 68.4 KB | 4500e387bf4b58fd9e2f1f55fc287191d1f68d2e73f84747b7fcb5b4d131ee0c |
| ZoAn Mgt Jan 2022 GL (00501158xE9B64).PDF | 73.3 KB | e173ba5ce70787bf13bd9d8b485584836e61eaf3558a412d030c97a5717741a5 |
| 12.31.2021 Point West CU Stmt (00501163xE9B64).PDF | 116 KB | 941365dafbb434376eebdd82bbe24ad79727189a74ba3d2bcb3e297a05193960 |
| ZoAn Mgt Inc - 12 December 2021 statement (00501168xE9B64).PDF | 205 KB | 6c3e42fbc2776a7ca4762ef714340a654bc7305f6bc9b1ebf6187548bcdd3f37 |
| TKM Land Sep thru Dec 2021 GL (00501157xE9B64).PDF | 62.1 KB | cfca209d7f82c2da6a9fd230e4bd7d50ed2a20aeb703771a7aef8b413d40f4a2 |
| Capital One Statement_122021_0830 (00501151xE9B64).PDF | 387 KB | c2889297704a3a194c0a328b5bc067020ee8e81406ce67be4bea01eb7162611e |
| Brazie-Columbia Bank 12.15.2021 (00501145xE9B64).PDF | 66.8 KB | a02ed44d422be3c7c5d1397afbedbf7db283e8841216457cea5f13c227bb1537 |
| ZoAn Mgt Inc - 11 November 2021 savings statement (00501150xE9B64).PDF | 203 KB | 2298a380a0f72d9b99b37a1485b08eb353e7fd64b924c8942af9c313065bdbbb |
| ZoAn Mgt Inc - 11 November 2021 statement (00501144xE9B64).PDF | 208 KB | adc72f2a5a61a8f9c38e936d6bcc7eeca9cb1a90e508f713412ef68d6d7b4eae |
| TKM Investment Prop - 11.2021 Unitus Statement (00501149xE9B64).PDF | 1.43 MB | 064bb4641ace3c3b13c966172f1f9b43b93f6a036802960d6298b2485a3b4b3a |
| Capital One Statement_012022_0830 (00501154xE9B64).PDF | 390 KB | ad361d260685a60ef33d8f5ae611aebaf4a268ccc0f7bae7f55fa0bb284368b7 |
| TKM Land Jan 2022 GL (00501143xE9B64).PDF | 61.6 KB | aa262967fd48312986a98bdcb3bd036183be87812fb9fa24635580c5fc999171 |
| Capital One Statement_112021_0830 (00501148xE9B64).PDF | 378 KB | 852f2702c9f9f259b97cee85319460c0da0c70a9598381ddcce615d2666289d7 |
| Senvoy corp_stmt_2022-Jan-01_2022-Feb-01 (00501153xE9B64).PDF | 610 KB | c8060f3c3d36cd205338d0878cc816177bcb64bcf7ecbb548980f099acfa5127 |
| American Express 2021-11-15 | 578 KB | ac8fb7476ebf3c5c2dc7c913ae35cc648e790febe1967d2d88814f6ed6d6d167 |

(00501147xE9B64).PDF

| | | |
|---|---|---|
| 11.30.2021 Point West CU Stmt (00501152xE9B64).PDF | 108 KB | a4e8de3fe6e464300a1d7f63056f21a7a3bdbf1fd157a23b90568f04a5bf0fa5 |
| MC 12.10.21 - 01.09.22 (00501146xE9B64).PDF | 163 KB | 6a7807568a91e03be69809b86bfb1bc092203acb3452c1d2d40a0a31f75517b7 |
| MC 11.10.21 - 12.09.21 (00501140xE9B64).PDF | 164 KB | 7a149bed77ec501003b6c13b3267982f6ea2ee28bfb974e8e7a1e6cd36d285b1 |
| 01.31.2022 Point West CU Stmt (00501139xE9B64).PDF | 109 KB | 5560e5cb63f66b9af9ce478e552255dce48001df96c8572c2ecf463f2564f559 |
| Brazie-Columbia Bank 01.17.2022 (00501138xE9B64).PDF | 69.3 KB | f99d91950da4c1af1497624ed7d5070fca66c329545326fbc0b53ef519c05354 |
| Brazie-Columbia Bank 11.15.2021 (00501137xE9B64).PDF | 57.5 KB | 24d5dd6d3ceb15307adc8f593c576ee1743c4abe54efc6d7a0c47c1863e6c078 |
| Costco Citi card - 11.15.21 Stmt (Brazie, Kathrynne) (00501142xE9B64).PDF | 334 KB | df3e1e9527b55d875cbff31b5dd6cbeae12c30991083cfcbd5764be3bd64afce |
| American Express 2022-01-16 (00501136xE9B64).PDF | 576 KB | b1de76617722fe9431c1a0fa7b7fef5c80c483c866b5fe4ab8f9d561c8387fba |
| ZoAn Mgt Inc - 01 January 2022 statement (00501141xE9B64).PDF | 212 KB | 5a8c7fe5132ba4c9e71b3479fe42ac734a7a4f9efeff65e8b894d2ddc9f1e7f0 |
| 01.31.2022 Point West CU Stmt (00501010xE9B64).PDF | 686 KB | 8f409cc1d8eaee07f334cccc3dca0225c3e80dbb56abcc5e1d9d8dcbce9c5b7d |

Please click on the following link to download the attachments:
https://fileshare.portlaw.com:8445/message/1UGapdUHBcMPChFGpSJKh8

You will need to authenticate to view this Secure Message. If you don't have an account on fileshare.portlaw.com, you can still click on the download link and you will be prompted to validate your email.

This email or download link can be forwarded to anyone.

The attachments are available until: **Sunday, 6 March.**

Message ID: 1UGapdUHBcMPChFGpSJKh8

Download Files

Reply to this Secure Message

Secure File Transfer System

**Secure File Transfer System:** https://fileshare.portlaw.com

# Exhibit 3

| From: | Nick Henderson |
|---|---|
| To: | Garcia, Norman - SOL |
| Cc: | "doug@vbcattorneys.com"; Terry Coble |
| Subject: | RE: Senvoy |
| Date: | Friday, February 18, 2022 11:20:39 AM |
| Attachments: | Brazie-Columbia Bank 02.15.2022 (00503702xE9B64).pdf |
| | Report of Payments to DOL - Progressive (00503299xE9B64).pdf |
| | Report of Payments to DOL - Point West Credit Union (00503295xE9B64).pdf |
| | Report of Payments to DOL - Credit Card Charges (00503293xE9B64).pdf |
| | Cleared Checks for Reimbursement (00503261xE9B64).pdf |

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Norm,

Attached are the following documents:

- Report with details about payments to credit cards;
- Report with details about payments to Progressive Insurance;
- Report with details about payments to Point West Credit Union;
- Brazie Joint Columbia Bank Statement; and
- Canceled checks showing repayment of amounts to Senvoy.

I'm told the payments made from Senvoy's accounts were automatic ACH payments that were overlooked. I'm also told that the automatic ACH payments have been stopped for all payments except the Point West Credit Union accounts. So, with the exception of that one payee, the transactions should no longer occur.

For Point West Credit Union, the creditor was directed to stop payments, but payments were processed for February. PWCU should not have processed the payments, not only because they have been directed to stop the payments, but also because Mr. Brazie filed his bankruptcy case, and the creditor should not have processed the payments after receiving notice of the bankruptcy. I'm looking into this further, and I will let you know what I find out.

Please note that while the checks for repayment to Senvoy were drawn on Mr. and Mrs. Brazie's joint checking account, the funds used to pay Senvoy back came from Gerald Brazie's mother-in-law, via wire transfer on 2/8/2022. Those were not funds from Mr. Brazie's bankruptcy estate.

Please let me know if you have any additional questions.

Regards,
Nick



Nicholas J. Henderson
Motschenbacher & Blattner LLP

117 SW Taylor Street, Suite 300
Portland, OR 97204-3029
Direct Tel: 503-417-0508; Direct Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged. If you are not the intended recipient, any use, distribution or copying is prohibited. If received in error, please contact the sender.

Exhibit 4

| | |
|---|---|
| **From:** | Garcia, Norman - SOL |
| **To:** | Nick Henderson |
| **Cc:** | "doug@vbcattorneys.com"; Terry Coble |
| **Subject:** | Senvoy/Brazie issues still remain |
| **Date:** | Friday, February 18, 2022 12:35:00 PM |

Hi Nick,

Thanking for you sending this.

I have a couple of issues, though, with the first being what you sent me is incomplete and does not accounting for all of the payments Senvoy made for Brazie's personal expenses.  For example, Senvoy's general ledger shows Senvoy making payments for three Northwestern Mutual Life insurance policies for Mr. Brazie during the prohibited time-period.  So, what is the status about the other personal payments that Senvoy made for Mr. Brazie?

Second, the 11/16/21 Contempt Order required Brazie to "diligently" check to ensure that his companies were not paying his debts on a "daily" basis and to repay any such payments within five days.  I see from what you sent me that some payments were made in November, yet Mr. Brazie did not write his check to repay Senvoy until 2/4/22 after the Show Cause hearing on 2/2/22 and after the Court ordered Defendants to produce the documents that were originally ordered to be produced on 1/21/22 to be produced on 2/4/22 – the same day that Brazie wrote the checks.

I further see that there is nothing on the back side of the checks showing when they were cashed, the wire transfer was not received until 2/8/22 and the bank statement shows the checks being negotiated on 2/10 & 11/22.  Thus, when Brazie wrote the checks on 2/4/22, he did not have funds in his account to cover them.

So, given that Brazie was supposed to diligently, on a daily basis, ensure that Senvoy did not pay his personal bills, what did he do?  How could these payments have continued to be made if he was conducting this daily, diligent review?

Moreover, once he found that Senvoy was paying his personal bills in contravention of the Court's order, what did he do?

How come it took him from November to February to repay Senvoy?

I will await your response as to how Point West Credit Union was told to stop payments and why they are continuing to take payments from someone who filed for bankruptcy.

Thanks,

Norm


Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA 94103 Telephone number: (415) 625-7747 Facsimile number: (415) 625-7772

Pronouns: he, him, his

ATTENTION: In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail. Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services. Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Nick Henderson <nhenderson@portlaw.com>
**Sent:** Friday, February 18, 2022 11:20 AM
**To:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; Terry Coble <tcoble@portlaw.com>
**Subject:** RE: Senvoy

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.


Norm,

Attached are the following documents:
- Report with details about payments to credit cards;
- Report with details about payments to Progressive Insurance;
- Report with details about payments to Point West Credit Union;
- Brazie Joint Columbia Bank Statement; and
- Canceled checks showing repayment of amounts to Senvoy.

I'm told the payments made from Senvoy's accounts were automatic ACH payments that were overlooked. I'm also told that the automatic ACH payments have been stopped for all payments except the Point West Credit Union accounts. So, with the exception of that one payee, the transactions should no longer occur.

For Point West Credit Union, the creditor was directed to stop payments, but payments were

processed for February.  PWCU should not have processed the payments, not only because they have been directed to stop the payments, but also because Mr. Brazie filed his bankruptcy case, and the creditor should not have processed the payments after receiving notice of the bankruptcy.  I'm looking into this further, and I will let you know what I find out.

Please note that while the checks for repayment to Senvoy were drawn on Mr. and Mrs. Brazie's joint checking account, the funds used to pay Senvoy back came from Gerald Brazie's mother-in-law, via wire transfer on 2/8/2022.  Those were not funds from Mr. Brazie's bankruptcy estate.

Please let me know if you have any additional questions.

Regards,
Nick



Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR  97204-3029
Direct Tel: 503-417-0508; Direct Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged.  If you are not the intended recipient, any use, distribution or copying is prohibited.  If received in error, please contact the sender.

# Exhibit 5

| From: | Nick Henderson |
| To: | Garcia, Norman - SOL; "doug@vbcattorneys.com" |
| Subject: | RE: Senvoy/Brazie issues still remain |
| Date: | Saturday, February 26, 2022 6:06:44 AM |

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Norm,

I apologize for the delay in getting back to you. I have been tied up in other matters.

Regarding the payments to Northwestern Mutual, those payments were reversed. There aren't any cancelled checks to show you. Once Senvoy's bank statements for February are available, I can provide copies of those statements to show that the payments were reversed. In the meantime, here is a screenshot of the KeyBank account that my client provided to me:

| Date | Type | Description | Credit | Debit |
|------|------|-------------|--------|-------|
| 9-Dec-21 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | - | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|------|------|-------------|--------|-------|
| 11-Jan-22 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | - | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|------|------|-------------|--------|-------|
| 3-Feb-22 | Preauthorized ACH Credit | DIRECT DEPOSIT, NORTHWESTERN MU ISA WTHDL | $2,589.01 | - |

| Date | Type | Description | Credit | Debit |
|------|------|-------------|--------|-------|
| 9-Feb-22 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | - | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|------|------|-------------|--------|-------|
| 16-Feb-22 | Preauthorized ACH Credit | DIRECT DEPOSIT, NORTHWESTERN MU ISA WTHDL | $1,294.50 | - |

In your email dated February 18, 2022, you made the following statement, which I don't understand:

"As such, when you told me that you would provide an accounting for Brazie's companies paying his personal bills, I thought you would do the same and have not received anything contrary to that. Please note that ZoAn has paid his personal bills and made shareholder distributions and I have not seen any reimbursement for that."

What are you asking for here, other than what I provided you above? Also, are you suggesting that because I'm working with Mr. Brazie and his counsel, and because I sent you an email with documents from multiple parties, that I am somehow committed to working for all of these entities? I'm unclear about the point you are trying to make in your statements above. Please clarify. To be clear from my perspective: I continue to represent only Senvoy, LLC. The documents I provided to you previously were provided through cooperation with Mr. Brazie, personally, and Zoan Management.

Regards,

Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204-3029
Direct Tel: 503-417-0508; Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged. If you are not the intended recipient, any use, distribution or copying is prohibited. If received in error, please contact the sender.

From: Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
Sent: Friday, February 25, 2022 5:35 PM
To: 'doug@vbcattorneys.com' <doug@vbcattorneys.com>
Cc: Nick Henderson <nhenderson@portlaw.com>
Subject: RE: Senvoy/Brazie issues still remain

Hi Doug,

I have not received any response to my e-mails below regarding your client's companies paying Mr. Brazie's personal bills in contravention of the Court's order and Mr. Brazie not reimbursing his companies for all payments made. As I identified below, even though some of the payments that Senvoy made were reimbursed by Mr. Brazie, other payments made by at least Senvoy and ZoAn Management, Inc. have not been paid.

This is especially programmatic because Mr. Brazie was ordered to diligently review the financials of his companies daily and to reimburse them within five days of his companies improperly paying his bills. Mr. Brazie failed both requirements.

So, please address the questions below.

Since, I am sending this e-mail to you for the first time and because maybe you thought Nick was handling it, I will give you one week. If I do not receive an adequate response by noon on next Friday, March 4th, I will act accordingly with the Court to inform it of further violations of its order.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA  94103 Telephone number:  (415) 625-7747 Facsimile number:  (415) 625-7772

Pronouns:  he, him, his

ATTENTION:  In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail.  Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services.  Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify the sender immediately.

**From:** Garcia, Norman - SOL
**Sent:** Friday, February 18, 2022 12:47 PM
**To:** 'Nick Henderson' <nhenderson@portlaw.com>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; 'Terry Coble' <tcoble@portlaw.com>
**Subject:** RE: Senvoy/Brazie issues still remain

Nick,

One more thing.  When you provided documents to me, you provided them to me for a lot more than just Senvoy even though you are just the counsel of record for Senvoy.  You provided me documents for Senvoy, for Mr. Brazie's other companies and for Mr. Brazie himself.  As such, when you told me that you would provide an accounting for Brazie's companies paying his personal bills, I thought you would do the same and have not received anything contrary to that.  Please note that ZoAn has paid his personal bills and made shareholder distributions and I have not seen any reimbursement for that.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA  94103 Telephone number:  (415) 625-7747 Facsimile number:  (415) 625-7772

Pronouns:  he, him, his

ATTENTION:  In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail.  Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services.  Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify the sender immediately.

**From:** Garcia, Norman - SOL
**Sent:** Friday, February 18, 2022 12:35 PM
**To:** Nick Henderson <nhenderson@portlaw.com>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; Terry Coble <tcoble@portlaw.com>
**Subject:** Senvoy/Brazie issues still remain

Hi Nick,

Thanking for you sending this.

I have a couple of issues, though, with the first being what you sent me is incomplete and does not accounting for all of the payments Senvoy made for Brazie's personal expenses.  For example, Senvoy's general ledger shows Senvoy making payments for three Northwestern Mutual Life insurance policies for Mr. Brazie during the prohibited time-period.  So, what is the status about the other personal payments that Senvoy made for Mr. Brazie?

Second, the 11/16/21 Contempt Order required Brazie to "diligently" check to ensure that his companies were not paying his debts on a "daily" basis and to repay any such payments within five days.  I see from what you sent me that some payments were made in November, yet Mr. Brazie did not write his check to repay Senvoy until 2/4/22 after the Show Cause hearing on 2/2/22 and after the Court ordered Defendants to produce the documents that were originally ordered to be produced on 1/21/22 to be produced on 2/4/22 – the same day that Brazie wrote the checks.

I further see that there is nothing on the back side of the checks showing when they were cashed, the wire transfer was not received until 2/8/22 and the bank statement shows the checks being negotiated on 2/10 & 11/22.  Thus, when Brazie wrote the checks on 2/4/22, he did not have funds in his account to cover them.

So, given that Brazie was supposed to diligently, on a daily basis, ensure that Senvoy did not pay his personal bills, what did he do?  How could these payments have continued to be made if he was conducting this daily, diligent review?

Moreover, once he found that Senvoy was paying his personal bills in contravention of the Court's order, what did he do?

How come it took him from November to February to repay Senvoy?

I will await your response as to how Point West Credit Union was told to stop payments and why they are continuing to take payments from someone who filed for bankruptcy.

Thanks,

Norm


Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA  94103 Telephone number:  (415) 625-7747 Facsimile number:  (415) 625-7772

Pronouns:  he, him, his

ATTENTION:  In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail.  Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services.  Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify the sender immediately.

**From:** Nick Henderson <nhenderson@portlaw.com>
**Sent:** Friday, February 18, 2022 11:20 AM
**To:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; Terry Coble <tcoble@portlaw.com>
**Subject:** RE: Senvoy

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.


Norm,

Attached are the following documents:
- Report with details about payments to credit cards;
- Report with details about payments to Progressive Insurance;
- Report with details about payments to Point West Credit Union;
- Brazie Joint Columbia Bank Statement; and
- Canceled checks showing repayment of amounts to Senvoy.

I'm told the payments made from Senvoy's accounts were automatic ACH payments that were overlooked.  I'm also told that the automatic ACH payments have been stopped for all payments except the Point West Credit Union accounts.  So, with the exception of that one payee, the transactions should no longer occur.

For Point West Credit Union, the creditor was directed to stop payments, but payments were processed for February.  PWCU should not have processed the payments, not only because they have been directed to stop the payments, but also because Mr. Brazie filed his bankruptcy case, and the creditor should not have processed the payments after receiving notice of the bankruptcy.  I'm looking into this further, and I will let you know what I find out.

Please note that while the checks for repayment to Senvoy were drawn on Mr. and Mrs. Brazie's joint checking account, the funds used to pay Senvoy back came from Gerald Brazie's mother-in-law, via wire transfer on 2/8/2022.  Those were not funds from Mr. Brazie's bankruptcy estate.

Please let me know if you have any additional questions.

Regards,
Nick


 MOTSCHENBACHER
& BLATTNER LLP
A T T O R N E Y S

Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR  97204-3029
Direct Tel: 503-417-0508; Direct Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged.  If you are not the intended recipient, any use, distribution or copying is prohibited.  If received in error, please contact the sender.

# Exhibit 6

| | |
|---|---|
| **From:** | Garcia, Norman - SOL |
| **To:** | Nick Henderson; "doug@vbcattorneys.com" |
| **Subject:** | There are still issues with Brazie's companies paying his personal bills |
| **Date:** | Monday, February 28, 2022 8:48:00 AM |
| **Importance:** | High |

Nick and Doug,

First, thank you Nick for providing a list of the actions that have been taken thus far for the Northwestern Mutual payments.  However, with that said, there are other payments that Senvoy and ZoAn made to Northwestern Mutual that are not accounted for in the screenshot provided below or thus far at any time.

In addition, there are other payments that were made by Brazie's companies to pay his personal bills that have not been accounted for in what I have received from Nick so far.

Brazie was required under the Court's order to perform a diligent search every day and to reimburse/payback his companies for any payments made within five days.  Obviously, this did not happen.  Furthermore, the credits below show that they were paid on or after the Court ordered Brazie and his companies to produce the documents that they should have previously produced on January 21, 2022.  It appears that but for his order, these payments would not have been made and raises concerns about the true reasons why the documents were not produced on January 21, 2022, in advance of the order to show cause hearing.

This is not a case of me taking over Brazie's duty to conduct a diligent search of him and his companies and only reacting to what I identify or Brazie and his companies only doing a spot check of some transactions.  Someone needs to get together with the bookkeeper, Brooke Wiggins, and go over the financials to determine all of the transactions that Brazie's companies paid his/his families' personal bills from November 9, 2021, to the present.  Once identified, they need to be paid back immediately.

Given what has happened, I have been more than patient in trying to get this corrected.  However, my patience is starting to wear thin.

Nick, I apologize for assuming that because you sent the documents from multiple parties once, that you would continue to do so.  It was hard to know if, and when, you were performing that task.

Doug, to make sure that there are no more misunderstandings from now on, please confirm that you will be providing information for personal bill payments that Brazie/his family received from his companies that Nick does not address to include payments from Senvoy that Nick does not address because it was Brazie's duty to conduct the diligent search and to pay back/reimburse the payments within five days.  If it is not you/your firm, please identify who will be doing this, if anyone.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA  94103 Telephone number:  (415) 625-7747 Facsimile number:  (415) 625-7772

Pronouns:  he, him, his

ATTENTION:  In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail.  Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services.  Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify the sender immediately.

**From:** Nick Henderson <nhenderson@portlaw.com>
**Sent:** Saturday, February 26, 2022 6:06 AM
**To:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>; 'doug@vbcattorneys.com' <doug@vbcattorneys.com>
**Subject:** RE: Senvoy/Brazie issues still remain

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Norm,

I apologize for the delay in getting back to you.  I have been tied up in other matters.

Regarding the payments to Northwestern Mutual, those payments were reversed.  There aren't any cancelled checks to show you.  Once Senvoy's bank statements for February are available, I can provide copies of those statements to show that the payments were reversed.  In the meantime, here is a screenshot of the KeyBank account that my client provided to me:

| Date | Type | Description | Credit | Debit |
|---|---|---|---|---|
| 9-Dec-21 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | - | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|---|---|---|---|---|
| 11-Jan-22 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | - | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|---|---|---|---|---|
| | | | | |

| | | | $2,589.01 | |
|---|---|---|---|---|
| 3-Feb-22 | Preauthorized ACH Credit | DIRECT DEPOSIT, NORTHWESTERN MU ISA WTHDL | | · |

| Date | Type | Description | Credit | Debit |
|---|---|---|---|---|
| 9-Feb-22 | Preauthorized ACH Debit | DIRECT WITHDRAWAL, NORTHWESTERN MU ISA PAYMNT | · | ($1,294.50) |

| Date | Type | Description | Credit | Debit |
|---|---|---|---|---|
| 16-Feb-22 | Preauthorized ACH Credit | DIRECT DEPOSIT, NORTHWESTERN MU ISA WTHDL | $1,294.50 | · |

In your email dated February 18, 2022, you made the following statement, which I don't understand:

"As such, when you told me that you would provide an accounting for Brazie's companies paying his personal bills, I thought you would do the same and have not received anything contrary to that. Please note that ZoAn has paid his personal bills and made shareholder distributions and I have not seen any reimbursement for that."

What are you asking for here, other than what I provided you above? Also, are you suggesting that because I'm working with Mr. Brazie and his counsel, and because I sent you an email with documents from multiple parties, that I am somehow committed to working for all of these entities? I'm unclear about the point you are trying to make in your statements above. Please clarify. To be clear from my perspective: I continue to represent only Senvoy, LLC. The documents I provided to you previously were provided through cooperation with Mr. Brazie, personally, and Zoan Management.

Regards,

Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204-3029
Direct Tel: 503-417-0508, Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged. If you are not the intended recipient, any use, distribution or copying is prohibited. If received in error, please contact the sender.

**From:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
**Sent:** Friday, February 25, 2022 5:35 PM
**To:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>
**Cc:** Nick Henderson <nhenderson@portlaw.com>
**Subject:** RE: Senvoy/Brazie issues still remain

Hi Doug,

I have not received any response to my e-mails below regarding your client's companies paying Mr. Brazie's personal bills in contravention of the Court's order and Mr. Brazie not reimbursing his companies for *all* payments made. As I identified below, even though some of the payments that Senvoy made were reimbursed by Mr. Brazie, other payments made by at least Senvoy and ZoAn Management, inc. have not been paid.

This is especially programmatic because Mr. Brazie was ordered to diligently review the financials of his companies daily and to reimburse them within five days of his companies improperly paying his bills. Mr. Brazie failed both requirements.

So, please address the questions below.

Since, I am sending this e-mail to you for the first time and because maybe you thought Nick was handling it, I will give you one week. If I do not receive an adequate response by noon on next Friday, March 4th, I will act accordingly with the Court to inform it of further violations of its order.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700, SF, CA 94103 Telephone number: (415) 625-7747 Facsimile number: (415) 625-7772

Pronouns: he, him, his

ATTENTION: In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail. Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services. Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Garcia, Norman - SOL
**Sent:** Friday, February 18, 2022 12:47 PM
**To:** 'Nick Henderson' <nhenderson@portlaw.com>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; 'Terry Coble' <tcoble@portlaw.com>

**Subject:** RE: Senvoy/Brazie issues still remain

Nick,

One more thing. When you provided documents to me, you provided them to me for a lot more than just Senvoy even though you are just the counsel of record for Senvoy. You provided me documents for Senvoy, for Mr. Brazie's other companies and for Mr. Brazie himself. As such, when you told me that you would provide an accounting for Brazie's companies paying his personal bills, I thought you would do the same and have not received anything contrary to that. Please note that ZoAn has paid his personal bills and made shareholder distributions and I have not seen any reimbursement for that.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA 94103 Telephone number: (415) 625-7747 Facsimile number: (415) 625-7772

Pronouns: he, him, his

ATTENTION: In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail. Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services. Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Garcia, Norman - SOL
**Sent:** Friday, February 18, 2022 12:35 PM
**To:** Nick Henderson <nhenderson@portlaw.com>
**Cc:** 'doug@vbcattorneys.com' <sdoug@vbcattorneys.com>; Terry Coble <tcoble@portlaw.com>
**Subject:** Senvoy/Brazie issues still remain

Hi Nick,

Thanking for you sending this.

I have a couple of issues, though, with the first being what you sent me is incomplete and does not accounting for all of the payments Senvoy made for Brazie's personal expenses. For example, Senvoy's general ledger shows Senvoy making payments for three Northwestern Mutual Life insurance policies for Mr. Brazie during the prohibited time-period. So, what is the status about the other personal payments that Senvoy made for Mr. Brazie?

Second, the 11/16/21 Contempt Order required Brazie to "diligently" check to ensure that his companies were not paying his debts on a "daily" basis and to repay any such payments within five days. I see from what you sent me that some payments were made in November, yet Mr. Brazie did not write his check to repay Senvoy until 2/4/22 after the Show Cause hearing on 2/2/22 and after the Court ordered Defendants to produce the documents that were originally ordered to be produced on 1/21/22 to be produced on 2/4/22 – the same day that Brazie wrote the checks.

I further see that there is nothing on the back side of the checks showing when they were cashed, the wire transfer was not received until 2/8/22 and the bank statement shows the checks being negotiated on 2/10 & 11/22. Thus, when Brazie wrote the checks on 2/4/22, he did not have funds in his account to cover them.

So, given that Brazie was supposed to diligently, on a daily basis, ensure that Senvoy did not pay his personal bills, what did he do? How could these payments have continued to be made if he was conducting this daily, diligent review?

Moreover, once he found that Senvoy was paying his personal bills in contravention of the Court's order, what did he do?

How come it took him from November to February to repay Senvoy?

I will await your response as to how Point West Credit Union was told to stop payments and why they are continuing to take payments from someone who filed for bankruptcy.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA 94103 Telephone number: (415) 625-7747 Facsimile number: (415) 625-7772

Pronouns: he, him, his

ATTENTION: In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail. Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services. Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Nick Henderson <nhenderson@portlaw.com>
**Sent:** Friday, February 18, 2022 11:20 AM
**To:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
**Cc:** 'doug@vbcattorneys.com' <doug@vbcattorneys.com>; Terry Coble <tcoble@portlaw.com>
**Subject:** RE: Senvoy

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Norm,

Attached are the following documents:

- Report with details about payments to credit cards;
- Report with details about payments to Progressive Insurance;
- Report with details about payments to Point West Credit Union;
- Brazie Joint Columbia Bank Statement; and
- Canceled checks showing repayment of amounts to Senvoy.

I'm told the payments made from Senvoy's accounts were automatic ACH payments that were overlooked. I'm also told that the automatic ACH payments have been stopped for all payments except the Point West Credit Union accounts. So, with the exception of that one payee, the transactions should no longer occur.

For Point West Credit Union, the creditor was directed to stop payments, but payments were processed for February. PWCU should not have processed the payments, not only because they have been directed to stop the payments, but also because Mr. Brazie filed his bankruptcy case, and the creditor should not have processed the payments after receiving notice of the bankruptcy. I'm looking into this further, and I will let you know what I find out.

Please note that while the checks for repayment to Senvoy were drawn on Mr. and Mrs. Brazie's joint checking account, the funds used to pay Senvoy back came from Gerald Brazie's mother-in-law, via wire transfer on 2/8/2022. Those were not funds from Mr. Brazie's bankruptcy estate.

Please let me know if you have any additional questions.

Regards,
Nick



Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204-3029
Direct Tel: 503-417-0508; Direct Fax: 503-417-0501
nhenderson@portlaw.com
www.portlaw.com

This message is confidential and privileged. If you are not the intended recipient, any use, distribution or copying is prohibited. If received in error, please contact the sender.

# Exhibit 7

| From: | Doug Ricks |
|---|---|
| To: | Garcia, Norman - SOL |
| Cc: | Nick Henderson; Doug Ricks |
| Subject: | Brazie, Gerald (USBC 22-30180-dwh11): Additional Information on Payments |
| Date: | Friday, March 4, 2022 4:34:17 PM |
| Attachments: | image001.png |
| | 12_16_2021 - $35,000.pdf |
| | 12_28_2021 - $5,000.pdf |
| | NWM 02_14_22.pdf |
| | ZoAn Mgt Inc - 12 December 2021 statement (00501168xE9B64).PDF |
| | ZoAn Mgt Sep thru Dec 2021 GL (00501165xE9B64).PDF |
| | 01_13_2022 - $9,000.pdf |
| | 11_16_2021 - $30,000.pdf |
| | 12_10_2021 - $10,000.pdf |

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Dear Norm:

I write in response to your e-mail of February 28, 2022 requesting additional information on payments and/or distributions made to or for the benefit of my client, Gerald Brazie, or his family members by his affiliated entities. I would note at the outset that your February 28, 2022 e-mail is couched in terms of enforcement of the terms of the 11/9/21 Contempt Order entered pre-petition in the matter of *Walsh v. Senvoy, LLC et al.* (USDC 3:16-cv-02293-HZ) (the "Senvoy Litigation") both in terms of compelling performance and payment by my client under the terms of that order.

As you know, the Senvoy Litigation is stayed. Any action continuing the Senvoy Litigation against my client or seeking to compel my client to make certain payments based on the Senvoy Litigation is absolutely barred by the automatic stay of my client's bankruptcy case. *See* 11 U.S.C. § 362(a). While I am supplying this response as a matter of courtesy and in an attempt to avoid wasteful litigation, any actions taken by the Secretary and any of its agents and employees in violation of the automatic stay will be addressed accordingly in the bankruptcy case.

With those preliminary comments, your February 28, 2022 e-mail suggested that "[s]omeone needs to get together with the bookkeeper, Brooke Wiggins, and go over the financials to determine all of the transactions that Brazie's companies paid his/his families' personal bills from November 9, 2021, to the present." I have asked Ms. Wiggins to undertake such a review of the financials and have discussed her findings from that review in detail. In addition to the items highlighted in Nick Henderson's e-mails from February 18, 2022 and February 26, 2022, I submit the following:

### ZoAn

Ms. Wiggins identified one payment made on 12/27/21 for $97.79 for personal utilities at Mr. Brazie's residence. In addition, ZoAn made a monthly payment of $87.25 to Northwestern Mutual for disability insurance. However, that disability policy covers ZoAn employees and not my client or his family. Finally, there were ledger entries for ZoAn showing shareholder distributions for the following dates and amounts:

- 11/16/21     $30,000
- 12/10/21     $10,000
- 12/16/21     $35,000
- 12/28/21     $5,000
- 01/03/22     $9,000

None of these distributions were paid to my client. Instead, they were booked as distributions but the funds were directly paid to Senvoy. The checks related to the distributions were made

payable to Senvoy and deposited by Senvoy.

> **Documents Attached:** KeyBank 12-2021 Statement Acct. 3338, ZoAn Management, Inc. 12-2021 General Ledger, Senvoy Deposits Dated 11/16/21, 12/10/21, 12/16/21, 12/28/21, and 1/13/22

### Senvoy

Again, in addition to the information provided by Mr. Henderson, there was an additional refund from Northwestern Mutual issued by check to Senvoy in the amount of $1,907.89 that was recently received. It appears to me that this covers all of the premiums that were paid during the period in question but leaves some remaining amounts paid by Senvoy on account of loans against the policies.

Post-bankruptcy, Point West Credit Union deducted payments from Senvoy of $1,497.30 on 2/10/22, $750.97 on 2/14/22, and $750.24 on 2/15/22 for my client's vehicle loans. I spoke with counsel for Point West Credit Union, Michael Caro, yesterday regarding the pending bankruptcy and specifically addressed these post-bankruptcy payments. Mr. Caro acknowledged the payments should not have been taken in light of the automatic stay and informed me that the Credit Union was in the process of refunding the payments to Senvoy.

> **Documents Attached:** Northwestern Mutual letter dated 2/14/22 including copy of check for $1,907.89

### Other Businesses

Ms. Wiggins did not identify any distributions or payments to or on behalf of Mr. Brazie from any of the other affiliated companies.

Again, I have provided this response to your e-mails as a matter of courtesy and to avoid wasteful litigation activities. If the Secretary, Senvoy, or ZoAn Management, Inc. believe that there are any amounts due from Mr. Brazie on account of the Contempt Order, then such claim(s) should be submitted to the Bankruptcy Court in connection with Mr. Brazie's bankruptcy case.

I have copied Nick Henderson on this message, and he should feel free to comment further on any matters related to Senvoy. Should there be any further inquires related to Mr. Brazie, I would request that those be made in connection with the bankruptcy case and in the manner provided under the bankruptcy code and rules.

Thanks,
Doug

**Douglas R. Ricks** | Attorney
503.241.4869 | doug@vbcattorneys.com

## Vanden Bos & Chapman LLP

vandenbos-chapman.com
319 SW Washington Street, Suite 520
Portland, OR 97204

NOTICE: Please be advised this transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify us by email (Doug@vbcattorneys.com) or by telephone (call us collect at (503) 241-4869) and delete this message and any attachments. Thank you in advance for your cooperation and assistance.

# Exhibit 8

| From: | Garcia, Norman - SOL |
|---|---|
| To: | Doug Ricks |
| Cc: | Nick Henderson |
| Subject: | Comments regarding Bankruptcy stay and payments Brazie made are inaccurate and incomplete |
| Date: | Monday, March 7, 2022 10:21:00 AM |
| Attachments: | image001.png |

Hi Doug,

Thank you for the information about the finances and the bankruptcy stay. However, there is a significant amount that is incorrect.

All litigation involving the Secretary is not stayed by the bankruptcy automatic stay provision because of the government police power exception at 11 U.S.C. § 362(b)(4). This is true not only in litigating cases in District Court to judgment but also in terms of enforcing the judgments and the parts thereof that do not deal with the Secretary collecting damages under them. There is also the issue that the bankruptcy courts act at the pleasure of their corresponding District Courts that a withdraw of reference could remove. With that said, I agree with you that if we can resolve this between the parties, it is in everybody's interest.

Your statements about the shareholder distributions are at least confusing, if not incorrect. As a preliminary matter, showing deposit slips that are not stamped by the bank, without more, does not show that these funds were indeed deposited. To the extent that ZoAn indeed provided this funding to Senvoy, there is the issue of the method of funding. Instead of ZoAn directly providing the funds free and clear, it chose to provide them as a shareholder distribution from Brazie for the purpose of benefiting Brazie, perhaps for tax purposes. Moreover, Brazie's SoFA answered no for insiders at nos. 7 & 8.

You identified below that Senvoy was repaying a loan to Northwest Mutual. To my knowledge, this was a loan that Brazie took. As you identified in filings with the District Court, these were Brazie's insurance policies, not Senvoy's. Thus, the loan was Brazie's loan, not Senvoy's loan. Therefore, it is a violation of Contempt Order for Senvoy to make payments on Brazie's loans and Brazie needs to repay Senvoy for the payments it made on his loans Brazie.

It also appears that whatever accounting Ms. Wiggins did was incomplete. It is not entirely clear if she did it by herself or if someone reviewed the financials with her, because it is still incomplete. Given all of the violations of the Contempt Order that Nick identified, it is questionable why you would solely rely on Ms. Wiggins if that is what you did.

Let me provide you with an example. The amended Bankruptcy Schedules listed Cabela's as a creditor. Senvoy paid Brazie's Cabela's bills even though Brazie used his Cabela's card to pay personal expenses such as food, purchases from Las Vegas shops, Kaiser, Walgreens, Hallmark, Google, etc. Senvoy made a $3K credit card payment to Brazie's account on 11/9/21 and

Brazie has not reimbursed Senvoy for this payment. There are also other Cabela's payments on the following dates: 11/16/21 for $500, 12/2/21 for $2K, 12/19/21 for $1K. These are transactions that I noticed while just skimming through the documents that Nick provided. It is not clear what else is out there that Brazie's companies paid him in violation of the contempt order. As such, I am requesting a person with accounting experience, other than Ms Wiggins now, personally and diligently review the financials of Brazie's companies to determine what other payments were made to him and his family in violation of the Court's Contempt Order.

Just like Brazie repaid Senvoy for the contempt payment violations that Nick found after Brazie filed for bankruptcy, I am requesting that Brazie immediately repay Senvoy, ZoAn and any other company for the payments they made in violation of the Court's Contempt Order. Again, under this order, Brazie was supposed to conduct a diligent daily review and to repay/reimburse those companies within five days of the improper payment.

I am requesting that you provide the results of the subsequent accounting and show proof that Brazie repaid his companies for the amounts that they paid for him in violation of the Court's contempt order by noon this Friday.

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA 94103 Telephone number: (415) 625-7747 Facsimile number: (415) 625-7772

Pronouns: he, him, his

ATTENTION: In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail. Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services. Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Doug Ricks <Doug@vbcattorneys.com>
**Sent:** Friday, March 4, 2022 4:32 PM
**To:** Garcia, Norman - SOL <Garcia.Norman@DOL.GOV>
**Cc:** Nick Henderson <nhenderson@portlaw.com>; Doug Ricks <Doug@vbcattorneys.com>
**Subject:** Brazie, Gerald (USBC 22-30180-dwh11): Additional Information on Payments

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Dear Norm:

I write in response to your e-mail of February 28, 2022 requesting additional information on payments and/or distributions made to or for the benefit of my client, Gerald Brazie, or his family members by his affiliated entities. I would note at the outset that your February 28, 2022 e-mail is couched in terms of enforcement of the terms of the 11/9/21 Contempt Order entered pre-petition in the matter of *Walsh v. Senvoy, LLC et al.* (USDC 3:16-cv-02293-HZ) (the "Senvoy Litigation") both in terms of compelling performance and payment by my client under the terms of that order.

As you know, the Senvoy Litigation is stayed. Any action continuing the Senvoy Litigation against my client or seeking to compel my client to make certain payments based on the Senvoy Litigation is absolutely barred by the automatic stay of my client's bankruptcy case. *See* 11 U.S.C. § 362(a). While I am supplying this response as a matter of courtesy and in an attempt to avoid wasteful litigation, any actions taken by the Secretary and any of its agents and employees in violation of the automatic stay will be addressed accordingly in the bankruptcy case.

With those preliminary comments, your February 28, 2022 e-mail suggested that "[s]omeone needs to get together with the bookkeeper, Brooke Wiggins, and go over the financials to determine all of the transactions that Brazie's companies paid his/his families' personal bills from November 9, 2021, to the present." I have asked Ms. Wiggins to undertake such a review of the financials and have discussed her findings from that review in detail. In addition to the items highlighted in Nick Henderson's e-mails from February 18, 2022 and February 26, 2022, I submit the following:

### ZoAn

Ms. Wiggins identified one payment made on 12/27/21 for $97.79 for personal utilities at Mr. Brazie's residence. In addition, ZoAn made a monthly payment of $87.25 to Northwestern Mutual for disability insurance. However, that disability policy covers ZoAn employees and not my client or his family. Finally, there were ledger entries for ZoAn showing shareholder distributions for the following dates and amounts:

- 11/16/21    $30,000
- 12/10/21    $10,000
- 12/16/21    $35,000
- 12/28/21    $5,000
- 01/03/22    $9,000

None of these distributions were paid to my client. Instead, they were booked as distributions but the funds were directly paid to Senvoy. The checks related to the distributions were made payable to Senvoy and deposited by Senvoy.

> **Documents Attached:** KeyBank 12-2021 Statement Acct. 3338, ZoAn Management, Inc. 12-2021 General Ledger, Senvoy Deposits Dated 11/16/21, 12/10/21, 12/16/21,

12/28/21, and 1/13/22

**Senvoy**

Again, in addition to the information provided by Mr. Henderson, there was an additional refund from Northwestern Mutual issued by check to Senvoy in the amount of $1,907.89 that was recently received. It appears to me that this covers all of the premiums that were paid during the period in question but leaves some remaining amounts paid by Senvoy on account of loans against the policies.

Post-bankruptcy, Point West Credit Union deducted payments from Senvoy of $1,497.30 on 2/10/22, $750.97 on 2/14/22, and $750.24 on 2/15/22 for my client's vehicle loans. I spoke with counsel for Point West Credit Union, Michael Caro, yesterday regarding the pending bankruptcy and specifically addressed these post-bankruptcy payments. Mr. Caro acknowledged the payments should not have been taken in light of the automatic stay and informed me that the Credit Union was in the process of refunding the payments to Senvoy.

**Documents Attached:** Northwestern Mutual letter dated 2/14/22 including copy of check for $1,907.89

**Other Businesses**

Ms. Wiggins did not identify any distributions or payments to or on behalf of Mr. Brazie from any of the other affiliated companies.

Again, I have provided this response to your e-mails as a matter of courtesy and to avoid wasteful litigation activities. If the Secretary, Senvoy, or ZoAn Management, Inc. believe that there are any amounts due from Mr. Brazie on account of the Contempt Order, then such claim(s) should be submitted to the Bankruptcy Court in connection with Mr. Brazie's bankruptcy case.

I have copied Nick Henderson on this message, and he should feel free to comment further on any matters related to Senvoy. Should there be any further inquires related to Mr. Brazie, I would request that those be made in connection with the bankruptcy case and in the manner provided under the bankruptcy code and rules.

Thanks,
Doug

**Douglas R. Ricks** | Attorney
503.241.4869 | doug@vbcattorneys.com

## Vanden Bos & Chapman LLP

vandenbos-chapman.com
319 SW Washington Street, Suite 520
Portland, OR 97204

NOTICE: Please be advised this transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify us by email (Doug@vbcattorneys.com) or by telephone (call us collect at (503) 241-4869) and delete this message and any attachments. Thank you in advance for your cooperation and assistance.

# Exhibit 9

**BLACK**

**Cabela's CLUB card ending in 4904**
Oct 21, 2021 - Nov 19, 2021 | 30 days in Billing Cycle

## Payment Information

**Payment Due Date**
**Dec 14, 2021**

For online and phone payments, the deadline is 8pm ET.

**New Balance**
**$7,755.06**

**Minimum Payment Due**
**$114.00**

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $40.00.

**MINIMUM PAYMENT WARNING:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Minimum Payment | 21 Years | $16,746 |
| $269 | 3 Years | $9,688 |
| Estimated savings if balance is paid off in about 3 years: $7,058 | | |

If you would like information about credit counseling services, call 1-888-326-8055.

## Account Summary

| | |
|---|---|
| Previous Balance | $9,218.48 |
| Payments | - $11,000.00 |
| Other Credits | $0.00 |
| Transactions | + $9,499.31 |
| Cash Advances | + $0.00 |
| Fees Charged | + $0.00 |
| Interest Charged | + $37.27 |
| **New Balance** | **= $7,755.06** |
| Credit Limit | $10,700.00 |
| Available Credit (as of Nov 19, 2021) | $2,944.94 |
| Cash Advance Credit Limit | $4,280.00 |
| Available Credit for Cash Advances | $2,944.94 |

| Points Summary as of 11/18/2021 | Your Current Level: BLACK |
|---|---|
| Redeem at Bass Pro Shops & Cabela's (Points shown in dollars) | Spend $25,000.00 each year to maintain BLACK status. You have $0.00 to go! |

| | | |
|---|---|---|
| Previous Balance | $734.93 | |
| Points earned at Bass Pro Shops and Cabela's | $0.00 | **Total Points Balance** |
| Other Points added (promos & other purchases) | $98.44 | **$833.37** |
| Points Redeemed | $0.00 | |

**For up-to-date points balance & program details, visit cabelas.com/myclub**

## Account Notifications

(i)   Please note that balances described as "Other Purchases and Transfers" in account opening disclosures and other program documents are displayed as the "Purchases" balance on this statement.

---

Pay or manage your account at cabelas.capitalone.com          Customer Service: 1-800-850-8402          See reverse for Important Information

   

JERRY E BRAZIE
PO BOX 14607
PORTLAND, OR 97293-0607


Save time, stay informed.
Discover new features with the Capital One Mobile app.

Scan this QR Code with your phone's camera to download the top-rated Capital One Mobile app.

**Payment Due Date: Dec 14, 2021**          Account ending in 4904

**New Balance**
**$7,755.06**

**Minimum Payment Due**
**$114.00**

**Amount Enclosed**
**$** _____

Capital One
P.O. Box 60599
City of Industry CA 91716-0599

Please send us this portion of your statement and only one check (or one money order) payable to Capital One to ensure your payment is processed promptly. Allow at least seven business days for delivery.

1  5463256448554904  19  7755060500000114004

**How can I Avoid Paying Interest Charges?** If you pay your New Balance in full by the due date **each month**, we will not charge interest on new transactions that post to the purchase balance. If you have been paying in full **without** Interest Charges, but fail to pay your next New Balance in full, we will charge interest on the unpaid balance. Interest Charges on Cash Advances and Special Transfers start on the transaction date. Promotional offers may allow you to pay less than the total New Balance and avoid paying interest on new transactions that post to your purchase balance. See the front of your statement for additional information.

**How is the Interest Charge Determined?** Interest Charges accrue from the date of the transaction, date the transaction is processed or the first day of the Billing Cycle. Interest accrues daily on every unpaid amount until it is paid in full. Interest accrued during a Billing Cycle posts to your account at the end of the Billing cycle and appears on your next statement. You may owe Interest Charges even if you pay the entire New Balance one month, but did not do so the prior month. Once you start accruing Interest Charges, you generally must pay your New Balance in full two consecutive Billing Cycles before Interest Charges stop being posted to your Statement. Interest Charges are added to the corresponding segment of your account.

**Do you assess a Minimum Interest Charge?** We may assess a minimum Interest Charge of $0.00 for each Billing Cycle if your account is subject to an Interest Charge.

**How do you Calculate the Interest Charge?** We use a method called Average Daily Balance (including new transactions).

1. First, for each segment we take the beginning balance each day and add in new transactions and the periodic Interest Charge on the previous day's balance. Then we subtract any payments and credits for that segment as of that day. The result is the daily balance for each segment. However, if your previous statement balance was zero or a credit amount, new transactions which post to your purchase segment are not added to the daily balance.

2. Next, for each segment, we add the daily balances together and divide the sum by the number of days in the Billing Cycle. The result is the Average Daily Balance for each segment.

3. At the end of each Billing Cycle, we multiply your Average Daily Balance for each segment by the daily periodic rate (APR divided by 365) for that segment, and then we multiply the result by the number of days in the Billing Cycle. We add the Interest Charges for all segments together. The result is your total Interest Charge for the Billing Cycle.

The Average Daily Balance is referred to as the Balance Subject to Interest Rate in the Interest Charge Calculation section of this Statement.

NOTE: Due to rounding or a minimum Interest Charge, this calculation may vary slightly from the Interest Charge actually assessed.

**How can I Avoid Membership Fees?** If a Renewal Notice is printed on this statement, you may avoid paying an annual membership Fee by contacting Customer Service no later than 45 days after the last day in the Billing Cycle covered by this statement to request that we close your account. To avoid paying a monthly membership Fee, close your account and we will stop assessing your monthly membership Fee.

**How can I Close My Account?** You can contact Customer Service anytime to request that we close your account.

**How do you Process Payments?** When you make a payment, you authorize us to initiate an ACH or electronic payment that will be debited from your bank account or other related account. When you provide a check or check information to make a payment, you authorize us to use information from the check to make a one-time ACH or other electronic transfer from your bank account. We may also process it as a check transaction. Funds may be withdrawn from your bank account as soon as the same day we process your payment.

**How do you Apply My Payment?** We generally apply payments up to your Minimum Payment first to the balance with the lowest APR (including 0% APR), and then to balances with higher APRs. We apply any part of your payment exceeding your Minimum Payment to the balance with the highest APR, and then to balances with lower APRs.

**Billing Rights Summary** (Does not Apply to Small Business Accounts)
**What To Do If You Think You Find A Mistake On Your Statement:** If you think there is an error on your statement, write to us at:
P.O. Box 30285, Salt Lake City, UT 84130-0285.

In your letter, give us the following information:
• Account information: Your name and account number.
• Dollar amount: The dollar amount of the suspected error.
• Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake. You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us or notify us electronically, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. We will notify you in writing within 30 days of our receipt of your letter. While we investigate whether or not there has been an error, the following are true:
• We cannot try to collect the amount in question, or report you as delinquent on that amount. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
• While you do not have to pay the amount in question until we send you a notice about the outcome of our investigation, you are responsible for the remainder of your balance.
• We can apply any unpaid amount against your credit limit. Within 90 days of our receipt of your letter, we will send you a written notice explaining either that we corrected the error (to appear on your next statement) or the reasons we believe the bill is correct.

**Your Rights If You Are Dissatisfied With Your Purchase:** If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase. To use this right, the following must be true:
1) You have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify; and
2) You must not yet have fully paid for the purchase.
If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at: P.O. Box 30285, Salt Lake City, UT 84130-0285. While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

© 2020 Capital One. Capital One is a federally registered service mark

ETC-08 10/01/2020

 Pay online at cabelas.capitalone.com

 Pay using the Capital One mobile app

 Customer Service 1-800-850-8402

## Changing your mailing address?

You can change your address by signing into your account online or by calling Customer Service.

Any written request on this form will not be honored.

**How do I Make Payments?** You may make your payment in several ways:

1. Online Banking by logging into your account;
2. Capital One Mobile Banking app for approved electronic devices;
3. Calling the telephone number listed on the front of this statement and providing the required payment information;
4. Sending mail payments to the address on the front of this statement with the payment coupon or your account information.

**When will you Credit My Payment?**

◆ For mobile, online or over the phone, as of the business day we receive it, as long as it is made **by 8 p.m. ET**.

◆ For mail, as of the business day we receive it, as long as it is received **by 5 p.m. local time** at our processing center. You must send the bottom portion of this statement and your check to the payment address on the front of this statement. Please allow at least seven (7) business days for mail delivery. Mailed payments received by us at any other location or payments in any other form may not be credited as of the day we receive them.



**BLACK**

## Transactions

Visit cabelas.capitalone.com to see detailed transactions.

### JERRY E BRAZIE #4904: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Oct 21 | Oct 21 | CAPITAL ONE ONLINE PYMTAuthDate 20-Oct | - $1,000.00 |
| Oct 23 | Oct 23 | CAPITAL ONE ONLINE PYMTAuthDate 22-Oct | - $2,000.00 |
| Oct 31 | Nov 1 | CAPITAL ONE ONLINE PYMTAuthDate 30-Oct | - $1,000.00 |
| Nov 1 | Nov 1 | CAPITAL ONE ONLINE PYMTAuthDate 01-Nov | - $2,000.00 |
| Nov 5 | Nov 5 | CAPITAL ONE ONLINE PYMTAuthDate 05-Nov | - $1,500.00 |
| Nov 8 | Nov 8 | CAPITAL ONE ONLINE PYMTAuthDate 08-Nov | - $3,000.00 |
| Nov 15 | Nov 15 | CAPITAL ONE ONLINE PYMTAuthDate 15-Nov | - $500.00 |

### JERRY E BRAZIE #4904: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Oct 19 | Oct 21 | THE STARK STREET PIZZAPORTLANDOR | $67.90 |
| Oct 21 | Oct 22 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Oct 21 | Oct 22 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Oct 21 | Oct 22 | NYNY AMERICALAS VEGASNV | $66.79 |
| Oct 21 | Oct 23 | GARRETT POPCORN SHOPSLAS VEGASNV | $7.58 |
| Oct 22 | Oct 23 | WLV THE COURTLAS VEGASNV | $41.18 |
| Oct 22 | Oct 23 | CENTURY THEATRES 424LAS VEGASNV | $23.50 |
| Oct 23 | Oct 25 | WLV THE COURTLAS VEGASNV | $41.10 |
| Oct 24 | Oct 26 | THE MARKETLAS VEGASNV | $6.58 |
| Oct 25 | Oct 25 | UBER   TRIP8005928996CA | $58.56 |
| Oct 25 | Oct 26 | UBER   TRIP8005928996CA | $3.00 |
| Oct 25 | Oct 26 | UBER   TRIP8005928996CA | $9.32 |
| Oct 25 | Oct 26 | UBER* TRIPSAN FRANCISCOCA | $22.50 |
| Oct 25 | Oct 27 | A-1 MINI STORAGE541-962-7200OR | $45.00 |
| Oct 27 | Oct 29 | CHARLEYS PHILLY STEAKSHAPPY VALLEYOR | $14.98 |
| Oct 28 | Oct 28 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Oct 29 | Oct 30 | CRAIGSLIST.ORG4153995200CA | $45.00 |
| Oct 29 | Oct 30 | CRAIGSLIST.ORG4153995200CA | $25.00 |
| Nov 1 | Nov 2 | GOOGLE *YouTubePremiumg.co/helppay#CA | $17.99 |
| Nov 1 | Nov 3 | EAST VALLEY STORAGEKENTWA | $809.00 |
| Nov 1 | Nov 3 | SNAPBOX SELF STORAGEBENTONVILLEAR | $333.00 |
| Nov 2 | Nov 3 | PY *ALL SECURE MINI ST503-9080563OR | $165.00 |
| Nov 3 | Nov 5 | ANCHOR STORAGEONTARIOOR | $60.00 |
| Nov 4 | Nov 5 | ODOT DMV2U503-9455400OR | $20.00 |
| Nov 4 | Nov 6 | NWSELF541-689-9230971-236-95050R | $315.00 |
| Nov 5 | Nov 5 | CRAIGSLIST.ORG415-399-5200CA | $25.00 |



**BLACK**

## Transactions (Continued)

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Nov 5 | Nov 5 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 5 | Nov 5 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 5 | Nov 5 | CRAIGSLIST.ORG415-399-5200CA | $10.00 |
| Nov 5 | Nov 6 | U STORE SELF STORAGE KKLAMATH FALLSOR | $67.00 |
| Nov 5 | Nov 6 | KAISER PH STERLINGSTERLINGVA | $11.00 |
| Nov 6 | Nov 6 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 7 | Nov 8 | DEVIL`S LAKE STORAGELINCOLN CITYOR | $95.00 |
| Nov 8 | Nov 8 | TST* PARTY FOWL - FRANFRANKLINTN | $100.52 |
| Nov 8 | Nov 9 | LEES MINI STORAGEGRANTS PASSOR | $87.00 |
| Nov 9 | Nov 10 | CITY OF PORTLAND DEPTPORTLANDOR | $4.00 |
| Nov 9 | Nov 10 | USPS PO BOXES ONLINE800-782-6724DC | $146.00 |
| Nov 11 | Nov 11 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 11 | Nov 11 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 13 | Nov 15 | DELTA    00642223485400PORTLANDOR | $40.00 |
| | | TK#: 00642223485400PSGR: BRAZIE/GERALDED | |
| | | ORIG: PDX, DEST: PDX, S/O: O, CARRIER: DL, SVC: X | |
| Nov 13 | Nov 15 | SLC KSL & KINGSSALT LAKE CITUT | $5.03 |
| **JERRY E BRAZIE #4904: Total Transactions** | | | **$3,148.53** |

### KATHIE S BRAZIE #8944: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|

### KATHIE S BRAZIE #8944: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Oct 20 | Oct 21 | WAL-MART #1560LAS VEGASNV | $25.97 |
| Oct 20 | Oct 21 | CURB SVC LV WESTERNLAS VEGASNV | $25.09 |
| Oct 21 | Oct 22 | CURB SVC LV NEW CABLAS VEGASNV | $51.48 |
| Oct 21 | Oct 23 | HERSHEYS CHOCOLATE WORLAS VEGASNV | $43.24 |
| Oct 21 | Oct 23 | THE MARKETLAS VEGASNV | $12.17 |
| Oct 21 | Oct 23 | NYNY AMERICALAS VEGASNV | $60.83 |
| Oct 22 | Oct 22 | VEGAS.COM18669983427NV | $102.51 |
| Oct 22 | Oct 23 | CENTURY THEATRES 424LAS VEGASNV | $14.09 |
| Oct 23 | Oct 23 | UBER   TRIP8005928996CA | $31.81 |
| Oct 23 | Oct 25 | TST* GRIFF'S SPORTS BALAS VEGASNV | $85.33 |
| Oct 23 | Oct 25 | UBER   TRIP8005928996CA | $5.00 |
| Oct 23 | Oct 25 | UBER   TRIP8005928996CA | $10.29 |
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $23.66 |
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $3.00 |



**BLACK**

## Transactions (Continued)

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $12.58 |
| Oct 24 | Oct 25 | VEGAS.COM18669983427NV | $108.85 |
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $19.39 |
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $31.74 |
| Oct 24 | Oct 25 | UBER   TRIP8005928996CA | $16.20 |
| Oct 25 | Oct 26 | EL SOMBRERO 3 INCFRANKLINTN | $97.56 |
| Oct 25 | Oct 27 | SPIRIT AI 48702830793320MIRAMARFL<br>TK#: 48702830793320PSGR: BRAZIE/G<br>ORIG: LAS, DEST: PDX, S/O: O, CARRIER: NK, SVC: Y | $41.00 |
| Oct 25 | Oct 27 | EXCALIBUR - FRONT DESK8552755733NV | $1,654.20 |
| Oct 26 | Oct 27 | KROGER #592FRANKLINTN | $82.78 |
| Oct 26 | Oct 28 | OLIVE GARDE41700064170FRANKLINTN | $90.64 |
| Oct 27 | Oct 28 | KROGER FUEL #9592FRANKLINTN | $92.01 |
| Oct 27 | Oct 28 | NASHVILLE ZOO, INC6158331534TN | $54.00 |
| Oct 27 | Oct 28 | NASHVILLE ZOO, INC6158331534TN | $36.00 |
| Oct 27 | Oct 28 | WAL-MART #0272FRANKLINTN | $242.83 |
| Oct 27 | Oct 28 | WAL-MART #0272FRANKLINTN | $30.57 |
| Oct 28 | Oct 29 | AT HOME STORE #107FRANKLINTN | $98.72 |
| Oct 29 | Oct 30 | MID-SOUTH MOWING LLC8887211115TN | $207.00 |
| Oct 30 | Nov 1 | KROGER #526FRANKLINTN | $133.09 |
| Nov 1 | Nov 2 | KROGER #526FRANKLINTN | $125.04 |
| Nov 2 | Nov 3 | KROGER #568FRANKLINTN | $17.44 |
| Nov 2 | Nov 3 | PUBLIX #142BRENTWOODTN | $16.62 |
| Nov 2 | Nov 4 | CHEDDARS 0202100021683BRENTWOODTN | $66.22 |
| Nov 3 | Nov 4 | LTF*LIFE TIME MO DUES888-430-6432MN | $337.23 |
| Nov 3 | Nov 4 | 1-800 CONTACTS, INC.8002668228UT | $218.97 |
| Nov 3 | Nov 4 | KROGER #592FRANKLINTN | $31.61 |
| Nov 3 | Nov 4 | HAND AND STONE MASSAGEFRANKLINTN | $69.14 |
| Nov 3 | Nov 5 | OLIVE GARDE41700064170FRANKLINTN | $137.53 |
| Nov 4 | Nov 5 | PANDA EXPRESS #1786FRANKLINTN | $30.57 |
| Nov 4 | Nov 5 | PUBLIX #1031FRANKLINTN | $36.82 |
| Nov 5 | Nov 6 | ECONO LODGE3173578236KY | $103.14 |
| Nov 5 | Nov 6 | ARBYS #5506 GOODLETTSVGOODLETTSVILLTN | $24.76 |
| Nov 5 | Nov 6 | HAND AND STONE MASSAGEFRANKLINTN | $52.05 |
| Nov 5 | Nov 8 | SHELL OIL 910027383QPSFRANKLINTN | $109.43 |
| Nov 6 | Nov 8 | Hand and Stone MassageHappy ValleyWA | $69.95 |
| Nov 6 | Nov 8 | EL SOMBRERO 3 INCFRANKLINTN | $71.38 |

**Additional Information on the next page**



## Transactions (Continued)

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Nov 6 | Nov 8 | SHELL OIL 575274609QPSBRENTWOODTN | $106.00 |
| Nov 6 | Nov 8 | ECONO LODGE3173578236KY | $5.00 |
| Nov 8 | Nov 9 | KROGER #592FRANKLINTN | $108.15 |
| Nov 8 | Nov 9 | HUNGRY HOWIES   1711FRANKLINTN | $21.91 |
| Nov 8 | Nov 10 | OLIVE GARDE41700064170FRANKLINTN | $118.10 |
| Nov 9 | Nov 10 | TARGET        00006957FRANKLINTN | $57.79 |
| Nov 10 | Nov 11 | SP * LOMA BEAUTYMONROEWA | $54.17 |
| Nov 10 | Nov 11 | EL SOMBRERO 3 INCFRANKLINTN | $128.31 |
| Nov 11 | Nov 13 | CHEDDARS 0202100021683BRENTWOODTN | $69.52 |
| Nov 12 | Nov 15 | SHELL OIL 12679925003ARRINGTONTN | $107.68 |
| Nov 13 | Nov 15 | TEXAS ROADHOUSE #2570MURFREESBOROTN | $151.28 |
| Nov 13 | Nov 15 | 4457 AMC THOROUGHBREDFRANKLINTN | $53.80 |
| Nov 14 | Nov 15 | OLIVE GARDE41700064170FRANKLINTN | $97.99 |
| Nov 14 | Nov 15 | 9640 AMC ONLINE8884404262KS | $78.06 |
| Nov 14 | Nov 15 | KROGER #526FRANKLINTN | $62.83 |
| Nov 16 | Nov 17 | SIAM PAD THAIFRANKLINTN | $68.66 |
| **KATHIE S BRAZIE #8944: Total Transactions** | | | **$6,350.78** |

| | |
|---|---|
| **Total Transactions for This Period** | **$9,499.31** |

## Fees

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| **Total Fees for This Period** | | | **$0.00** |

## Interest Charged

| | |
|---|---|
| Interest Charge on Bass Pro/Cabela's Purchases | $0.00 |
| Interest Charge on Purchases | $37.27 |
| Interest Charge on Cash Advances | $0.00 |
| Interest Charge on Other Balances | $0.00 |
| **Total Interest for This Period** | **$37.27** |

## Totals Year-to-Date

| | |
|---|---|
| **Total Fees charged** | **$0.00** |
| **Total Interest charged** | **$1,192.01** |

**Additional Information on the next page**



Case 3:16-cv-02293-HZ    Document 100-1    Filed 03/14/22    Page 56 of 74

Page 6 of 6
**Cabela's CLUB card ending in 4904**
Oct 21, 2021 - Nov 19, 2021  |  30 days in Billing Cycle

BLACK

## Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charged |
|---|---|---|---|
| Bass Pro/Cabela's Purch | 9.99% | $0.00 | $0.00 |
| Purchases | 15.07% F | $3,008.93 | $37.27 |
| Cash Advances | 25.07% F | $0.00 | $0.00 |

**Variable APRs:** If you have a letter code displayed next to any of the above APRs, this means they are variable APRs. They may increase or decrease based on one of the following indices (reported in The Wall Street Journal) as described below.

| Code next to your APR(s) | How do we calculate your APR(s)? | When your APR(s) will change |
|---|---|---|
| P | Prime Rate + margin | The first day of the Billing Cycles that end in Jan., April, July and Oct. |
| L | 3 month LIBOR + margin | |
| D | Prime Rate + margin | The first day of each Billing Cycle |
| F | 1 month LIBOR + margin | |

Page 1 of 4

**Cabela's CLUB card ending in 4904**
Nov 20, 2021 - Dec 20, 2021  |  31 days in Billing Cycle

## Payment Information

Payment Due Date
### Jan 14, 2022

For online and phone payments, the deadline is 8pm ET.

New Balance | Minimum Payment Due
### $9,882.22 | $199.00

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $40.00.

**MINIMUM PAYMENT WARNING:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay… | You will pay off the balance shown on this statement in about… | And you will end up paying an estimated total of… |
|---|---|---|
| Minimum Payment | 23 Years | $21,518 |
| $343 | 3 Years | $12,346 |
| Estimated savings if balance is paid off in about 3 years: $9,172 | | |

If you would like information about credit counseling services, call 1-888-326-8055.

## Account Summary

| | |
|---|---|
| Previous Balance | $7,755.06 |
| Payments | - $3,122.00 |
| Other Credits | $0.00 |
| Transactions | + $5,148.62 |
| Cash Advances | + $0.00 |
| Fees Charged | + $0.00 |
| Interest Charged | + $100.54 |
| **New Balance** | **= $9,882.22** |
| Credit Limit | $10,700.00 |
| Available Credit (as of Dec 20, 2021) | $817.78 |
| Cash Advance Credit Limit | $4,280.00 |
| Available Credit for Cash Advances | $817.78 |

| Points Summary as of 12/18/2021 | Your Current Level: BLACK |
|---|---|
| Redeem at Bass Pro Shops & Cabela's (Points shown in dollars) | Spend $25,000.00 each year to maintain BLACK status. You have $0.00 to go! |

| | | |
|---|---|---|
| Previous Balance | $833.37 | |
| Points earned at Bass Pro Shops and Cabela's | $0.00 | **Total Points Balance** |
| Other Points added (promos & other purchases) | $50.08 | **$883.45** |
| Points Redeemed | $0.00 | |

**For up-to-date points balance & program details, visit cabelas.com/myclub**

## Account Notifications

ⓘ  Please note that balances described as "Other Purchases and Transfers" in account opening disclosures and other program documents are displayed as the "Purchases" balance on this statement.

---

Pay or manage your account at cabelas.capitalone.com          Customer Service: 1-800-850-8402          See reverse for Important Information




JERRY E BRAZIE
PO BOX 14607
PORTLAND, OR 97293-0607



Save time, stay informed. Discover new features with the Capital One Mobile app.

Scan this QR Code with your phone's camera to download the top-rated Capital One Mobile app.

Payment Due Date: **Jan 14, 2022**          Account ending in 4904

New Balance | Minimum Payment Due | Amount Enclosed
### $9,882.22 | $199.00 | $ _____

Please send us this portion of your statement and only one check (or one money order) payable to Capital One to ensure your payment is processed promptly. Allow at least seven business days for delivery.

Capital One
P.O. Box 60599
City of Industry CA 91716-0599

1  5463256448554904  20  9882221122000199000

**How can I Avoid Paying Interest Charges?** If you pay your New Balance in full by the due date **each month**, we will not charge interest on new transactions that post to the purchase balance. If you have been paying in full **without** Interest Charges, but fail to pay your next New Balance in full, we will charge interest on the unpaid balance. Interest Charges on Cash Advances and Special Transfers start on the transaction date. Promotional offers may allow you to pay less than the total New Balance and avoid paying interest on new transactions that post to your purchase balance. See the front of your statement for additional information.

**How is the Interest Charge Determined?** Interest Charges accrue from the date of the transaction, date the transaction is processed or the first day of the Billing Cycle. Interest accrues daily on every unpaid amount until it is paid in full. Interest accrued during a Billing Cycle posts to your account at the end of the Billing cycle and appears on your next statement. You may owe Interest Charges even if you pay the entire New Balance one month, but did not do so the prior month. Once you start accruing Interest Charges, you generally must pay your New Balance in full two consecutive Billing Cycles before Interest Charges stop being posted to your Statement. Interest Charges are added to the corresponding segment of your account.

**Do you assess a Minimum Interest Charge?** We may assess a minimum Interest Charge of $0.00 for each Billing Cycle if your account is subject to an Interest Charge.

**How do you Calculate the Interest Charge?** We use a method called Average Daily Balance (including new transactions).

1. First, for each segment we take the beginning balance each day and add in new transactions and the periodic Interest Charge on the previous day's balance. Then we subtract any payments and credits for that segment as of that day. The result is the daily balance for each segment. However, if your previous statement balance was zero or a credit amount, new transactions which post to your purchase segment are not added to the daily balance.

2. Next, for each segment, we add the daily balances together and divide the sum by the number of days in the Billing Cycle. The result is the Average Daily Balance for each segment.

3. At the end of each Billing Cycle, we multiply your Average Daily Balance for each segment by the daily periodic rate (APR divided by 365) for that segment, and then we multiply the result by the number of days in the Billing Cycle. We add the Interest Charges for all segments together. The result is your total Interest Charge for the Billing Cycle.

The Average Daily Balance is referred to as the Balance Subject to Interest Rate in the Interest Charge Calculation section of this Statement.

NOTE: Due to rounding or a minimum Interest Charge, this calculation may vary slightly from the Interest Charge actually assessed.

**How can I Avoid Membership Fees?** If a Renewal Notice is printed on this statement, you may avoid paying an annual membership Fee by contacting Customer Service no later than 45 days after the last day in the Billing Cycle covered by this statement to request that we close your account. To avoid paying a monthly membership Fee, close your account and we will stop assessing your monthly membership Fee.

**How can I Close My Account?** You can contact Customer Service anytime to request that we close your account.

**How do you Process Payments?** When you make a payment, you authorize us to initiate an ACH or electronic payment that will be debited from your bank account or other related account. When you provide a check or check information to make a payment, you authorize us to use information from the check to make a one-time ACH or other electronic transfer from your bank account. We may also process it as a check transaction. Funds may be withdrawn from your bank account as soon as the same day we process your payment.

**How do you Apply My Payment?** We generally apply payments up to your Minimum Payment first to the balance with the lowest APR (including 0% APR), and then to balances with higher APRs. We apply any part of your payment exceeding your Minimum Payment to the balance with the highest APR, and then to balances with lower APRs.

**Billing Rights Summary** (Does not Apply to Small Business Accounts)
**What To Do If You Think You Find A Mistake On Your Statement:** If you think there is an error on your statement, write to us at:
P.O. Box 30285, Salt Lake City, UT 84130-0285.

In your letter, give us the following information:
• Account information: Your name and account number.
• Dollar amount: The dollar amount of the suspected error.
• Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake. You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us or notify us electronically, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. We will notify you in writing within 30 days of our receipt of your letter. While we investigate whether or not there has been an error, the following are true:
• We cannot try to collect the amount in question, or report you as delinquent on that amount. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
• While you do not have to pay the amount in question until we send you a notice about the outcome of our investigation, you are responsible for the remainder of your balance.
• We can apply any unpaid amount against your credit limit. Within 90 days of our receipt of your letter, we will send you a written notice explaining either that we corrected the error (to appear on your next statement) or the reasons we believe the bill is correct.

**Your Rights If You Are Dissatisfied With Your Purchase:** If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase. To use this right, the following must be true:
1) You have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify; and
2) You must not yet have fully paid for the purchase.
If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at: P.O. Box 30285, Salt Lake City, UT 84130-0285. While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

© 2020 Capital One. Capital One is a federally registered service mark

ETC-08 10/01/2020

 Pay online at cabelas.capitalone.com

 Pay using the Capital One mobile app

 Customer Service 1-800-850-8402

## Changing your mailing address?

You can change your address by signing into your account online or by calling Customer Service.

Any written request on this form will not be honored.

**How do I Make Payments?** You may make your payment in several ways:

1. Online Banking by logging into your account;
2. Capital One Mobile Banking app for approved electronic devices;
3. Calling the telephone number listed on the front of this statement and providing the required payment information;
4. Sending mail payments to the address on the front of this statement with the payment coupon or your account information.

**When will you Credit My Payment?**

♦ For mobile, online or over the phone, as of the business day we receive it, as long as it is made **by 8 p.m. ET**.
♦ For mail, as of the business day we receive it, as long as it is received **by 5 p.m. local time** at our processing center. You must send the bottom portion of this statement and your check to the payment address on the front of this statement. Please allow at least seven (7) business days for mail delivery. Mailed payments received by us at any other location or payments in any other form may not be credited as of the day we receive them.



**BLACK**

Page 2 of 4
**Cabela's CLUB card ending in 4904**
Nov 20, 2021 - Dec 20, 2021  |  31 days in Billing Cycle

## Transactions

Visit **cabelas.capitalone.com** to see detailed transactions.

### JERRY E BRAZIE #4904: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Dec 1 | Dec 1 | CAPITAL ONE ONLINE PYMTAuthDate 01-Dec | - $2,000.00 |
| Dec 8 | Dec 8 | CAPITAL ONE ONLINE PYMTAuthDate 08-Dec | - $1,122.00 |

### JERRY E BRAZIE #4904: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Nov 19 | Nov 20 | GOOGLE *Fox Newsg.co/helppay#CA | $5.99 |
| Nov 20 | Nov 22 | MCDONALD'S F13418FRANKLINTN | $21.53 |
| Nov 20 | Nov 22 | TOUCHTUNES.HELPSHIFT.CTOUCHTUNES.CONY | $24.00 |
| Nov 21 | Nov 22 | MJS POOL HALLMURFREESBOROTN | $134.32 |
| Nov 23 | Nov 23 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 23 | Nov 23 | CRAIGSLIST.ORG415-399-5200CA | $45.00 |
| Nov 23 | Nov 23 | CRAIGSLIST.ORG415-399-5200CA | $25.00 |
| Nov 23 | Nov 23 | TST* CORNER PUB - COOLFRANKLINTN | $74.01 |
| Nov 24 | Nov 26 | A-1 MINI STORAGE541-962-7200OR | $45.00 |
| Nov 26 | Nov 29 | TACO BELL #004189FRANKLINTN | $21.21 |
| Nov 29 | Nov 29 | TST* PARTY FOWL - FRANFRANKLINTN | $90.85 |
| Dec 1 | Dec 2 | GOOGLE *YouTubePremiumg.co/helppay#CA | $17.99 |
| Dec 1 | Dec 3 | EAST VALLEY STORAGEKENTWA | $809.00 |
| Dec 1 | Dec 3 | SNAPBOX SELF STORAGEBENTONVILLEAR | $333.00 |
| Dec 3 | Dec 4 | PY *ALL SECURE MINI ST503-9080563OR | $165.00 |
| Dec 3 | Dec 6 | ANCHOR STORAGEONTARIOOR | $60.00 |
| Dec 3 | Dec 6 | NWSELF541-689-9230971-236-9505OR | $315.00 |
| Dec 6 | Dec 7 | U STORE SELF STORAGE KKLAMATH FALLSOR | $67.00 |
| Dec 6 | Dec 7 | LEES MINI STORAGEGRANTS PASSOR | $87.00 |
| Dec 7 | Dec 8 | DEVIL'S LAKE STORAGELINCOLN CITYOR | $95.00 |
| Dec 11 | Dec 13 | HUDSON ST 1476SEATACWA | $8.84 |
| Dec 16 | Dec 18 | TACO BELL #004189FRANKLINTN | $23.42 |
| Dec 19 | Dec 20 | GOOGLE *Fox Newsg.co/helppay#CA | $5.99 |
| Dec 19 | Dec 20 | CHARLEYS PHILLY STEAKSFRANKLINTN | $14.26 |
| **JERRY E BRAZIE #4904: Total Transactions** | | | **$2,533.41** |



**BLACK**

**Cabela's CLUB card ending in 4904**
Nov 20, 2021 - Dec 20, 2021  |  31 days in Billing Cycle

## Transactions (Continued)

### KATHIE S BRAZIE #8944: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|

### KATHIE S BRAZIE #8944: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Nov 21 | Nov 23 | SHELL OIL 10014467004MURFREESBOROTN | $102.65 |
| Nov 24 | Nov 26 | KROGER #526FRANKLINTN | $57.74 |
| Nov 24 | Nov 26 | TARGET      00006957FRANKLINTN | $31.14 |
| Nov 24 | Nov 26 | CHEDDAR'S 0202168BRENTWOODTN | $144.86 |
| Nov 26 | Nov 27 | SP * AIDEN & OAKSTAPLESMN | $105.97 |
| Nov 26 | Nov 27 | CRACKER BARREL #26 NASNASHVILLETN | $59.28 |
| Nov 27 | Nov 27 | DIME BEAUTY CO8019968274UT | $292.70 |
| Nov 27 | Nov 29 | L'ANGE HAIR, INC.8184462003CA | $53.73 |
| Nov 27 | Nov 29 | WM SUPERCENTER #272FRANKLINTN | $77.77 |
| Nov 27 | Nov 29 | HUNGRY HOWIES  1711FRANKLINTN | $40.54 |
| Nov 28 | Nov 30 | MID-SOUTH MOWING LLC8887211115TN | $124.20 |
| Nov 29 | Dec 1 | SHELL OIL 12610798006FRANKLINTN | $108.78 |
| Dec 2 | Dec 3 | USPS PO 4733240064FRANKLINTN | $9.25 |
| Dec 3 | Dec 4 | LTF*LIFE TIME MO DUES888-430-6432MN | $337.23 |
| Dec 3 | Dec 4 | MCDONALD'S F20810FRANKLINTN | $23.21 |
| Dec 3 | Dec 6 | DESTINATION XL 9886FRANKLINTN | $67.30 |
| Dec 5 | Dec 7 | SUPER BURRITO EXPRESSPORTLANDOR | $23.17 |
| Dec 6 | Dec 6 | Hand and Stone MassageHappy ValleyWA | $69.95 |
| Dec 8 | Dec 9 | SALON SOCIALFRANKLINTN | $42.00 |
| Dec 8 | Dec 10 | SHELL OIL 12610798006FRANKLINTN | $108.69 |
| Dec 10 | Dec 11 | TARGET      00006957FRANKLINTN | $105.03 |
| Dec 11 | Dec 13 | HUNGRY HOWIES  1711FRANKLINTN | $35.07 |
| Dec 13 | Dec 14 | SQ *SOUTHERN BOUTIQUESBrentwoodTN | $83.38 |
| Dec 13 | Dec 14 | NikePOS_USBrentwoodTN | $120.70 |
| Dec 13 | Dec 14 | MILCROFTON PAYMENTS8002401420TN | $104.88 |
| Dec 13 | Dec 14 | PUBLIX #1031FRANKLINTN | $88.95 |
| Dec 14 | Dec 15 | SUN TAN CITY #095FRANKLINTN | $87.29 |
| Dec 17 | Dec 20 | SHELL OIL 910026894QPSFRANKLINTN | $109.75 |
| **KATHIE S BRAZIE #8944: Total Transactions** | | | **$2,615.21** |

**Total Transactions for This Period**                                              **$5,148.62**

**Additional Information on the next page**

Case 3:16-cv-02293-HZ    Document 100-1    Filed 03/14/22    Page 62 of 74

Page 4 of 4
**Cabela's CLUB card ending in 4904**
Nov 20, 2021 - Dec 20, 2021  |  31 days in Billing Cycle



**BLACK**

## Transactions (Continued)

### Fees

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| **Total Fees for This Period** | | | **$0.00** |

### Interest Charged

| | |
|---|---|
| Interest Charge on Bass Pro/Cabela's Purchases | $0.00 |
| Interest Charge on Purchases | $100.54 |
| Interest Charge on Cash Advances | $0.00 |
| Interest Charge on Other Balances | $0.00 |
| **Total Interest for This Period** | **$100.54** |

### Totals Year-to-Date

| | |
|---|---|
| **Total Fees charged** | **$0.00** |
| **Total Interest charged** | **$1,292.55** |

## Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charged |
|---|---|---|---|
| Bass Pro/Cabela's Purch | 9.99% | $0.00 | $0.00 |
| Purchases | 15.08% F | $7,848.99 | $100.54 |
| Cash Advances | 25.08% F | $0.00 | $0.00 |

**Variable APRs:** If you have a letter code displayed next to any of the above APRs, this means they are variable APRs. They may increase or decrease based on one of the following indices (reported in The Wall Street Journal) as described below.

| Code next to your APR(s) | How do we calculate your APR(s)? | When your APR(s) will change |
|---|---|---|
| P<br>L | Prime Rate + margin<br>3 month LIBOR + margin | The first day of the Billing Cycles that end in Jan., April, July and Oct. |
| D<br>F | Prime Rate + margin<br>1 month LIBOR + margin | The first day of each Billing Cycle |

Rev. 6/2021
BR415351
RV230073
M-134061
230073



| FACTS | WHAT DOES CAPITAL ONE® DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Account balances and payment history<br>• Account transactions and credit card or other debt |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Capital One chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Capital One share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** – to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** – information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** – information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | Call us toll free at 1-888-817-2970 and one of our representatives will update your privacy choices.<br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. If you're an *existing* customer and have opted out previously, you don't need to update your privacy choices again. When you are *no longer* our customer, we continue to share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
|---|---|
| **Questions?** | Go to capitalone.com/privacy or capitalone.com/contact |



Please Recycle

230073

## Who we are

| | |
|---|---|
| **Who is providing this notice?** | Capital One, N.A. and Capital One Bank (USA), N.A., and their affiliates that use the names Capital One, Chevy Chase, and Greenpoint. |

## What we do

| | |
|---|---|
| **How does Capital One protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Capital One collect my personal information?** | We collect your personal information, for example, when you:<br><br>• open an account or deposit money<br>• pay your bills or apply for a loan<br>• use your credit or debit card<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only:<br><br>• sharing for affiliates' everyday business purposes – information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Our affiliates include financial companies with the Capital One, Chevy Chase, Capital One Shopping, and Greenpoint names, such as Capital One Bank (USA), National Association; and Capital One, National Association.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Nonaffiliates we share with can include insurance companies, co-branded partners, retailers, data processors, and advertisers.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>• *Our joint marketing partners include companies such as other banks and insurance companies.* |

## Other important information

**For California residents:**  We will not share information we collect about you with nonaffiliated third parties, except as permitted by law, including, for example, with your consent or to service your account.

**For Vermont residents:**  We will not share information we collect about you with nonaffiliated third parties, except as permitted by law, including, for example, with your consent or to service your account. We will not share information about your creditworthiness with our affiliates, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**For Nevada residents:**  Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 1-888-817-2970. If you would like more information about telemarketing practices, you may contact us at Capital One, P.O. Box 30285, Salt Lake City, UT 84130-0285 or webinfo@capitalone.com. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: 1-702-486-3132; e-mail: BCPINFO@ag.state.nv.us.

**Telephone Communications:** All telephone communications with us or our authorized agents may be monitored or recorded.

This notice is available in Spanish.
Este aviso está disponible en Español.

© 2021 Capital One. Capital One is a federally registered service mark.

**BLACK**

**Cabela's CLUB card ending in 4904**
Dec 21, 2021 - Jan 20, 2022  |  31 days in Billing Cycle

## Payment Information

| | |
|---|---|
| Payment Due Date | For online and phone payments, the deadline is 8pm ET. |
| **Feb 14, 2022** | |

| New Balance | Minimum Payment Due |
|---|---|
| **$10,760.45** | **$244.00** |

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $40.00.

**MINIMUM PAYMENT WARNING:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Minimum Payment | 24 Years | $23,480 |
| $373 | 3 Years | $13,446 |
| Estimated savings if balance is paid off in about 3 years: $10,034 | | |

If you would like information about credit counseling services, call 1-888-326-8055.

## Account Summary

| | |
|---|---|
| Previous Balance | $9,882.22 |
| Payments | - $200.00 |
| Other Credits | $0.00 |
| Transactions | + $911.91 |
| Cash Advances | + $0.00 |
| Fees Charged | + $29.00 |
| Interest Charged | + $137.32 |
| **New Balance** | **= $10,760.45** |
| Credit Limit | $10,700.00 |
| Available Credit  (as of Jan 20, 2022) | $0.00 |
| Cash Advance Credit Limit | $4,280.00 |
| Available Credit for Cash Advances | $0.00 |

| Points Summary as of 01/19/2022 | Your Current Level: BLACK |
|---|---|
| Redeem at Bass Pro Shops & Cabela's (Points shown in dollars) | Spend $25,000.00 each year to maintain BLACK status. You have $24,088.09 to go! |

| | | |
|---|---|---|
| Previous Balance | $883.45 | |
| Points earned at Bass Pro Shops and Cabela's | $0.00 | **Total Points Balance** |
| Other Points added (promos & other purchases) | $10.39 | **$893.84** |
| Points Redeemed | $0.00 | |

**For up-to-date points balance & program details, visit cabelas.com/myclub**

## Account Notifications

Please check page 3 of this statement for your Account Notifications.

---

Pay or manage your account at cabelas.capitalone.com          Customer Service: 1-800-850-8402          See reverse for Important Information

 

JERRY E BRAZIE
PO BOX 14607
PORTLAND, OR 97293-0607


Save time, stay informed.
Discover new features with
the Capital One Mobile app.

Scan this QR Code with your phone's camera to download the top-rated Capital One Mobile app.

| Payment Due Date: **Feb 14, 2022** | | Account ending in 4904 |
|---|---|---|
| New Balance | Minimum Payment Due | Amount Enclosed |
| **$10,760.45** | **$244.00** | $ _____ |

Please send us this portion of your statement and only one check (or one money order) payable to Capital One to ensure your payment is processed promptly. Allow at least seven business days for delivery.

Capital One
P.O. Box 60599
City of Industry CA 91716-0599

1  5463256448554904  20  0000000200000244004

**How can I Avoid Paying Interest Charges?** If you pay your New Balance in full by the due date **each month**, we will not charge interest on new transactions that post to the purchase balance. If you have been paying in full **without** Interest Charges, but fail to pay your next New Balance in full, we will charge interest on the unpaid balance. Interest Charges on Cash Advances and Special Transfers start on the transaction date. Promotional offers may allow you to pay less than the total New Balance and avoid paying interest on new transactions that post to your purchase balance. See the front of your statement for additional information.

**How is the Interest Charge Determined?** Interest Charges accrue from the date of the transaction, date the transaction is processed or the first day of the Billing Cycle. Interest accrues daily on every unpaid amount until it is paid in full. Interest accrued during a Billing Cycle posts to your account at the end of the Billing cycle and appears on your next statement. You may owe Interest Charges even if you pay the entire New Balance one month, but did not do so the prior month. Once you start accruing Interest Charges, you generally must pay your New Balance in full two consecutive Billing Cycles before Interest Charges stop being posted to your Statement. Interest Charges are added to the corresponding segment of your account.

**Do you assess a Minimum Interest Charge?** We may assess a minimum Interest Charge of $0.00 for each Billing Cycle if your account is subject to an Interest Charge.

**How do you Calculate the Interest Charge?** We use a method called Average Daily Balance (including new transactions).

1. First, for each segment we take the beginning balance each day and add in new transactions and the periodic Interest Charge on the previous day's balance. Then we subtract any payments and credits for that segment as of that day. The result is the daily balance for each segment. However, if your previous statement balance was zero or a credit amount, new transactions which post to your purchase segment are not added to the daily balance.

2. Next, for each segment, we add the daily balances together and divide the sum by the number of days in the Billing Cycle. The result is the Average Daily Balance for each segment.

3. At the end of each Billing Cycle, we multiply your Average Daily Balance for each segment by the daily periodic rate (APR divided by 365) for that segment, and then we multiply the result by the number of days in the Billing Cycle. We add the Interest Charges for all segments together. The result is your total Interest Charge for the Billing Cycle.

The Average Daily Balance is referred to as the Balance Subject to Interest Rate in the Interest Charge Calculation section of this Statement.

NOTE: Due to rounding or a minimum Interest Charge, this calculation may vary slightly from the Interest Charge actually assessed.

**How can I Avoid Membership Fees?** If a Renewal Notice is printed on this statement, you may avoid paying an annual membership Fee by contacting Customer Service no later than 45 days after the last day in the Billing Cycle covered by this statement to request that we close your account. To avoid paying a monthly membership Fee, close your account and we will stop assessing your monthly membership Fee.

**How can I Close My Account?** You can contact Customer Service anytime to request that we close your account.

**How do you Process Payments?** When you make a payment, you authorize us to initiate an ACH or electronic payment that will be debited from your bank account or other related account. When you provide a check or check information to make a payment, you authorize us to use information from the check to make a one-time ACH or other electronic transfer from your bank account. We may also process it as a check transaction. Funds may be withdrawn from your account as soon as the same day we process your payment.

**How do you Apply My Payment?** We generally apply payments up to your Minimum Payment first to the balance with the lowest APR (including 0% APR), and then to balances with higher APRs. We apply any part of your payment exceeding your Minimum Payment to the balance with the highest APR, and then to balances with lower APRs.

**Billing Rights Summary** (Does not Apply to Small Business Accounts)
**What To Do If You Think You Find A Mistake On Your Statement:** If you think there is an error on your statement, write to us at:
P.O. Box 30285, Salt Lake City, UT 84130-0285.

In your letter, give us the following information:
• Account information: Your name and account number.
• Dollar amount: The dollar amount of the suspected error.
• Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake. You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us or notify us electronically, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. We will notify you in writing within 30 days of our receipt of your letter. While we investigate whether or not there has been an error, the following are true:
• We cannot try to collect the amount in question, or report you as delinquent on that amount. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
• While you do not have to pay the amount in question until we send you a notice about the outcome of our investigation, you are responsible for the remainder of your balance.
• We can apply any unpaid amount against your credit limit. Within 90 days of our receipt of your letter, we will send you a written notice explaining either that we corrected the error (to appear on your next statement) or the reasons we believe the bill is correct.

**Your Rights If You Are Dissatisfied With Your Purchase:** If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase. To use this right, the following must be true:
1) You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify; and
2) You must not yet have fully paid for the purchase.
If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at: P.O. Box 30285, Salt Lake City, UT 84130-0285. While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

© 2020 Capital One. Capital One is a federally registered service mark

ETC-08 10/01/2020

 Pay online at cabelas.capitalone.com

 Pay using the Capital One mobile app

 Customer Service 1-800-850-8402

## Changing your mailing address?

You can change your address by signing into your account online or by calling Customer Service.

Any written request on this form will not be honored.

**How do I Make Payments?** You may make your payment in several ways:

1. Online Banking by logging into your account;
2. Capital One Mobile Banking app for approved electronic devices;
3. Calling the telephone number listed on the front of this statement and providing the required payment information;
4. Sending mail payments to the address on the front of this statement with the payment coupon or your account information.

**When will you Credit My Payment?**

♦ For mobile, online or over the phone, as of the business day we receive it, as long as it is made **by 8 p.m. ET**.
♦ For mail, as of the business day we receive it, as long as it is received **by 5 p.m. local time** at our processing center. You must send the bottom portion of this statement and your check to the payment address on the front of this statement. Please allow at least seven (7) business days for mail delivery. Mailed payments received by us at any other location or payments in any other form may not be credited as of the day we receive them.



**BLACK**

Page 2 of 3
**Cabela's CLUB card ending in 4904**
Dec 21, 2021 - Jan 20, 2022  | 31 days in Billing Cycle

## Transactions

Visit **cabelas.capitalone.com** to see detailed transactions.

### JERRY E BRAZIE #4904: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Jan 18 | Jan 18 | CAPITAL ONE ONLINE PYMTAuthDate 18-Jan | - $200.00 |

### JERRY E BRAZIE #4904: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Dec 19 | Dec 21 | ZAXBY'S #69702FRANKLINTN | $31.89 |
| Dec 20 | Dec 21 | SONIC DRIVE IN #3453FRANKLINTN | $32.72 |
| Dec 21 | Dec 22 | EL SOMBRERO 3 INCFRANKLINTN | $79.28 |
| Dec 23 | Dec 27 | 0097-OLD CHICAGOFRANKLINTN | $134.42 |
| Dec 24 | Dec 27 | KNICK NASHFRANKLINTN | $84.49 |
| Dec 24 | Dec 27 | WALGREENS #4903FRANKLINTN | $3.06 |
| Dec 24 | Dec 27 | AMY'S HALLMARK #685FRANKLINTN | $22.59 |
| Dec 24 | Dec 27 | OLIVE GARDE41700064170FRANKLINTN | $297.29 |
| Dec 24 | Dec 27 | BATH AND BODY WORKS 39FRANKLINTN | $18.11 |
| Dec 24 | Dec 27 | A-1 MINI STORAGE541-962-7200OR | $45.00 |
| Jan 1 | Jan 3 | GOOGLE *YouTubePremiumg.co/helppay#CA | $17.99 |
| Jan 2 | Jan 3 | Amazon web servicesaws.amazon.coWA | $1.95 |
| Jan 5 | Jan 7 | SHELL OIL 12750715000ARRINGTONTN | $113.13 |
| Jan 6 | Jan 7 | GOOGLE *AllTrails comg.co/helppay#CA | $29.99 |
| **JERRY E BRAZIE #4904: Total Transactions** | | | **$911.91** |

### KATHIE S BRAZIE #8944: Payments, Credits and Adjustments

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|

### KATHIE S BRAZIE #8944: Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|

| **Total Transactions for This Period** | | | **$911.91** |

## Fees

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Jan 14 | Jan 14 | PAST DUE FEE | $29.00 |

| **Total Fees for This Period** | | | **$29.00** |

**Additional Information on the next page**



**Cabela's CLUB card ending in 4904**
Dec 21, 2021 - Jan 20, 2022 | 31 days in Billing Cycle

## Transactions (Continued)

### Interest Charged

| | |
|---|---:|
| Interest Charge on Bass Pro/Cabela's Purchases | $0.00 |
| Interest Charge on Purchases | $137.32 |
| Interest Charge on Cash Advances | $0.00 |
| Interest Charge on Other Balances | $0.00 |
| **Total Interest for This Period** | **$137.32** |

### Totals Year-to-Date

| | |
|---|---:|
| **Total Fees charged** | **$29.00** |
| **Total Interest charged** | **$137.32** |

## Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charged |
|---|---|---:|---:|
| Bass Pro/Cabela's Purch | 9.99% | $0.00 | $0.00 |
| Purchases | 15.09% F | $10,715.57 | $137.32 |
| Cash Advances | 25.09% F | $0.00 | $0.00 |

**Variable APRs:** If you have a letter code displayed next to any of the above APRs, this means they are variable APRs. They may increase or decrease based on one of the following indices (reported in The Wall Street Journal) as described below.

| Code next to your APR(s) | How do we calculate your APR(s)? | When your APR(s) will change |
|---|---|---|
| P | Prime Rate + margin | The first day of the Billing Cycles that end in Jan., April, July and Oct. |
| L | 3 month LIBOR + margin | |
| D | Prime Rate + margin | The first day of each Billing Cycle |
| F | 1 month LIBOR + margin | |

## Account Notifications

 Please note that balances described as "Other Purchases and Transfers" in account opening disclosures and other program documents are displayed as the "Purchases" balance on this statement.

ⓘ You were assessed a past due fee because your minimum payment was not received by the due date. To avoid this fee in the future, we recommend that you allow at least 7 business days for your minimum payment to reach Capital One.

ⓘ Your account has gone over its credit limit. In addition to your required minimum payment, please pay enough to bring your account balance below your credit limit to avoid the possibility of being declined.

# Exhibit 10

Debtor 1   **Gerald Edward Brazie, Jr**     Case number *(if known)*   **22-30180-dwh11**

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |
| **For last calendar year:**<br>(January 1 to December 31, 2021 ) | ☐ Wages, commissions, bonuses, tips<br>■ Operating a business | $231,505.53** | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | **These include gross amounts paid to debtor whether in the form of distributions or draws and amounts paid to third parties on the debtor's behalf. |
| | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | $5,500.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | Figures are subject to final accounting and review for tax purposes. Debtor also had income and losses attributable on a tax basis that have yet to be fixed for tax purposes. |
| **For the calendar year before that:**<br>(January 1 to December 31, 2020 ) | ☐ Wages, commissions, bonuses, tips<br>■ Operating a business | $290,227.21** | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |
| | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | $89,913.28 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |

5.  **Did you receive any other income during this year or the two previous calendar years?**

Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☐ No
■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Describe below. | **Gross income from each source**<br>(before deductions and exclusions) | **Sources of income**<br>Describe below. | **Gross income**<br>(before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | Rental Income | $4,950.00 | | |
| **For last calendar year:**<br>(January 1 to December 31, 2021 ) | Rental Income | $64,350.00 | | |
| **For the calendar year before that:**<br>(January 1 to December 31, 2020 ) | Rental Income | $9,900.00 | | |

| **Part 3:** | **List Certain Payments You Made Before You Filed for Bankruptcy** |

6.  **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

■ No.   **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,825* or more?

☐ No.   Go to line 7.
■ Yes   List below each creditor to whom you paid a total of $6,825* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

* Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.

Debtor 1  **Gerald Edward Brazie, Jr**                              Case number *(if known)*   **22-30180-dwh11**

☐ Yes.  **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

  ☐ No.   Go to line 7.
  ☐ Yes   List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **Select Portfolio Servicing** PO Box 65250 Salt Lake City, UT 84165 | **11/2/21 - $3,515; 12/3/21 - $3,515; 1/3/22 - $3,515** | **$10,545.00** | **$315,635.00** | ■ Mortgage ☐ Car ☐ Credit Card ☐ Loan Repayment ☐ Suppliers or vendors ☐ Other___ |
| **Elite Properties** | **Last 90 days - monthly payments of $4,550** | **$13,650.00** | **$0.00** | ☐ Mortgage ☐ Car ☐ Credit Card ☐ Loan Repayment ☐ Suppliers or vendors ■ Other  Monthly rental in TN |

7.  **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

  ■ No
  ☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

8.  **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider.

  ■ No
  ☐ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

# Exhibit 11

| | |
|---|---|
| **From:** | Garcia, Norman - SOL |
| **To:** | Doug Ricks |
| **Subject:** | Status of ZoAn |
| **Date:** | Thursday, March 10, 2022 9:59:00 AM |

Hi Doug,

At the 341 creditor's mtg yesterday you represented that ZoAn ceased operations at the end of 2021.

However, its Jan. 2022 GL shows that it was still operating in at least Jan 2022 wherein it paid out over $30K in payroll expenses, paid dental insurance, paid $9K in shareholder distributions, etc.  How could it be doing these activities, especially employee payroll, if it ceased operations in 2021?

Also, to whom was this $9K in Shareholder's contributions paid ?

Please provide the bank statements and general ledger for ZoAn for February 2022?

Thanks,

Norm

Norman E. Garcia
Senior Trial Attorney
United States Department of Labor
90 7th Street, Rm. 3-700; SF, CA  94103 Telephone number:  (415) 625-7747 Facsimile number:  (415) 625-7772

Pronouns:  he, him, his

ATTENTION:  In light of the current restrictions put in place by federal, state, and by local county governments in response to COVID-19, the Office of the Solicitor in San Francisco requests that all communication and document delivery be handled electronically/via e-mail.  Until further notice, please send any documents and correspondence electronically rather than using U.S. Mail or overnight delivery services.  Thank you

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify the sender immediately.